UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x
                                           :

|  |  |
|---|---|
| | : **Chapter 11** |
| | : |
| **In re:** | : **Case No.  03 - 11540 (CB)** |
| | : |
| **SPIEGEL, INC., et al.,**[1] | : **(Jointly Administered)** |
| | : |
| Debtors. | : |
| | : |

----------------------------------------------------------x

## DISCLOSURE STATEMENT
## PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE
## FOR THE JOINT PLAN OF REORGANIZATION OF AFFILIATED DEBTORS

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179
James L. Garrity, Jr. (JG-8389)
Andrew V. Tenzer (AT-2263)
Marc B. Hankin (MH-7001)

Attorneys for the Debtors and Debtors in
Possession

Dated as of February 18, 2005

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  A HEARING TO CONSIDER THE ADEQUACY OF THIS DISCLOSURE STATEMENT UNDER SECTION 1125 OF THE BANKRUPTCY CODE HAS BEEN SET BY THE BANKRUPTCY COURT FOR MARCH 29, 2005 AT 10:00 A.M.  THE DEBTORS RESERVE THE RIGHT TO MODIFY OR SUPPLEMENT THIS DISCLOSURE STATEMENT PRIOR TO AND UP TO THE DATE OF SUCH HEARING.**

---

[1]    The other Debtors in these jointly administered Chapter 11 proceedings are Newport News, Inc., Spiegel Catalog, Inc., Spiegel Publishing Co., Ultimate Outlet Inc., Spiegel Catalog Services, LLC, Spiegel Marketing Corporation, Spiegel Management Group, Inc., Eddie Bauer, Inc., Eddie Bauer Diversified Sales, LLC, Eddie Bauer International Development, LLC, Eddie Bauer Services, LLC, Eddie Bauer of Canada, Inc., Newport News Services, LLC, New Hampton Realty Corp., Distribution Fulfillment Services, Inc. (DFS), Spiegel Group Teleservices, Inc., Spiegel Group Teleservices-Canada, Inc., Retailer Financial Products, Inc. and Gemini Credit Services, Inc.

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

     A.      Purpose of Disclosure Statement and Plan ...........................................1

     B.      Holders of Claims Entitled to Vote......................................................3

     C.      Voting Procedures................................................................................4

     D.      Confirmation Hearing ..........................................................................5

     E.      Miscellaneous .....................................................................................5

II.      OVERVIEW OF THE PLAN ..............................................................................7

     A.      Substantive Consolidation ...................................................................8

     B.      Eddie Bauer Holdings ..........................................................................8

     C.      SHI Settlement ....................................................................................9

     D.      Restrictions on Transfers of Eddie Bauer Holdings Common Stock .....................9

     E.      Summary of Classification and Treatment of Claims and Equity Interests Under the Plan...................................................................................10

III.      DESCRIPTION AND HISTORY OF BUSINESSES ......................................14

     A.      Overview.............................................................................................14

     B.      The Merchant Divisions and Support Companies ..................................14
              1.      Eddie Bauer................................................................................14
              2.      Newport News ...........................................................................16
              3.      Spiegel Catalog .........................................................................16
              4.      Distribution Fulfillment Services, Inc. (DFS)...........................16
              5.      Spiegel Group Teleservices ......................................................17
              6.      Spiegel Management Group, Inc. ..............................................17

     C.      Relationships with Otto KG and Affiliates .............................................17
              1.      Generally....................................................................................17
              2.      Financing....................................................................................18
              3.      Buying Agent Agreements..........................................................18
              4.      Vendor Payment Services Agreement .......................................19
              5.      Joint Ventures ............................................................................19

     D.      Prepetition Funding of the Debtors' Operations.....................................20
              1.      The Securitization Transactions.................................................20

2. The Unsecured Revolving and 364-Day Credit Facilities .........................21

3. The Unsecured Term Loans ................................................................22

4. The Letter of Credit Facilities ...........................................................22

5. Financial Support from Otto KG and Otto-Spiegel Finance ....................22

6. The Secured Term Loans ...................................................................23

7. The Interest Rate Swaps ...................................................................23

8. The Import Fee Guarantees ...............................................................23

IV. EVENTS LEADING TO CHAPTER 11 FILING ................................................23

A. Overview ..............................................................................................23

B. Pay-Out Events Under the Securitization Transactions .........................24

C. FCNB's Agreement with the OCC ........................................................25

D. Securities and Exchange Commission Action .......................................26

E. Decision to File Chapter 11 Cases .......................................................26

V. HISTORY OF THESE BANKRUPTCY CASES ................................................26

A. General Case Background ....................................................................26

B. Parties-in-Interest:  Retention of Professionals and Appointment of Creditors'
Committee ............................................................................................27

1. Professionals Retained by the Debtors ...............................................27

2. The Official Committee of Unsecured Creditors ..................................29

C. Stabilization of Business ......................................................................31

1. The DIP Facility ...............................................................................31

2. First Day Orders ..............................................................................31

3. Adequate Assurance to Utilities .........................................................32

4. Key Employee Retention Program and Employment Agreements
with Certain Key Executives ..............................................................32

D. Management and Corporate Governance Changes ................................33

1. Management Changes in the Months Immediately Preceding and
Following the Petition Date ................................................................33

2. Establishment of the Restructuring Committee .....................................34

E. Development and Execution of Restructuring Strategy ...........................35

1. Stabilization and Improvement of the Merchant Divisions ....................35

2. Separation and Sale of the Merchant Divisions ...................................40

3. Employee Matters .............................................................................44

F. Other Restructuring Matters .................................................................46

1. The Directors' & Officers' Insurance Policies ......................................46

| | | |
|---|---|---|
| | 2. | The Canadian Proceedings.................................................................46 |
| | 3. | Executory Contracts...........................................................................48 |
| | 4. | The NOL Notice Procedures...............................................................48 |

| | | |
|---|---|---|
| G. | Operating Results During Chapter 11 ...........................................................49 |

| | | |
|---|---|---|
| H. | Current Directors and Officers of Spiegel and Eddie Bauer, Inc. .........49 |
| | 1. | Spiegel................................................................................................49 |
| | 2. | Eddie Bauer, Inc.................................................................................50 |

| | | |
|---|---|---|
| I. | Claims Process and Bar Date .......................................................................50 |
| | 1. | The Debtors' Schedules of Assets and Liabilities and Bar Date Order ..................................................................................................50 |
| | 2. | The Claims Reconciliation Process ....................................................51 |
| | 3. | Reclamation Claims............................................................................51 |
| | 4. | The Establishment of Alternative Dispute Resolution Procedures............52 |
| | 5. | Preference Analysis ...........................................................................52 |
| | 6. | The Creditors' Committee Avoidance Action Motion ...........................52 |

| | | |
|---|---|---|
| J. | SHI Settlement .............................................................................................53 |
| | 1. | Cash Payment and Allocation.............................................................54 |
| | 2. | Claim Allowance and Treatment ........................................................54 |
| | 3. | SHI Settlement Releases.....................................................................55 |
| | 4. | Claims Over Protection.......................................................................57 |
| | 5. | Post-Effective Date Litigation ...........................................................58 |
| | 6. | Conditions Precedent to Effective Date..............................................58 |
| | 7. | Contents of Documents.......................................................................58 |
| | 8. | Additional Provisions.........................................................................59 |

| | | |
|---|---|---|
| K. | Postpetition Material Events with Respect to Securities and Exchange Commission Action .....................................................................................61 |
| | 1. | Motion for Clarification of the Securities and Exchange Commission Judgment.........................................................................61 |
| | 2. | Authorization to Compensate Counsel to Certain Former and Current Directors and Officers of the Debtors in Connection with the Investigation by the Independent Examiner.......................61 |
| | 3. | The Report of the Independent Examiner ...........................................61 |
| | 4. | Dismissal of KPMG LLP.....................................................................62 |
| | 5. | Modification of the Amended Partial Final Judgment.........................62 |
| | 6. | The Section 12(j) Order ......................................................................62 |
| | 7. | Future of the SEC Investigation.........................................................63 |
| | 8. | The Federal Securities Class Actions .................................................63 |

| | | |
|---|---|---|
| L. | The Liquidation of FCNB and Related Events ............................................63 |
| | 1. | The FCNB/MBIA Settlement Agreement and the OCC Consent Order ..................................................................................................63 |
| | 2. | The FCNB Liquidation Plan ...............................................................64 |

|  |  | 3. | Potential Recovery from the Liquidation of FCNB | 64 |

| | M. | The MBIA Action and Related Securities Litigation | 65 |
| | | 1. | The MBIA Action | 65 |
| | | 2. | Defense of SAC and SCCIII in the MBIA Action | 65 |
| | | 3. | The Securities Litigation | 66 |
| | | 4. | Settlement of the MBIA Action and the Securities Litigation | 66 |

| | N. | The Bank Group Plan Presentation | 66 |

| VI. | FUTURE BUSINESSES OF THE REORGANIZED DEBTORS | | | 66 |

| | A. | Organizational Structure and Business Operations of the Reorganized Debtors | 66 |
| | | 1. | Organizational Structure of the Reorganized Debtors | 66 |
| | | 2. | Business Operations of the Reorganized Debtors | 67 |

| | B. | Projected Financial Information | 73 |
| | | 1. | Risk Factors | 74 |

| | C. | Executive Officers and Directors of the Reorganized Debtors | 78 |
| | | 1. | Description of Directors and Officers of the Reorganized Debtors | 78 |
| | | 2. | Management Incentives for Directors and Officers of the Reorganized Debtors | 79 |

| | D. | Creditor Trust | 79 |

| VII. | SUMMARY OF THE PLAN OF REORGANIZATION | | | 79 |

| | A. | Introduction | 79 |

| | B. | Securities to Be Issued Pursuant to the Plan and Other Post-Reorganization Indebtedness | 80 |
| | | 1. | Reorganization Value | 80 |
| | | 2. | Eddie Bauer Holdings Common Stock | 82 |
| | | 3. | The New Eddie Bauer Holdings Working Capital Facility | 83 |
| | | 4. | Eddie Bauer Holdings Senior Debt Facility or Creditor Notes | 83 |
| | | 5. | Creditor Trust Interests | 83 |

| | C. | Compromise and Settlement of Disputes | 84 |
| | | 1. | Introduction | 84 |
| | | 2. | Cash Settlement Payment | 85 |
| | | 3. | Assumption of Certain Executory Contracts | 85 |
| | | 4. | Allowance of Claims | 85 |
| | | 5. | Releases and Claims Over Protection | 85 |
| | | 6. | Post-Effective Date Litigation | 86 |
| | | 7. | Tax Reimbursement Agreements | 86 |
| | | 8. | Termination of Temporary Restraining Order | 86 |

D.     Administrative Claims, Reclamation Claims, Professional Fees and Priority Tax Claims ...................................................................................................................86
     1.     Introduction...........................................................................................86
     2.     Administrative Claims ...........................................................................87
     3.     Reclamation Claims ...............................................................................87
     4.     Statutory Fees.........................................................................................87
     5.     Professional Fees ...................................................................................87
     6.     Priority Tax Claims................................................................................89

E.     Classification and Treatment of Classified Claims and Equity Interests.............89
     1.     Summary ................................................................................................89
     2.     Class 1 – Groveport Secured Claims .....................................................90
     3.     Class 2 – Other Secured Claims.............................................................90
     4.     Class 3 – Non-Tax Priority Claims ........................................................91
     5.     Class 4 – General Unsecured Claims .....................................................91
     6.     Class 5 – Convenience Claims ...............................................................92
     7.     Class 6 – Equity Interests ......................................................................92

F.     Acceptance or Rejection of the Plan ..................................................................92
     1.     Voting Classes .......................................................................................92
     2.     Acceptance by Class of Creditors and Holders of Interests.....................92
     3.     Cramdown ..............................................................................................93

G.     Effect of Confirmation ......................................................................................93
     1.     Reorganized Debtors and Creditor Trust Debtors as Separate Corporate Entities; Vesting and Revesting .................................................93
     2.     Binding Effect .......................................................................................93
     3.     Corporate Action....................................................................................94
     4.     Dissolution of Creditors' Committee; Plan Oversight Committee ...........94
     5.     Late Claims ............................................................................................94

H.     Implementation of the Plan................................................................................95
     1.     Substantive Consolidation of the Debtors................................................95
     2.     The Cash Settlement Payment ................................................................95
     3.     Cancellation of Intercompany Claims .....................................................95
     4.     Cancellation of Notes, Instruments, Common Stock and Stock Options ...................................................................................................95
     5.     Eddie Bauer Holdings Working Capital Facility .....................................96
     6.     Eddie Bauer Holdings Senior Debt Facility or Creditor Notes.................96
     7.     Restructuring Transactions .....................................................................96
     8.     Violations of Claims Trading Order ........................................................97
     9.     Creation of the Creditor Trust................................................................98
     10.    The Trustees.........................................................................................100
     11.    Release of Liens and Perfection of Liens................................................101
     12.    Corporate Governance, Directors and Officers, and Corporate Action ...................................................................................................102
     13.    Sources of Cash for Plan Distribution ...................................................104

14.    Issuance of Eddie Bauer Holdings Common Stock ...................104
15.    Management Stock Incentive Program ....................................105
16.    Listing of Eddie Bauer Holdings Common Stock; Registration of Securities ...............................................................................105

I.    Rights of Action ..............................................................................105
1.    Maintenance of Eddie Bauer Rights of Action ........................105
2.    Maintenance of the Creditor Trust Rights of Action ...............105
3.    Preservation of All Rights of Action Not Expressly Settled or Released ....................................................................................106
4.    Timing .......................................................................................107

J.    Provisions Regarding Distributions .................................................107
1.    Initial Distribution to Creditors ...............................................107
2.    Subsequent Distributions to Creditors .....................................107
3.    Time and Manner of Payments .................................................108
4.    Delivery of Distributions .........................................................108
5.    Undeliverable Distributions .....................................................108
6.    Compliance with Tax Requirements/Allocation .......................109
7.    Time Bar to Cash Payments .....................................................109
8.    Fractional Dollars, Fractional Shares and *De Minimis* Distributions ......109
9.    Set-off ......................................................................................110
10.    Settlement of Claims and Controversies ..................................110

K.    Procedures for Resolving Disputed Claims .....................................111
1.    Prosecution of Objections to Claims ........................................111
2.    Estimation of Claims ................................................................111
3.    Cumulative Remedies ..............................................................112
4.    Allowance of Claims and Interests ..........................................112
5.    Personal Injury Claims ............................................................112

L.    Executory Contracts and Unexpired Leases ....................................113
1.    Rejection of Executory Contracts and Unexpired Leases .........113
2.    Assumption of Executory Contracts and Unexpired Leases .....113
3.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ......................................................................................114
4.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ......................................................................114
5.    Miscellaneous ..........................................................................114
6.    Indemnification of Officers, Employees and Restructuring Committee Board Members .....................................................114
7.    Compensation and Benefit Programs .......................................115

M.    Conditions Precedent to Confirmation and Effective Date of the Plan .............115
1.    Conditions Precedent to Confirmation of the Plan ..................115
2.    Conditions Precedent to Effective Date of the Plan .................116
3.    Waiver of Conditions Precedent ..............................................116

N.  Injunction, Release and Indemnification ...........................................................116
   1.  Injunction ................................................................................................116
   2.  Discharge ................................................................................................117
   3.  Releases by the Debtors .........................................................................118
   4.  SHI Settlement Releases ........................................................................118
   5.  Released Parties Claims Over Protection ...............................................120
   6.  Post-Petition Released Party Exculpation and Limitation of
     Liability ...................................................................................................120
   7.  Reservation of Rights .............................................................................121

O.  Retention of Jurisdiction ....................................................................................121

P.  Miscellaneous Provisions ...................................................................................123
   1.  Modification of Plan ..............................................................................123
   2.  Revocation or Withdrawal .....................................................................124
   3.  Term of Existing Injunctions or Stays ...................................................124
   4.  Post-Effective Date Fees and Expenses .................................................124
   5.  Exemption from Registration .................................................................124
   6.  Section 1146 Exception .........................................................................124
   7.  Severability .............................................................................................125
   8.  Plan Supplement .....................................................................................125
   9.  Governing Law .......................................................................................125
   10. Reservation of Rights for Certain Canadian Creditors ...........................125
   11. Notices ....................................................................................................125
   12. Closing of Cases ....................................................................................126
   13. Section Headings ....................................................................................127
   14. Continuing Viability of Other Orders/Agreements .................................127

VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................127

  A.  Tax Consequences to Spiegel ............................................................................127
     1.  Reorganization of Spiegel ......................................................................127
     2.  Cancellation of Debt Income .................................................................128
     3.  Net Operating Loss Carryover ...............................................................129
     4.  Section 382 Limitation ...........................................................................130
     5.  Alternative Minimum Tax ......................................................................131

  B.  Tax Consequences to the Creditors ....................................................................131
     1.  Exchange of Claims for Eddie Bauer Holdings Common Stock,
       Cash and Other Property .........................................................................132
     2.  Original Issue Discount ..........................................................................133
     3.  Securitization Note .................................................................................135
     4.  Subsequent Disposition of Eddie Bauer Holdings Common Stock
       and Creditor Notes ..................................................................................135
     5.  Receipt of a Beneficial Interest in the Creditor Trust .............................136
     6.  Tax Consequences to Creditors on the Redemption of Claims by
       Spiegel for Cash .....................................................................................139

C.      Backup Withholding .......................................................................139

IX.    CERTAIN CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN140

    A.     Tax Consequences to Companies in the Spiegel Group ......................140
         1.     Tax Consequences to Spiegel on the Transfer of Shares of Spiegel
              Group Teleservices-Canada, Inc. ...........................................140
         2.     Tax Consequences to Spiegel Group Teleservices-Canada, Inc. and
              Eddie Bauer of Canada, Inc. on Debt Forgiveness .................141

X.     CONFIRMATION OF THE PLAN..................................................................142

    A.     Confirmation Hearing ......................................................................142

    B.     Confirmation ....................................................................................143
         1.     Acceptance .............................................................................143
         2.     Unfair Discrimination and Fair and Equitable Tests .............143
         3.     Feasibility..............................................................................144
         4.     Best Interests Test .................................................................145

XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION  OF THE PLAN147

    A.     Liquidation Under Chapter 7 ............................................................147

    B.     Alternative Chapter 11 Plan.............................................................148

    C.     Dismissal of the Chapter 11 Cases....................................................148

XII.   CONCLUSION AND RECOMMENDATION.............................................149

# TABLE OF EXHIBITS

EXHIBIT A –            Joint Plan of Reorganization

EXHIBIT B –            Organizational Charts of the Reorganized Debtors

EXHIBIT C –            Organizational Charts of the Creditor Trust Debtors

EXHIBIT D –            Historical Unaudited Consolidated Financial Statements for Eddie Bauer as of January 3, 2004 and January 1, 2005 and for the Three-Year Period Ending January 1, 2005

EXHIBIT E –            Projected Consolidated Balance Sheet for the Reorganized Debtors as of the Projected Effective Date of May 31, 2005

EXHIBIT F –            Projections Related for the Reorganized Debtors for the Fiscal Years Ended December 31, 2005 through January 3, 2009

EXHIBIT G –            Liquidation Analysis of the Debtors

# I. INTRODUCTION

## A. Purpose of Disclosure Statement and Plan

This Disclosure Statement (this "<u>Disclosure Statement</u>") has been prepared pursuant to section 1125 of the Bankruptcy Code by Spiegel, Inc. ("<u>Spiegel</u>") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>" or the "<u>Spiegel Group</u>"), in connection with the Debtors' solicitation of votes to confirm the Debtors' Joint Plan of Reorganization of Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code (the "<u>Plan</u>"). Capitalized terms that are not defined in this Disclosure Statement will have the meanings set forth in the Plan.

The purpose of this Disclosure Statement is to set forth information: (i) regarding the history of the Debtors, their businesses, the Chapter 11 Cases, and the related Canadian proceedings; (ii) concerning the Plan and alternatives to the Plan; (iii) advising the Holders of Claims and Equity Interests of their rights under the Plan; and (iv) assisting the Holders of Claims entitled to vote in making an informed judgment regarding whether they should vote to accept or reject the Plan.

Attached as exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (**Exhibit A**)

- Organizational Charts of the Debtors that would continue to operate after the Effective Date of the Plan, as they would be reorganized under the Plan (collectively, the "<u>Reorganized Debtors</u>") (**Exhibit B**)

- Organizational Charts of the Debtors that would be transferred to a liquidating trust pursuant to the Plan, as they would be reorganized under the Plan (collectively, the "<u>Creditor Trust Debtors</u>") (**Exhibit C**)

- Historical Unaudited Consolidated Financial Statements for Eddie Bauer[2] as of January 3, 2004 and January 1, 2005 and for the three-year period ending January 1, 2005 (**Exhibit D**)

- The Projected Consolidated Balance Sheet for the Reorganized Debtors as of the projected Effective Date of May 31, 2005 (**Exhibit E**)

- Projections Related to the Reorganized Debtors for the fiscal years ended December 31, 2005 through January 3, 2009 (**Exhibit F**)

- Liquidation Analysis of the Debtors (**Exhibit G**)

---

[2] The term "Eddie Bauer" as used in this Disclosure Statement means, collectively, Eddie Bauer, Inc., Eddie Bauer Diversified Sales, LLC, Eddie Bauer International Development, LLC, Eddie Bauer Services, LLC, and Eddie Bauer of Canada, Inc.

On _____, 2005, after notice and a hearing, the Bankruptcy Court entered an order approving this Disclosure Statement (the "Disclosure Statement Order") as containing "adequate information" to enable a hypothetical, reasonable investor typical of Holders of Claims against, or Equity Interests in, the Debtors to make an informed judgment as to whether to accept or reject the Plan, and authorized the Debtors to use this Disclosure Statement in connection with the solicitation of votes to accept or reject the Plan. The Disclosure Statement Order establishes _____, 2005 at 4:00 p.m. as the deadline for the return of Ballots accepting or rejecting the Plan (the "Voting Deadline"). **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Debtors will file a plan supplement (the Plan Supplement) as early as practicable but in no event later than 10 days before the Voting Deadline or on such other date as may be established by the Bankruptcy Court. The Plan Supplement will contain, among other things, (i) forms of the Creditor Trust Agreement, the Eddie Bauer Holdings, Inc. Certificate of Incorporation, the Eddie Bauer Holdings, Inc. Bylaws, and the Securitization Note, (ii) the principal terms and conditions of the Senior Debt Facility (if applicable) and the Working Capital Facility, (iii) the identity of the proposed senior officers and directors of Eddie Bauer Holdings, Inc., (iv) the identity and compensation of any insiders to be retained or employed by Eddie Bauer Holdings, Inc., (v) a schedule of executory contracts and unexpired leases to be assumed pursuant to the terms of the Plan, and (vi) a list of the Eddie Bauer Holdings Rights of Action. The Plan Supplement is a public document that will be available at the Bankruptcy Court Clerk's Office and the official website of the Bankruptcy Court (http://pacer.psc.uscourts.gov).

The Disclosure Statement Order sets forth in detail the deadlines, procedures, and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses other than the information contained in this Disclosure Statement, the Plan and all exhibits hereto and thereto.

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES FOR THE BEST AVAILABLE RECOVERY TO THEIR CREDITORS. THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED IN THESE CASES SUPPORTS THE CONFIRMATION OF THE PLAN AND RECOMMENDS THAT CREDITORS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR EQUITY INTEREST. THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS A SUMMARY ONLY. HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

B.      Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests which are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote on the plan. Classes of claims or equity interests in which the holders of claims or equity interests are not impaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests in which the holders of claims or equity interests will receive no recovery under a chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Article VII.E of this Disclosure Statement.

In the Chapter 11 Cases, only Holders of Claims in Class 4 and Class 5 are impaired by the Plan and entitled to vote to accept or reject the Plan. Claims in Class 1, Class 2 and Class 3 are not impaired by the Plan, and the Holders thereof are conclusively presumed to have accepted the Plan. Class 6 Holders of Equity Interests in Spiegel will receive no distribution under the Plan and are, therefore, deemed to have rejected the Plan.

The Bankruptcy Code provides that a class of claims has accepted a plan if creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots vote to accept the plan. Thus, acceptance of the Plan by Class 4 and Class 5 will occur only if at least two-thirds in dollar amount and a majority in number of the Holders of Claims in each such Class that cast their Ballots vote to accept the Plan. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection of the Plan was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. For a more detailed description of the requirements for confirmation of the Plan, see Article X of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan does not accept the Plan, the Debtors reserve the right to amend the Plan or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both. Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or equity interests. Under that section, a plan may be confirmed by a bankruptcy court if, among other things, the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article X of this Disclosure Statement.

In the event that a Class of Claims entitled to vote does not vote to accept the Plan, the Debtors' determination as to whether to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code will be announced prior to the Confirmation Hearing.

C.     Voting Procedures

If you are entitled to vote to accept or reject the Plan, enclosed is a Ballot for the acceptance or rejection of the Plan and a pre-addressed envelope for the return of the Ballot. BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 4 AND CLASS 5 BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  Please use only the official Ballot (or Ballots) that accompanies this Disclosure Statement.  If you are the Holder of a Claim in one of these Classes and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning this Disclosure Statement, any of the exhibits hereto, the Plan or the voting procedures in respect thereof, please contact the Debtors' Solicitation Agent, Bankruptcy Services LLC ("BSI"), at:

> Bankruptcy Services LLC
> 757 Third Avenue, 3rd Floor
> New York, New York  10017
> (Attn:  Kate Mailloux)
> Telephone:  866-777-0744 (toll free)

After carefully reviewing this Disclosure Statement and the exhibits attached hereto, please indicate your vote with respect to the Plan on the enclosed Ballot and transmit that ballot to BSI in accordance with any one of the following three methods.  FAILURE TO COMPLY WITH THE REQUIREMENTS OF ANY OF THESE METHODS MAY RESULT IN YOUR VOTE NOT BEING COUNTED.

(a)     Executed Ballots will be accepted if sent by mail and timely delivered to the following address:

**Bankruptcy Services LLC**
**757 Third Avenue, 3rd Floor**
**New York, New York  10017**
**Attn:  Spiegel, Inc. Balloting**

(b)     A facsimile copy of an executed Ballot which is faxed to **(646) 282-2501** and received by BSI prior to the Voting Deadline shall be effective as delivery of a manually executed ballot.

(c)     A scanned copy of an executed Ballot, saved in portable document format (PDF) and attached to an e-mail that is sent to **spiegelvote@bsillc.com** and received at such address before the Voting Deadline shall be effective as delivery of a manually executed ballot.

IN ORDER TO BE COUNTED, BALLOTS MUST BE <u>RECEIVED</u> BY THE VOTING DEADLINE.  IF YOU ARE REQUIRED TO RETURN YOUR BALLOT TO YOUR BANK OR BROKER, OR THE AGENT OF EITHER, YOU MUST RETURN YOUR BALLOT TO THEM IN SUFFICIENT TIME FOR THEM TO PROCESS IT AND RETURN IT TO THE BALLOTING AGENT BY THE VOTING DEADLINE.  ANY EXECUTED BALLOTS THAT ARE TIMELY RECEIVED BUT DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL BE COUNTED AS AN ACCEPTANCE OF THE PLAN.

Any Claim in an impaired Class as to which an objection is pending or which is recorded in the Schedules (as defined below) or in BSI's records as wholly unliquidated, disputed or contingent is not entitled to vote unless the Holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

The Debtors believe that prompt confirmation and implementation of the Plan is in the best interests of the Debtors, all Holders of Claims and the Estates.

CREDITORS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE DISCLOSURE STATEMENT ORDER AND THE PLAN FOR A FULL UNDERSTANDING OF VOTING REQUIREMENTS.

D.    <u>Confirmation Hearing</u>

In accordance with the Disclosure Statement Order and section 1128 of the Bankruptcy Code, a hearing will be held before the Honorable Cornelius Blackshear, United States Bankruptcy Judge for the Southern District of New York, United States Bankruptcy Court, Courtroom 601, One Bowling Green, New York, New York 10004 on _____, 2005, at 10:00 a.m. (prevailing Eastern Time), to consider confirmation of the Plan.  Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before _____, 2005, at 4:00 p.m. (prevailing Eastern Time), in the manner set forth in the Disclosure Statement Order.  The hearing on confirmation of the Plan may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof.

E.    <u>Miscellaneous</u>

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS IN GOOD FAITH BASED UPON INFORMATION DERIVED FROM (I) THE DEBTORS' BOOKS AND RECORDS AND (II) THE DEBTORS' DIRECTORS AND OFFICERS, SENIOR MANAGEMENT, KEY PERSONNEL AND VARIOUS OF THEIR OUTSIDE PROFESSIONALS, INCLUDING THEIR LEGAL, ACCOUNTING AND FINANCIAL ADVISORS.  THE DEBTORS' FINANCIAL STATEMENTS WERE PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES IN THE UNITED STATES.

THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THIS DISCLOSURE STATEMENT IS WITHOUT ERROR. ALTHOUGH ALL REASONABLE EFFORTS UNDER THE CIRCUMSTANCES HAVE BEEN MADE TO BE ACCURATE, HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ THIS DISCLOSURE STATEMENT CAREFULLY AND IN ITS ENTIRETY, AND WHERE POSSIBLE, CONSULT WITH COUNSEL OR OTHER ADVISORS PRIOR TO VOTING ON THE PLAN. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. INTERESTED PARTIES DESIRING ANY SUCH OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT IS NOT AN ASSURANCE THAT THERE HAS BEEN NO CHANGE IN ANY OF THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH, APPROVED BY OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS AND PROVISIONS OF THE PLAN SHALL CONTROL.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.

THE INFORMATION CONTAINED ON THE SPIEGEL WEBSITE ADDRESS OR OTHER WEBSITE ADDRESSES MENTIONED IN THIS DISCLOSURE STATEMENT, OTHER THAN THE DISCLOSURE STATEMENT ITSELF, IS NOT INTENDED TO BE INCORPORATED HEREIN BY REFERENCE OR OTHERWISE. NO RELIANCE SHOULD BE PLACED ON ANY SUCH INFORMATION, AND THE DEBTORS DO NOT ACCEPT ANY LIABILITY (IN CONTRACT OR TORT, IN NEGLIGENCE OR OTHERWISE) FOR ANY LOSS SUFFERED AS A RESULT OF ANY RELIANCE PLACED ON, OR USE MADE OF, ANY SUCH INFORMATION.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD-LOOKING FORECASTS AND ARE BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS.  SUCH FORWARD-LOOKING STATEMENTS CAN OFTEN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "BELIEVE," "EXPECT," "MAY," "ARE EXPECTED TO," "SHOULD," "WOULD BE," "SEEK" OR "ANTICIPATE" OR SIMILAR EXPRESSIONS OR COMPARABLE TERMINOLOGY, OR BY DISCUSSIONS OF STRATEGIC PLANS OR INTENTIONS.  ALL STATEMENTS, OTHER THAN STATEMENTS OF HISTORICAL FACT INCLUDED IN THIS DISCLOSURE STATEMENT, WITHOUT LIMITATION, ARE FORWARD-LOOKING STATEMENTS AND ARE MADE PURSUANT TO THE SAFE HARBOR PROVISIONS OF SECTION 1125 OF THE BANKRUPTCY CODE.  THE DEBTORS HAVE BASED THESE FORWARD-LOOKING STATEMENTS ON THE DEBTORS' CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.  THE DEBTORS AND THEIR ADVISORS UNDERTAKE NO OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS REQUIRED BY APPLICABLE LAW OR REGULATIONS.

ALL PROJECTED RECOVERIES SET FORTH IN THE PLAN AND THIS DISCLOSURE STATEMENT ARE BASED ON THE TRANSACTIONS DESCRIBED HEREIN.  ALL SUCH RECOVERIES ARE MERELY PROJECTED RECOVERIES BASED ON ASSUMPTIONS WHICH ARE SET FORTH HEREIN.  TO THE EXTENT THAT ACTUAL RESULTS VARY FROM THE ASSUMPTIONS, RECOVERIES MAY VARY FROM THE PROJECTIONS.

## II.    OVERVIEW OF THE PLAN

The Plan has five principal components:  (i) substantive consolidation of all of the Debtors' estates and Distributions to Creditors based on such substantive consolidation (except for Distributions to certain affiliates of the Debtors, as described below); (ii) a revised corporate structure for the Debtors pursuant to which a new holding company, Eddie Bauer Holdings, Inc. ("Eddie Bauer Holdings"), will be the parent company for the Eddie Bauer companies, and the remaining assets of the Debtors will be transferred to a liquidating trust established for the benefit of Creditors (the "Creditor Trust"); (iii) the global settlement of all claims that may be asserted by the Estates and creditors against Spiegel Holdings, Inc. ("SHI"), Spiegel's majority shareholder and sole voting shareholder, and Otto (GmbH & Co KG) ("Otto KG") and certain of their respective affiliates, officers, directors, professionals and agents; (iv) certain restrictions with respect to transfers of the 30 million shares of Eddie Bauer Holdings common stock, to be issued to Holders of Allowed General Unsecured Claims pursuant to the terms of the Plan (the "Eddie Bauer Holdings Common Stock"), which restrictions are designed to maximize the net operating loss carryovers ("NOLs") available to Eddie Bauer Holdings and its subsidiaries; and (v) the Distributions to Creditors, including the Distribution to Holders of Allowed Claims in Class 4 (General Unsecured Claims) of a combination of (a) Eddie Bauer Holdings Common Stock, (b) beneficial interests in the Creditor Trust, and (c) Cash and/or notes.

A.    Substantive Consolidation

The Plan provides for the substantive consolidation of all of the Debtors solely for purposes of voting on the Plan, confirmation of the Plan and treatment of Claims against the Debtors under the Plan.  Accordingly, all assets and liabilities of all Debtors will be treated as if they are assets and liabilities of a single legal entity for purposes of the Plan (except with respect to certain claims of certain affiliates of the Debtors, which will be allowed solely as claims against Spiegel, as described below).  As a result, no Distributions will be made in respect of intercompany claims, and any Holder of a Claim against a Debtor and a guaranty claim against another Debtor in respect of such claim shall only receive a single recovery in respect of such Claims.

B.    Eddie Bauer Holdings

A new parent company, Eddie Bauer Holdings, will be created on the Effective Date.  Pursuant to the Plan, Spiegel will transfer all of the stock of Eddie Bauer, Inc. and related subsidiaries and assets and certain other assets, including the stock of Spiegel Acceptance Corporation ("SAC") and Financial Services Acceptance Corporation ("FSAC"), to Eddie Bauer Holdings.  A chart setting forth the structure for Eddie Bauer Holdings and its subsidiaries is attached as **Exhibit B**.  Except for the SHI Unsecured Claims (as defined below), Creditors holding Allowed General Unsecured Claims against the Debtors will receive, in addition to other consideration, their Pro Rata Share of the Eddie Bauer Holdings Common Stock in satisfaction of their claims (except with respect to certain affiliates of the Debtors, which will be allowed solely as claims against Spiegel, as described below).  The Distribution of Eddie Bauer Holdings Common Stock to Holders of Allowed General Unsecured Claims is subject to dilution ("Dilution") resulting from (i) grants pursuant to the management stock incentive program described in Section VI.C.2 of this Disclosure Statement and (ii) adjustments to the total issued Eddie Bauer Holdings Common Stock as may occur pursuant to Section 9.7 of the Plan.

Following the Effective Date, Eddie Bauer, Inc., as reorganized pursuant to the Plan ("Reorganized Eddie Bauer") will continue to source, market and distribute premium, high quality private label men's and women's apparel, accessories, field and gear merchandise and home furnishings to customers through its existing channels (stores, catalog, and e-commerce).  Over the course of 2005, Reorganized Eddie Bauer expects to discontinue operating its home concept in order to focus on its core apparel concept.  The financial projections shown in **Exhibit F** incorporate the estimated financial impact associated with discontinuing both the retail and direct home concepts.  In the future, Reorganized Eddie Bauer may include key home categories in its portfolio of licensed merchandise.

For a further description of the business of Reorganized Eddie Bauer, see Section VI.A.2 of this Disclosure Statement.

The assets of the Debtors that are not transferred to Eddie Bauer Holdings or its subsidiaries will be transferred to the Creditor Trust.  A chart setting forth the structure of the Creditor Trust assets is attached as **Exhibit C**.  The Creditor Trust's mandate will be to monetize its assets for the benefit of Creditors holding the beneficial interests in the trust and to distribute any recoveries to such Creditors.  In addition, the Creditor Trust will be responsible for resolving

any remaining Disputed Claims (other than Administrative Claims) against the Debtors, and for making any distributions to Creditors in the event their Claims are allowed, whether pursuant to an agreement with the Creditor Trust or as a result of a ruling by the Bankruptcy Court.

The assets of the Creditor Trust will include causes of action currently held by the Estates against Messrs. Michael Moran, James Sievers, Richard Fersch, KPMG, Kirkland & Ellis, White & Case, and any of their respective past and present shareholders, officers, directors, employees, members, partners, heirs, successors, and assigns (collectively and with the express exception of Dr. Urs Aschenbrenner, the "Excluded Defendants"; and claims held by the Estates against the Excluded Defendants are, hereafter, the "Excluded Claims"). It is anticipated that the Creditor Trust will prosecute these actions against some or all of the Excluded Defendants. The assets of the Creditor Trust will also include a nonrecourse promissory note (the "Securitization Note") to be issued by Eddie Bauer Holdings to the Creditor Trust that will entitle the holder of the note to receive an amount equal to 90% of funds indefeasibly received by SAC and FSAC in respect of any Securitization Interests held by either entity as of the Effective Date.

C.      SHI Settlement

The Plan incorporates the proposed settlement and compromise of certain claims that may be asserted by the Estates against SHI, Spiegel's majority shareholder and sole voting shareholder, and Otto KG and their respective affiliates. Pursuant to this settlement: (i) SHI will pay $104 million to the Debtors on the Effective Date (the "Cash Settlement Payment"); (ii) Otto KG and certain of its affiliates will hold approximately $26.9 million in allowed general unsecured claims that will be treated as Class 4 Claims as described below; and (iii) approximately $173 million in claims held by Otto-Spiegel Finance GmbH & Co. ("OSF") and SHI will be treated as claims solely against Spiegel on a non-substantively consolidated basis and will only receive a distribution of not less than 2.3% in Cash.

In consideration of the Cash Settlement Payment and the allowance and treatment of the claims described above, the Released Parties would receive a full release from (i) any and all claims that the Debtors and their subsidiaries may hold against Released Parties and (ii) any and all claims that the Debtors' creditors may hold against Released Parties related to the Debtors or their subsidiaries. The settlement also contains standard provisions for a settlement of this type, including "claims over protection" so that the Released Parties will not be liable for contribution claims that may be brought by certain persons against whom the Creditor Trust may bring legal action.

This settlement is a compromise of disputed claims and a good faith settlement and release of those claims and associated alleged injuries. The consideration proposed to be provided pursuant to the settlement is not to be construed as an admission of liability or wrongdoing on the part of any of the Released Parties.

D.      Restrictions on Transfers of Eddie Bauer Holdings Common Stock

Creditors who pursuant to the Plan receive less than 4.75% of Eddie Bauer Holdings Common Stock will be restricted from selling Eddie Bauer Holdings Common Stock, without prior notice to and approval from Eddie Bauer Holdings, to any person who holds, or

would accumulate as a result of the sale, 4.75% or more of the outstanding shares. Stock ownership is determined under complex attribution rules pursuant to the Internal Revenue Code and generally includes stock held directly, through intervening entities and by certain related parties.

Creditors who receive 4.75% or more of Eddie Bauer Holdings Common Stock pursuant to the Plan will be restricted from purchasing any additional Eddie Bauer Holdings Common Stock, without prior notice to and approval from Eddie Bauer Holdings, and will be restricted from selling Eddie Bauer Holdings Common Stock, without such prior notice and approval, to any person who holds, or would accumulate as a result of the sale, 4.75% or more of the outstanding shares. Furthermore, such holders will be required to place 10% (subject to reduction in accordance with Section 7.12(b) of the Plan) of their shares into escrow with Eddie Bauer Holdings, pursuant to an escrow arrangement that will be included in the Plan Supplement, and the prior notice and approval restrictions would apply to such escrowed shares.

Eddie Bauer Holdings could deny approval for any proposed sale if, in its reasonable assessment, the sale could jeopardize realization of the full benefits of unrestricted use of the NOLs of Eddie Bauer Holdings or its subsidiaries.

These restrictions (i) will expire no earlier than January 1, 2008 absent a vote of the shareholders of Eddie Bauer Holdings to the contrary in accordance with applicable law or a determination pursuant to (iii) of this sentence; (ii) will expire on January 4, 2009 unless the Board of Directors of Eddie Bauer Holdings in good faith determines that it is in the best interests of Eddie Bauer Holdings and its shareholders for these restrictions to expire as of an earlier date, but subject to clause (iii) of this sentence, not earlier than January 1, 2008; or (iii) may expire on any date after the Effective Date if the Board of Directors of Eddie Bauer Holdings in good faith determines that the requirements under Section 382(l)(5) of the Internal Revenue Code of 1986, as amended (the "Tax Code"), will not be satisfied with respect to the ownership change occurring as a result of the consummation of the Plan.

E.    Summary of Classification and Treatment of Claims and Equity Interests Under the Plan

The Plan contemplates the payment in full in Cash of all Administrative Claims and Priority Claims against the Debtors, and the repayment in full in Cash of outstanding amounts, if any, under the Debtors' postpetition financing facility. Furthermore, the Plan provides for the treatment of Allowed Claims and Equity Interests as follows:

- With respect to the Allowed Class 1 Claims of the Debtors' prepetition secured lenders, payment in Cash of all amounts, including interest, due in respect of the Groveport Secured Claims, estimated at approximately $55.5 million;

- With respect to each Holder (other than the Debtors' prepetition secured lenders) of an Allowed Class 2 Secured Claim, either (i) the return of the Assets on which such Holder has a senior perfected and indefeasible lien or security interest, or (ii) payment in Cash of all amounts due in respect of such Claim;

- With respect to each Holder of an Allowed Class 4 General Unsecured Claim (other than Holders of Convenience Claims or SHI Unsecured Claims), distribution of its Pro Rata Share of: (i) 100% of the Eddie Bauer Holdings Common Stock, subject to Dilution, (ii) the Class 4 Distributable Cash (estimated to be $200.9 million), (iii) the Cash Settlement Payment, (iv) the beneficial interests in the Creditor Trust (the "Creditor Trust Interests"), and (v) either (a) the proceeds of a $300 million debt obligation that may be incurred by Eddie Bauer Holdings (the "Senior Facility Proceeds") or (b) promissory notes that may be issued by Eddie Bauer Holdings (the "Creditor Notes"); provided, however, that (x) with respect to each Holder of an Otto KG Goods Unsecured Claim (as defined below), the Holders of the Otto KG Goods Unsecured Claims will not be entitled to receive any Distribution made to Creditors on account of the Cash Settlement Payment; and (y) notwithstanding the foregoing, with respect to each Holder of an SHI Unsecured Claim, each Holder will be only entitled to receive payment in Cash equal to not less than 2.3% of such Claims, with the ultimate amount of such Distribution to be determined by the Debtors based on the distributions on General Unsecured Claims that would have been made by Spiegel if it were not substantively consolidated with the other Debtors, and without regard to the Cash Settlement Payment;

- With respect to each Holder of an Allowed Class 5 Convenience Claim (a "Convenience Claim" is a General Unsecured Claim in (i) in the amount of five thousand dollars ($5,000) or less or (ii) allowed in an amount greater than five thousand dollars ($5,000) but less than or equal to ten thousand dollars ($10,000) but which is reduced to five thousand dollars ($5,000) by an irrevocable written election of the Holder of such Claim made on a properly submitted Ballot), a Distribution in Cash of 100% of the allowed amount of such Claim; and

- With respect to Holders of Class 6 Equity Interests, no distributions will be made on account of common stock issued by Spiegel, including claims arising out of, or with respect to, such common stock interests.

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan. The summary also identifies which Classes are entitled to vote on the Plan in accordance with the Disclosure Statement Order and describes the estimated recovery for the allowed claims in each class. The summary set forth herein is qualified in its entirety by reference to the full text of the Plan. The Debtors estimate that the aggregate amount of Claims that will become Allowed Claims entitled to a Distribution under the Plan is approximately $1.5 billion representing approximately: $32.1 million in Administrative Claims, Reclamation Claims, and Professional Fees, $13.9 million in Priority Tax Claims, $55.5 million in Groveport Secured Claims, $1.46 billion in General Unsecured Claims (including the approximately $26.9 million in Otto KG Goods Unsecured Claims and the approximately $173.9 million in SHI Unsecured Claims), and $6.4 million in Convenience Claims.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery | Status |
|---|---|---|---|---|
| Class 1 | Groveport Secured Claims | Cash equal to the full amount of such Allowed Class 1 Claim, except to the extent that any Holder of an Allowed Class 1 Claim agrees to less favorable treatment thereof. | 100% | Unimpaired, Not Entitled to Vote |
| Class 2 | Other Secured Claims | Either (i) the return of the Assets on which the Holder has a senior perfected and indefeasible lien or security interest, or (ii) Cash equal to the full amount of such Allowed Class 2 Claim, except to the extent that any Holder of an Allowed Class 2 Claim agrees to less favorable treatment thereof. | 100% | Unimpaired, Not Entitled to Vote |
| Class 3 | Non-Tax Priority Claims | Cash equal to the full amount of such Allowed Priority Claim, except to the extent that any Holder of an Allowed Class 3 Claim agrees to less favorable treatment thereof. | 100% | Unimpaired, Not Entitled to Vote |
| Class 4 | General Unsecured Claims | Each Holder of an Allowed Class 4 General Unsecured Claim shall be entitled to receive, on account of such Allowed General Unsecured Claim, Distributions in an aggregate amount equal to such Holder's Pro Rata Share of (i) 100% of the Eddie Bauer Holdings Common Stock, subject to Dilution, (ii) the Class 4 Distributable Cash (estimated to be $200.9 million), (iii) the Cash Settlement Payment (iv) the Creditor Trust Interests, and (v) either (a) the Senior Facility Proceeds or (b) the Creditor Notes; provided, however, that (x) each Holder of an Otto KG Goods General Unsecured Claim | General Unsecured Claims: 91%[3]<br><br>Otto Entity General Unsecured Claims: 82.8%[3]<br><br>SHI Unsecured Claims: 2.3% | Impaired, Entitled to Vote |

---

[3] The estimated recovery for Class 4 Claims does not include any value that may ultimately be received by a Class 4 Creditor in respect of the beneficial interests in the Creditor Trust. See Section IV.B.5.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery | Status |
|---|---|---|---|---|
| | | shall not receive any Distribution on account of the Cash Settlement Payment; and (y) notwithstanding the foregoing, each Holder of an SHI Unsecured Claim shall only be entitled to receive Cash equal to not less than 2.3% of such Claim, with the ultimate amount of such Distribution to be determined by the Debtors based on the distributions on General Unsecured Claims that would have been made by Spiegel if it were not substantively consolidated with the other Debtors, and without regard to the Cash Settlement Payment. | | |
| Class 5 | Convenience Claims | Each Holder of an Allowed Convenience Claim shall receive, on the Effective Date, Cash in an amount equal to 100% of the Allowed amount of such Claim. | 100% | Impaired, Entitled to Vote |
| Class 6 | Equity Interests | All Equity Interests in Spiegel shall be cancelled on the Effective Date and Holders of such Equity Interests shall not receive or retain any property or Distributions under the Plan. | 0% | Impaired, Not entitled to vote (deemed to have rejected Plan under the Bankruptcy Code). |

## III.    DESCRIPTION AND HISTORY OF BUSINESSES

A.    Overview

As of March 17, 2003 (the "Petition Date"), Spiegel served as a holding company for 30[4] direct and indirect subsidiaries, including 19 subsidiaries that are debtors in possession in the Chapter 11 Cases.  As of the Petition Date, the Spiegel Group was a leading international general merchandise and specialty retailer that offered apparel, home furnishings and other merchandise through catalogs, e-commerce sites and stores.  Spiegel's business operated through its three groups of merchant companies:  Eddie Bauer, Spiegel Catalog and Newport News (each, a "Merchant Division").  Each Merchant Division is comprised of several entities, all of which are Debtors.

As described in greater detail below, during the course of the Chapter 11 Cases, the Debtors have sold the assets comprising the Spiegel Catalog and Newport News Merchant Divisions and the assets of the Spiegel Group companies that supported these Merchant Divisions' operations.

B.    The Merchant Divisions and Support Companies

The following is an overview of the Merchant Divisions and the Spiegel Group companies that provide support services to the Merchant Divisions:

1.    Eddie Bauer

In 1988, Spiegel acquired Eddie Bauer, Inc. and certain related Canadian assets (collectively, "Eddie Bauer").  Eddie Bauer sells distinctive men's and women's apparel and accessories, field and gear products and home furnishings that reflect a modern interpretation of Eddie Bauer's unique outdoor heritage.  Eddie Bauer offers versatile, comfortable, high-quality merchandise and, in its 84-year history, has evolved from a single store in Seattle, Washington to a leading, international, tri-channel specialty retailer.

*a.    Eddie Bauer Retail and Outlet Stores*

Eddie Bauer's retail and outlet stores comprise one of the channels of its tri-channel business.  Eddie Bauer's core retail stores are generally located in upscale regional malls or in high-traffic metropolitan areas.  Eddie Bauer also maintains and opens stores in certain smaller markets where it believes a concentration of its target customers exists.  As of the Petition Date, Eddie Bauer operated 431 retail stores in the U.S. and Canada.

Eddie Bauer outlet stores are located predominately in outlet malls and value strip centers and generally in areas not serviced by its core specialty retail stores.  Eddie Bauer's outlet store strategy includes the liquidation of excess inventory while also offering products made exclusively for the outlet stores.  As of the Petition Date, Eddie Bauer operated 102 outlet

---

4    Not including dissolved entities or joint ventures.

stores, as well as two warehouse stores and an employee-only salvage store, co-located with its distribution facilities.

Since the Petition Date through December 2004, Eddie Bauer has closed 103 underperforming stores and opened 11 stores. As of December 2004, Eddie Bauer operated 441 stores, comprised of 340 retail stores in the U.S. and Canada and 101 outlet stores in the U.S. Eddie Bauer also continues to operate its warehouse and salvage stores.

### b. Eddie Bauer Direct Business

Eddie Bauer's direct business consists of the other two channels of its tri-channel business – catalog and Internet operations – and offers a larger assortment of Eddie Bauer merchandise than its retail stores. Its e-commerce site, www.eddiebauer.com, had over 40 million customer visits in 2004, making it one of the most visited specialty apparel Internet sites. Eddie Bauer distributed approximately 94 million catalogs to existing and prospective customers in 2004 and actively pursues new customers through initiatives such as list rentals, utilizing names of its store customers and e-commerce marketing programs.

### c. Eddie Bauer Licensing Opportunities

Eddie Bauer also capitalizes on select licensing opportunities, including a rich history with Ford Motor Company, which uses the Eddie Bauer name and logo on a special series of Ford vehicles. Other arrangements include The Lane Company (a division of Furniture Brands International), American Recreation Products, Inc. and Cosco, Inc., a manufacturer of infant and juvenile car seats and strollers, among others.

### d. Eddie Bauer Joint Ventures

Eddie Bauer provides its joint ventures with access to its full product line, sourcing network, marketing materials, catalog photography/page layouts and general operational knowledge. For these services, Eddie Bauer receives a royalty payment plus its equity share in the earnings of each joint venture.

Eddie Bauer Japan: In 1993, Eddie Bauer entered into a joint venture arrangement with Otto-Sumisho, Inc. (a joint venture company of Otto KG, a related party, and Sumitomo Corporation) to sell Eddie Bauer products through retail stores and catalogs in Japan. As of the Petition Date, Eddie Bauer Japan operated 28 retail stores, eight outlet stores, a direct business with six major catalogs annually and an e-commerce site. As of December 2004, Eddie Bauer Japan operated 35 retail stores and nine outlet stores, as well as catalog and e-commerce operations.

Eddie Bauer Germany: In 1995, Eddie Bauer entered into an agreement with Heinrich Heine GmbH and Sport-Scheck GmbH (both subsidiaries of Otto KG) to form a joint venture to sell Eddie Bauer products through retail stores and catalogs in Germany. As of the Petition Date, Eddie Bauer Germany operated 11 retail stores, a direct business with eight major catalogs annually and an Internet site. As of December 2004, Eddie Bauer Germany operated 10 retail stores, as well as catalog and e-commerce operations.

Eddie Bauer United Kingdom:  In 1996, Eddie Bauer entered into an agreement with Grattan plc (a subsidiary of Otto KG) to form a joint venture to sell Eddie Bauer products through retail stores and catalogs in England, Scotland and The Republic of Ireland.  This joint venture's operations effectively ceased in the first quarter of 2000.

2.    Newport News

In 1993, the Debtors acquired New Hampton, Inc.  In 1995, New Hampton, Inc.'s name was changed to Newport News, Inc. ("Newport News").  During the period in which it was owned by Spiegel, Newport News was a dual-channel (catalog and e-commerce) direct marketer of moderately priced women's fashions and home furnishings.  On June 22, 2004, the Debtors sold substantially all of the operating and other assets of Newport News and its related affiliates to Newport News International Limited, an unrelated third party, for approximately $28.6 million in cash, subject to a post-closing working capital adjustment, plus the assumption of certain liabilities.

3.    Spiegel Catalog

Spiegel Catalog, Inc. ("Spiegel Catalog") began selling merchandise through catalogs in 1905 and through e-commerce in 1995.  During the period in which it was owned by Spiegel, Spiegel Catalog offered private-label and branded apparel and home merchandise to its customers.  Spiegel also offered overstock, end-of-season and other merchandise through its Ultimate Outlet stores, which were predominately located in outlet malls, and through catalogs and the ultimateoutlet.com e-commerce site.

On July 16, 2004, the Debtors sold substantially all of the operating and other assets of their Spiegel Catalog business, including certain Canadian assets, to Spiegel Catalog International Limited, an unrelated third party, and its Canadian affiliate, for approximately $2.0 million in cash plus the assumption of certain liabilities.

4.    Distribution Fulfillment Services, Inc. (DFS)

Distribution Fulfillment Services, Inc. ("DFS") performs logistics services and supplies purchasing, as well as accounts payable services, for the Merchant Divisions.  As of the Petition Date, DFS employed approximately 1,320 associates and operated two facilities commonly referred to as the Groveport Facility (the "Groveport Facility"), located in Groveport, Ohio, and the Fisher Road Facility (the "Fisher Road Facility"), located in Columbus, Ohio.

At the Groveport Facility, DFS performed the following services:  direct-to-consumer assembly-ship and returns services primarily for Spiegel Catalog and Eddie Bauer; purchasing of non-merchandise inventory and services for all Debtor locations; processing of non-merchandise supply accounts payable for all Debtor locations; processing of merchandise accounts payable for Spiegel Catalog; and shipping and transportation coordination for all Merchant Divisions and locations.  The services performed for Spiegel Catalog at the Groveport Facility ceased in September 2004, following the sale of the Spiegel Catalog business in July 2004.

At the Fisher Road Facility, DFS performed retail distribution and returns processing services primarily for Eddie Bauer and fulfillment of direct-to-consumer large items, called "separate ship" ("Separate Ship"), for both Spiegel Catalog and Eddie Bauer.

In September 2003, the Debtors consolidated all functions performed at the Fisher Road Facility, with the exception of Separate Ship services, into the Groveport Facility. In March 2004, the Debtors sold the Fisher Road Facility and continue to perform Separate Ship services in that facility on a leased space basis.

5.      Spiegel Group Teleservices

Spiegel Group Teleservices, Inc. and Spiegel Group Teleservices-Canada, Inc. (collectively, "SGTS") operate contact centers that perform customer order and customer service functions on behalf of the Merchant Divisions. As of the Petition Date, SGTS employed approximately 2,200 associates and operated a network of five call centers located in Rapid City, South Dakota; Bothell, Washington; Hampton, Virginia; Saint John, New Brunswick, Canada; and Sydney, Nova Scotia, Canada.

As part of their cost rationalization efforts and the subsequent sale of the Spiegel Catalog and Newport News Merchant Divisions, the Debtors closed the Bothell contact center in July 2003 and the Rapid City contact center in September 2004. The Sydney, Nova Scotia contact center was relocated to New Waterford, Nova Scotia in February 2004 and was subsequently transferred to the purchaser of the Canadian assets of Spiegel Catalog. The Hampton contact center was sold and transferred to the purchaser of the Newport News assets. The contact center in Saint John continues to support Eddie Bauer.

6.      Spiegel Management Group, Inc.

Spiegel Management Group, Inc. ("Spiegel Management Group") consisted of two divisions. The primary division was Spiegel Group Information Services ("SGIS"), which was comprised of the systems, networks and personnel responsible for the information system requirements of the entire Spiegel Group. The second division represented the management personnel of the Spiegel Group that supported the tax, legal, treasury, human resources and finance functions for the Merchant Divisions and the Support Companies that comprised the Spiegel Group.

Spiegel Management Group has continued to support the Debtors throughout the Chapter 11 Cases. Subsequent to the sale and transition support of the Newport News and Spiegel Catalog Merchant Divisions, the SGIS organization was realigned to support Eddie Bauer on a stand-alone basis and re-named Eddie Bauer Information Technology.

C.      Relationships with Otto KG and Affiliates

1.      Generally

Otto Versand (GmbH & Co), a privately held German partnership, acquired Spiegel in 1982. In April 1984, Otto Versand (GmbH & Co) sold its interest in Spiegel to its partners which included certain members of the Otto family. In October 2002, Otto Versand

(GmbH & Co) changed its name to Otto KG. Dr. Michael Otto is the Chairman of the board of directors of Spiegel (the "<u>Board of Directors</u>"), and the Debtors have been advised that he is the Chief Executive Officer and Chairman of Otto KG.

In 1987, Spiegel made an initial public offering of its stock. As a result of this offering, Spiegel has two classes of common stock, Class A and Class B. Members of the general public hold non-voting Class A shares, which represent approximately 11% of the economic interest in Spiegel's equity. SHI currently holds 100% of the Debtors' Class B voting common stock. The Debtors have been advised that the Otto family of Hamburg beneficially owns more than 50% of the common stock of SHI and, therefore, controls the manner in which SHI votes its Class B voting common stock of Spiegel.

As described in detail below, Otto KG has extended substantial financial support to the Debtors, provided critical buying agent and vendor payment services to the Debtors and formed joint ventures with Eddie Bauer to help Eddie Bauer extend the reach of its retail brand to certain foreign countries.

2.     <u>Financing</u>

In October 2001, the Spiegel Group had substantially exhausted borrowing availability under its existing bank facilities. Furthermore, in February 2002, the Spiegel Group determined that a material adverse change had occurred with respect to its unsecured revolving credit facilities and its letter of credit facilities. This material adverse change resulted from the Debtors' recorded operating performance in the fourth quarter of fiscal 2001, as well as deterioration and losses recorded for certain credit card related assets. Accordingly, the borrowing capacity under the Debtors' unsecured revolving credit facility was capped, and no additional letter of credit facilities were available to the Debtors. The Debtors then obtained financial support from Otto KG and certain affiliates beginning in October 2001 and through the period immediately prior to the Petition Date.

3.     <u>Buying Agent Agreements</u>

The Debtors utilized the services of certain affiliates of Otto KG as buying agents for Spiegel Catalog and Newport News in Hong Kong, Taiwan, Korea, India, Italy, Indonesia, Singapore, Thailand, Poland, Brazil and Turkey. Buying agents locate suppliers, inspect inventory to maintain quality control, arrange for appropriate documentation and, in general, expedite the process of procuring merchandise in these areas. The agreements governing these arrangements were transferred or terminated in conjunction with the Spiegel Catalog and Newport News sales.

In 1993, Eddie Bauer entered into an agreement with Eddie Bauer International, Ltd. ("<u>EBI</u>") (a subsidiary of Otto KG) whereby EBI acts as buying agent in Asia, and, in 1997, Eddie Bauer entered into an agreement with Eddie Bauer International (Americas), Inc. ("<u>EBI America</u>") (a subsidiary of Otto KG) whereby EBI America acts as buying agent in the Americas. These agreements are collectively referred to herein as the "<u>Buying Agency Agreements</u>." EBI and EBI America contact suppliers, inspect inventory and handle shipping documentation for Eddie Bauer. The Debtors believe that the terms of the Buying Agency

Agreements are no less favorable to Eddie Bauer than would be the case in an arrangement with an unrelated third party. The Debtors paid approximately $12.0 million to EBI and approximately $2.8 million to EBI America for these services in fiscal 2004.

4.     Vendor Payment Services Agreement

In March 2002, due to the fact that the Merchant Divisions were unable to issue new letters of credit for the purchase of goods or obtain credit from vendors in Asia, the Debtors entered into a Vendor Payment Services Agreement with Otto International Hong Kong ("OIHK") in order to permit the Debtors to obtain inventory in Asia. The Debtors understand that OIHK is a subsidiary of Otto KG. The duration of the agreement was for one year, automatically continuing unless terminated by either party upon three months' written notice. Under the terms of the agreement, the Spiegel Group had open account terms with various vendors in certain countries in Asia. Prior to their bankruptcy filings, the Debtors had terms ranging from 21 to 60 days to remit cash to OIHK. OIHK paid these vendors the purchase price for inventory, less a fee, within seven days of the purchase order receipt. Since the bankruptcy filing, the Debtors have prepaid OIHK for 100% of the purchase order value for inventory purchased by the Merchant Divisions. Accordingly, the Debtors have not financed the purchase of any inventory through this facility following the Petition Date.

5.     Joint Ventures

a.     *Eddie Bauer Joint Ventures*

In order to extend the reach of the Eddie Bauer retail brand into developed markets in Europe and Asia, Eddie Bauer entered into joint venture agreements with certain Otto KG affiliates, as described below. Eddie Bauer provides its joint ventures with access to its full product line, sourcing network, marketing materials, catalog photography/page layouts and general operational knowledge. For these services, Eddie Bauer receives a royalty payment plus its share, as an equity holder, in the earnings of each joint venture.

(1)     The Japan Joint Venture

In 1993, Eddie Bauer formed a joint venture with Otto-Sumisho, Inc. (a joint venture company of Otto KG and Sumitomo Corporation) and entered into license agreements to sell Eddie Bauer products through retail stores and direct sales channels in Japan. The Debtors believe that the terms of the arrangement are no less favorable to Eddie Bauer than would be the case in an arrangement with an unrelated third party. As of the Petition Date, Eddie Bauer had contributed approximately $9.3 million to the project. In 1994, Eddie Bauer received an initial licensing fee for the use of its name of approximately $2.5 million. In fiscal 2004, Eddie Bauer received approximately $3.8 million (unaudited) in royalties for retail and direct sales related to the joint venture and recorded income of approximately $1.0 million (unaudited) for its equity share of the joint venture.

(2)     The Germany Joint Venture

During 1995, Eddie Bauer formed a joint venture with Heinrich Heine GmbH and Sport-Scheck GmbH (both subsidiaries of Otto KG) and entered into license agreements to sell

Eddie Bauer products through retail stores and direct sales channels in Germany. The Debtors believe that the terms of the arrangement are no less favorable to Eddie Bauer than would be the case in an arrangement with an unrelated third party. As of the Petition Date, Eddie Bauer had contributed approximately $14.8 million to the project. Eddie Bauer received an initial licensing fee of approximately $1.0 million in 1995 for the use of its name. In fiscal 2004, Eddie Bauer received approximately $2.5 million (unaudited) in royalties for retail and direct sales related to the joint venture and recorded approximately $2.6 million (unaudited) of income for its equity share of the joint venture.

(3)      The United Kingdom Joint Venture

During 1996, Eddie Bauer formed a joint venture with Grattan plc (a subsidiary of Otto KG) to sell Eddie Bauer products through retail stores and catalogs in England, Scotland, and The Republic of Ireland. Eddie Bauer subsequently transferred its interest in this joint venture to Eddie Bauer Ltd., a wholly owned subsidiary of Eddie Bauer. In October 1999, Eddie Bauer and Grattan plc agreed to terminate this joint venture. The joint venture company ceased operations in the first quarter of 2000. In October 2004, Eddie Bauer and Grattan plc entered into a Share Sale and Purchase Agreement under which Grattan plc purchased Eddie Bauer's interest in Eddie Bauer Ltd. On January 5, 2005, the Bankruptcy Court entered an order authorizing Eddie Bauer to enter into, and perform, all of its obligations under that Share Sale and Purchase Agreement. Pursuant to that agreement, Eddie Bauer no longer has any interest in this joint venture.

*b.     The Product Returns Joint Venture*

In 2001, Spiegel entered into a 60% joint venture investment with Hermes General Service USA, Inc., an affiliated company of Otto KG, forming the limited liability company Spiegel-Hermes General Service, LLC ("Hermes"). In January 2003, Spiegel-Hermes General Service, LLC formally changed its name to Spiegel General Service, LLC ("SGS"). The sole remaining asset of SGS is an equity interest in Newgistics, Inc. ("Newgistics"). Newgistics (www.newgistics.com) specializes in managing product returns for catalog, web and multi-channel retailers. Eddie Bauer presently uses Newgistics to manage its product returns.

D.     <u>Prepetition Funding of the Debtors' Operations</u>

Prior to the Petition Date, the Debtors' liquidity needs were met through certain (i) securitization transactions, (ii) secured and unsecured loans provided by financial institutions, and (iii) unsecured financing provided by Otto KG and certain of its affiliates.

1.     <u>The Securitization Transactions</u>

In 1990, Spiegel acquired First Consumers National Bank ("FCNB"). FCNB was a special-purpose bank specializing in the issuance of credit cards. FCNB is not a Debtor.

In an effort to build brand loyalty and to provide additional convenience for the Merchant Divisions' customers, FCNB offered credit programs to qualifying customers in the form of preferred credit cards imprinted with an Eddie Bauer, Newport News or Spiegel logo.

This credit card allowed a customer to purchase products from any of the Merchant Divisions, regardless of the imprint on the card. Historically, these credit cards were serviced by FCNB.

FCNB also operated a bankcard business pursuant to which it issued MasterCard™ and Visa™ bankcards to the general public. FCNB's bankcard portfolio included secured cards, co-branded cards and affinity cards, such as the FCNB MasterCard, the FCNB Visa, the Spiegel MasterCard and the Eddie Bauer MasterCard.

Prior to the Petition Date, a principal source of liquidity for the Spiegel Group was FCNB's ability to securitize substantially all of the private-label credit card and bankcard receivables that it generated. Many of the customers of the Merchant Divisions received credit through private-label credit cards issued by FCNB. Specifically, during the 2002 fiscal year, customers used FCNB's private-label cards to make approximately 18% of Eddie Bauer net sales, 62% of Spiegel net sales, and 48% of Newport News net sales.

FCNB securitized the receivables generated by the use of its private-label cards and bankcards by selling them to securitization vehicles, which, in turn, financed their purchase of such receivables by selling asset-backed securities to investors. Prior to the Petition Date, there were six series (each, a "Series") of asset-backed securities, three of which were backed, on a revolving basis, by private-label receivables and three of which were backed, also on a revolving basis, by bankcard receivables. MBIA Insurance Corporation ("MBIA") insures the asset-backed securities issued in respect of two of the private-label Series. Under these arrangements, the securitization vehicles had outstanding an aggregate of approximately $2.2 billion of notes and certificates at the end of December 2002.

In the ordinary course of business, the securitization transactions returned a significant portion of the proceeds of collections on receivables sold into these securitization transactions to FCNB in exchange for the deposit of additional receivables. FCNB used these proceeds to reimburse the Merchant Divisions for charges made with the private-label credit cards.

The occurrence of pay-out events under the securitization transactions was a critical factor that precipitated the commencement of the Chapter 11 Cases. FCNB has submitted a liquidation plan to the Office of the Comptroller of the Currency (the "OCC") and has begun its formal liquidation.

2.    The Unsecured Revolving and 364-Day Credit Facilities

Spiegel had two separate prepetition bank credit facilities: a $600 million long-term agreement scheduled to mature in July 2003 and a $150 million 364-day agreement that matured in June 2002. Spiegel's obligations under both of these facilities were guaranteed by Eddie Bauer, Inc., Newport News, DFS, Ultimate Outlet Inc., Spiegel Publishing Co. and Spiegel Catalog (collectively, the "Subsidiary Guarantors"). In February 2002, the Debtors determined that a material adverse change had occurred due to the operating performance experienced in the fourth quarter of fiscal 2001 and deterioration and losses recorded for certain credit card related assets. Accordingly, at that time, the borrowing capacity under these facilities was capped at $700 million ($600 million on the long-term agreement and $100 million on the

364-day revolving credit agreement), which represented the Debtors' borrowings outstanding on that date. The Debtors were therefore unable to make any additional borrowings after that time. As of the Petition Date, approximately $700 million was outstanding under these facilities.

      3.      The Unsecured Term Loans

      Spiegel had sixteen separate unsecured term loans provided by various financial institutions (the "Unsecured Term Loans"), all of which also extended credit under the revolving credit facilities. The Unsecured Term Loans are guaranteed by each of the Subsidiary Guarantors. As of the Petition Date, approximately $393 million was outstanding under the Unsecured Term Loans.

      4.      The Letter of Credit Facilities

      Spiegel maintained a $150 million letter of credit facility in addition to $6 million of standby letters of credit, which were used for the purchase of inventories. Spiegel's obligations under this facility were guaranteed by the Subsidiary Guarantors. The total letter of credit commitments outstanding were approximately $83.5 million at December 29, 2001. At December 29, 2001, there was an additional $72.5 million of commitments available for the issuance of letters of credit. However, the letter of credit facilities provide for restrictions on the availability of additional financing if a "material adverse change" in the Debtors' business has occurred. In February 2002, the Debtors determined that a material adverse change had occurred due to the reasons described above in Section III.C.2 of this Disclosure Statement. Accordingly, on February 18, 2002, no additional letter of credit facilities were available to the Debtors. As of the Petition Date, total letter of credit facility commitments outstanding were approximately $6 million. Accordingly, the Debtors funded approximately $77.5 million in letter of credit payments throughout 2002 and 2003 for the purchase of inventory. Subsequent to the date of the bankruptcy filing, HSBC Bank USA, the letter of credit issuer, funded approximately $2.1 million. This amount was not funded by Spiegel and is a liability included in Class 4 (General Unsecured Claims). The remaining $3.9 million of letters of credit expired or were cancelled in 2004.

      5.      Financial Support from Otto KG and Otto-Spiegel Finance

      In September 2001, the Debtors entered into a revolving credit agreement with Otto KG. The initial availability under this credit agreement was $75 million, and was later increased to $100 million bearing interest at a variable rate based on LIBOR plus a margin, comparable to the Debtors' other revolving credit agreements. As of February 2002, the balance outstanding under the revolving credit agreement with Otto KG was approximately $100 million.

      Beginning in March 2002, the Debtors borrowed additional amounts pursuant to senior unsecured loans from Otto KG, which had an interest rate of LIBOR plus a margin. Certain of the borrowings were repaid during the course of 2002. As of December 31, 2002, this loan balance was approximately $60 million. The Debtors understand that the Otto KG loan balances were transferred to OSF, a related party. As of March 17, 2003, the related party borrowings outstanding consisted of the unsecured $100 million term loan and $60 million senior unsecured loans then held by OSF.

6.     The Secured Term Loans

The Debtors had two secured term loans (each, a "Secured Term Loan," and collectively, the "Secured Term Loans").  As of the Petition Date, approximately $24 million was outstanding under a Secured Term Loan provided by Norddeutsche Landesbank Gironzentrale and approximately $24 million was outstanding under a Secured Term Loan provided by Deutsche Bank, AG.  The Secured Term Loans are secured by the Groveport Facility and are guaranteed by each of the Subsidiary Guarantors other than DFS.  The amounts outstanding under the Secured Term Loans are defined in the Plan as the "Groveport Secured Claims" and are classified in Class 1 (Groveport Secured Claims).

7.     The Interest Rate Swaps

Prior to the chapter 11 filing, certain variable-rate debt obligations exposed the Debtors to fluctuating interest payments.  To limit the fluctuations of certain interest payments, the Debtors entered into receive-variable, pay-fixed interest rate swaps.  Under these interest rate swaps, the Debtors received variable interest rate payments and made fixed interest rate payments thereby effectively creating fixed-rate debt.  The variable-rate of interest received was based on the same terms, including interest rates, notional amounts and payment schedules, as the hedged interest payments on the variable-rate debt.  These interest rate swaps were considered highly effective; therefore, changes in fair value were reflected in accumulated other comprehensive loss and not recognized in earnings until the related interest payments were made.  As of the Petition Date, the Debtors had interest rate swap agreements covering approximately $65 million in notional amount expiring through March 2005.  As of the Petition Date, the Debtors had recorded obligations owed to the interest rate swap counterparties approximating $6.9 million related to the fair value of the interest rate swap agreement as of the Petition Date.

8.     The Import Fee Guarantees

At September 27, 2003, the Debtors had outstanding certain guarantees for the payment of import fees to customs agents for the importation of inventory into the United States.  Certain insurance carriers have issued customs bonds, which may be drawn upon by U.S. Customs if the Debtors do not pay duties for importing inventory for sale in the United States.  The Debtors continue to pay duties for importing inventory as required.  The Debtors do not consider it probable that these customs bonds will be utilized.

## IV.     EVENTS LEADING TO CHAPTER 11 FILING

A.     Overview

During 2001, the financial performance of the Spiegel Group declined significantly for several reasons.  Net sales at the Merchant Divisions declined by over 9% due to weak customer response to all product offerings.  Eddie Bauer reflected comparable store sales declines of over 15%.  Weak sales led to a significant reduction in income for the Merchant Divisions' direct businesses.  In addition, as a result of Spiegel's expansion of credit to high risk, sub-prime borrowers beginning in 1999, the performance of the receivables held in the securitization vehicles also declined significantly.  For example, actual customer charge-off rates

for the private label credit card portfolio nearly doubled between 2000 and 2001, leading to a significant reduction in operating income. Spiegel maintained cash reserve accounts representing reserve funds used as a credit enhancement for the securitization transactions (as described below). The significant escalation in charge-off rates in 2001 led to an approximately $80 million increase in these required cash reserve accounts resulting in lower liquidity for the Spiegel Group. Finally, at the end of 2001, Spiegel determined that it would sell its FCNB credit entity. This led to the recording of an approximate $319.3 million loss on the projected sale of FCNB. The events described above resulted in Spiegel and the applicable members of the Spiegel Group not being in compliance with certain financial and other covenants under the $600 million unsecured revolving and $150 million 364-day credit facilities, as well as the Unsecured Term Loans and the Secured Term Loans.

In February 2002, the Debtors, together with the lending institutions under their $600 million unsecured revolving and $150 million 364-day credit agreements, determined that a material adverse change had occurred due to the Debtors' operating performance in the fourth quarter of 2001 and the estimated loss recorded on the expected sale of the bankcard segment. Additionally, for the reporting period ended December 29, 2001, Spiegel was in default of financial and other covenants under these credit agreements and their other non-affiliated loan agreements.

A principal source of liquidity for the Debtors had been FCNB's ability to securitize substantially all of the credit card receivables that the Debtors generated. As described below, in March 2003, a pay-out event occurred on all six Series of the asset-backed securitizations, thereby precluding FCNB from continuing to securitize new credit card receivables. The Debtors were unable to secure alternative sources of financing from their existing lenders or other third parties to provide adequate liquidity to fund the Debtors' operations.

B.    Pay-Out Events Under the Securitization Transactions

In March 2003, FCNB notified the trustees for all six Series of its asset-backed securitization trusts that a pay-out event, or an early amortization event, had occurred on each Series.

Pay-out events on the First Consumers Master Note Trust Series 1999-A, the First Consumers Credit Card Master Note Trust Series 2001-A and the Spiegel Credit Card Master Note Trust Series 2000-A occurred because each of these Series failed to meet certain minimum performance requirements for the reporting period ended February 28, 2003. This failure was due to the securitized receivables generating insufficient returns to meet the obligation under the securitization documents (or the failure to meet what is commonly referred to as the "excess spread test"). The failure to meet the excess spread test resulted from significant declines in the performance and credit quality of the securitized receivables due to higher charge-off rates and lower net sales and collections.

The pay-out events on the two First Consumers Series caused, through cross-default provisions, a pay-out event on the First Consumers Credit Card Master Note Trust Series 2001-VFN. The pay-out event on the Spiegel 2000-A Series caused, through cross-default

provisions, a pay-out event on the Spiegel Credit Card Master Note Trust Series 2001-VFN. In addition, MBIA declared a pay-out event on the Spiegel 2001-A Series. As a result of these pay-out events, substantially all monthly excess cash flow from securitized receivables remaining after the payment of debt service and other expenses of the trusts was diverted to repay principal to investors of the trusts on an accelerated basis, rather than to pay the cash to FCNB upon deposit of new receivables. On March 11, 2003, the Merchant Divisions ceased honoring the private-label credit cards issued to their customers by FCNB in response to these events. Accordingly, the Debtors lost a significant source of liquidity.

C.      FCNB's Agreement with the OCC

        On May 15, 2002, FCNB entered into an agreement with the OCC. The agreement calls for FCNB to comply with certain requirements and restrictions regarding its bankcard business and, on November 27, 2002, the OCC approved a disposition plan for FCNB. Under the terms of the disposition plan, if FCNB did not receive an acceptable offer to buy the bankcard portfolio by January 2003, it was required to implement plans to liquidate its bankcard portfolio.

        As part of this agreement, SHI, the holder of all of Spiegel's voting common shares and 89% of the economic value of all its common shares, agreed to provide certain credit support to FCNB. In May 2002, SHI provided, among other things, approximately $120 million of escrow deposits to secure payments of certificates of deposit and secured credit card deposits. The amount of the required escrow deposits had been reduced to approximately $30 million prior to the Petition Date, as the certificates of deposit were paid by FCNB and secured credit card deposits were either returned to the cardholder or credited against the cardholder's outstanding balance. In addition, SHI provided a $78 million letter of credit facility for the benefit of FCNB in order to secure payment of amounts that could become due against FCNB in the event of the occurrence of certain contingencies. Spiegel agreed to indemnify SHI on the letter of credit facility in case the facility was utilized by FCNB. On March 12, 2003, FCNB drew down approximately $15 million on the facility and later FCNB drew down an additional $1 million. On the Petition Date, SHI sued FCNB. Also, SHI issued a demand of payment notice to the Debtors. The Debtors understand that SHI has received partial payment from FCNB for the funds drawn and SHI's remaining $13.4 million claim has been allowed and is included in Class 4 as an "SHI Unsecured Claim."

        On February 14, 2003, Spiegel received a letter from the OCC requiring FCNB to immediately begin the process of liquidating the bankcard receivables portfolio and indicating the steps it must take to do so. On March 7, 2003, FCNB discontinued charging privileges on all MasterCard and Visa bankcards issued by FCNB to its customers and began the liquidation process required by the OCC.

        On March 14, 2003, the OCC commenced a cease and desist proceeding against FCNB and issued a temporary cease and desist order indicating, among other things, that FCNB should cease performing its duties as servicer of the bankcard and private-label receivables securitizations as soon as practicable. In response to the temporary OCC order, MBIA filed an action in the United States District Court for the District of Oregon against FCNB alleging certain violations of the securitization agreements (the "FCNB Action").

D.      Securities and Exchange Commission Action

On March 7, 2003, the SEC commenced a civil proceeding against Spiegel in the United States District Court for the Northern District of Illinois (the "Chicago District Court") alleging, among other things, that Spiegel's public disclosures violated Sections 10(b) and 13(a) of the Securities Exchange Act of 1934 (the "SEC Action"). Simultaneously with the filing of the SEC's complaint, Spiegel announced that it had entered into a consent and stipulation with the SEC resolving, in part, the claims asserted in the SEC Action. In accordance with that consent and stipulation, Spiegel consented to the entry of a partial final judgment (the "SEC Judgment") pursuant to which Spiegel agreed, among other things, to the entry of a permanent injunction enjoining any conduct in violation of Sections 10(b) and 13(a) of the Securities Exchange Act of 1934 and various rules and regulations promulgated thereunder. Spiegel also consented to the appointment of an independent examiner (the "Independent Examiner") by the Chicago District Court to review its financial records since January 1, 2000, and to provide a report to the Chicago District Court and other parties regarding Spiegel's financial condition and financial accounting. As part of the settlement, Spiegel neither admitted nor denied the allegations of the SEC's complaint. The SEC reserved its right to petition the Chicago District Court to require Spiegel to pay disgorgement, prejudgment interest and civil penalties, or to impose other equitable relief.

The subsequent history of the SEC Action, including a description of the issuance of the report by the Independent Examiner, is contained in Article V.K.3 of this Disclosure Statement.

E.      Decision to File Chapter 11 Cases

In view of the foregoing, and following a thorough and careful review of all of their available options, the Debtors concluded that it was in the best interests of their creditors, shareholders and other parties-in-interest for the Debtors to seek protection under chapter 11 of the Bankruptcy Code, with the goals of protecting and preserving their businesses and restructuring their financial and operational affairs to maximize their value for the benefit of their constituents. The Debtors also concluded that it was necessary to have the chapter 11 proceedings recognized in Canada to, among other things, prevent actions and proceedings that could interfere with certain Canadian operations of the Debtors during the reorganization period.

## V.      HISTORY OF THESE BANKRUPTCY CASES

A.      General Case Background

On the Petition Date, the Debtors voluntarily commenced the Chapter 11 Cases before the Bankruptcy Court. The following material subsidiaries of Spiegel did not commence chapter 11 cases: FCNB, FSAC, SAC and Spiegel Credit Corporation III ("SCCIII"). Both SAC and SCCIII participated in the securitization transactions described in greater detail in Section III.D.1 of this Disclosure Statement.

On March 24, 2003, the United States trustee for the Southern District of New York (the "U.S. Trustee") appointed a statutory committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Cases. As of the date hereof, no request has been

made for the appointment of a trustee or examiner in these cases. The Debtors have continued in possession of their respective properties and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. By Order dated March 17, 2003, the Chapter 11 Cases were procedurally consolidated and are being jointly administered under the caption "*In re Spiegel, Inc., et al.*, Case No. 03-11540 (CB)" only for procedural purposes. The Honorable Cornelius Blackshear has presided over these cases since the Petition Date.

**B.      Parties-in-Interest:  Retention of Professionals and Appointment of Creditors' Committee**

   1.      Professionals Retained by the Debtors

       a.      *Shearman & Sterling LLP*

       To assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors employed, with authorization from the Bankruptcy Court, Shearman & Sterling LLP as their lead counsel. On February 15, 2005, the Bankruptcy Court entered an order expanding the scope of Shearman & Sterling LLP's retention to include providing advice with respect to the potential issuance of notes in connection with the Debtors' reorganization strategy.

       b.      *Alvarez & Marsal, Inc.*

       During the months preceding the Petition Date, the Debtors sought the assistance of a "restructuring consultant" to remedy the financial and operational difficulties that resulted in the occurrence of defaults under certain of the Debtors' credit and other arrangements described in Section III.D of this Disclosure Statement. After interviewing several well qualified firms, on February 27, 2003, Spiegel entered into an engagement letter with Alvarez & Marsal, Inc. As described in greater detail in Section V.D.1 of this Disclosure Statement, on February 28, 2003, the Debtors announced that the Board of Directors had named William Kosturos, a managing director at Alvarez & Marsal, Inc., as Chief Restructuring Officer. On the Petition Date, the Bankruptcy Court entered an interim order and on April 11, 2003, the Bankruptcy Court entered a final order authorizing the Debtors to employ Alvarez & Marsal, Inc. as their restructuring consultants.

       c.      *Miller Buckfire Ying & Co., LLC*

       On August 7, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain Miller Buckfire Ying & Co., LLC ("MBY") as their financial advisor and investment banker. MBY has, among other things, provided strategic advice to the Debtors' Restructuring Committee (as defined below) and Board of Directors, participated in the marketing of both Newport News and Spiegel Catalog, participated in the marketing of Eddie Bauer, and raised the Eddie Bauer Holdings exit financing.

       d.      *Other Professionals Retained by the Debtors*

       Additionally, the Debtors have retained the following professionals with Bankruptcy Court approval during the course of the Chapter 11 Cases:

On March 21, 2003, the Bankruptcy Court entered an interim order, and on April 11, 2003 entered a final order, authorizing the Debtors to retain J. Frank Associates LLC as their public relations consultant.

On April 11, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain BSI as their official claims and noticing agent.

On April 14, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain Sullivan & Cromwell LLP as special counsel to the Debtors in connection with the investigation by the SEC concerning Spiegel's compliance with its disclosure obligations under the securities laws of the United States and related matters, including certain federal securities class actions pending in the Chicago District Court.

On April 21, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C. as special counsel in connection with matters in the Debtors' cases where it would be inappropriate for Shearman & Sterling LLP, lead counsel for the Debtors, to represent the Debtors under applicable standards of professional conduct and responsibility.

On April 28, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain Deloitte & Touche LLP as their bankruptcy reorganization services provider. Deloitte & Touche LLP has primarily assisted the Debtors with the preparation of and amendments to their statements and schedules and provided certain tax advice to the Debtors.

On April 28, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain Schopf & Weiss as special local counsel in connection with the investigation by the SEC concerning Spiegel's compliance with its disclosure obligations under the securities laws of the United States and related matters, including certain federal securities class actions pending in the Chicago District Court.

On May 30, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain KPMG LLP as their independent public accountant and tax advisor. On November 17, 2003, the Debtors determined to dismiss KPMG LLP. By order of the Bankruptcy Court entered December 18, 2003, the Debtors retained BDO Seidman, LLP to replace KPMG LLP.

On June 5, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain Keen Realty LLC as their special real estate consultant.

On June 20, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain Aird & Berlis LLP as their Canadian counsel. Aird & Berlis LLP has represented and continues to represent the Debtors in connection with the Canadian bankruptcy proceedings.

On July 10, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain Sachnoff & Weaver, Ltd. as their special insurance coverage counsel. Sachnoff & Weaver, Ltd. has provided advice with respect to, among other things, the directors' and officers' liability insurance coverage.

On July 17, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain Watson Wyatt & Company as their employee benefits consultant. Watson Wyatt & Company has assisted in, among other things, the development of the Key Employee Retention Program described in Section V.C.4 of this Disclosure Statement. On February 17, 2005 the Debtors filed a motion seeking to expand the scope of Watson Wyatt & Company's retention to enable them (i) to assist the Debtors in the development of a post-Effective Date equity plan to assure the retention and continued motivation of key employees of the Reorganized Debtors and (ii) assist the Debtors in a number of particular projects, including but not limited to annual incentive design, post-Effective Date equity plan design and general consulting services.

On August 22, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain Great American Group as their liquidation consultant. Great American Group has assisted in the disposition of certain excess Spiegel furniture, fixtures and equipment.

On October 31, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain Assessment Technologies, Ltd. as their tax consultants. Assessment Technologies, Ltd. has primarily assisted the Debtors in evaluating certain real property tax claims filed against the Debtors by various taxing authorities.

On December 18, 2003, the Bankruptcy Court entered an order authorizing the Debtors to retain CB Richard Ellis, Inc. as real estate broker in connection with the sale of the "Eddie Bauer Corporate Campus."

On April 27, 2004, the Bankruptcy Court entered an order authorizing the Debtors to retain Sheppard, Mullin, Richter & Hampton LLP as their special counsel to provide certain employment and labor advice.

On July 27, 2004, the Bankruptcy Court entered an order authorizing the Debtors to retain Staubach Midwest LLC as their real estate broker in connection with the potential subletting or assignment of approximately 120,000 square feet on floors 1, 2, and LL of the building used as Spiegel's corporate headquarters located at 3500 Lacey Road, Downers Grove, Illinois.

On February 11, 2005, the Debtors and the Creditors' Committee filed a joint motion to retain Spencer Stuart as their consultant to, among other things, search for individuals to serve on the board of directors of Eddie Bauer Holdings.

*e.     Ordinary Course Professionals*

In addition, pursuant to the Order Authorizing the Debtors to Employ Professionals Utilized in the Ordinary Course of Business *Nunc Pro Tunc* to the Petition Date, entered by the Bankruptcy Court on May 30, 2003, the Debtors have employed approximately 60 professionals to assist in the Debtors' day-to-day business operations.

2.     <u>The Official Committee of Unsecured Creditors</u>

Although individual creditors may be represented in a bankruptcy case by their own attorneys, the interests of creditors in chapter 11 proceedings are collectively represented by

a committee appointed by the U.S. Trustee. Section 1103 of the Bankruptcy Code sets forth the duties and powers of the official creditors' committee. Among other things, an official committee consults with the debtors, investigates the debtors' assets and resources, participates in the plan of reorganization process and advises its constituency concerning any plan.

On March 24, 2003, the U.S. Trustee appointed the Creditors' Committee. Following its formation, the Debtors have kept the Creditors' Committee informed about the Debtors' operations and have sought the support of the Creditors' Committee for actions and transactions taken outside of the ordinary course of the Debtors' business. The Creditors' Committee has, through its advisors, participated actively, together with the Debtors' management and professionals, in, among other things, reviewing the Debtors' operations, the marketing and sale of certain assets, including the Newport News and Spiegel Catalog businesses, the marketing of the Debtors' Eddie Bauer business and all matters related to Otto KG and its affiliates. The Debtors and their respective professionals have consulted with the Creditors' Committee and its professionals in connection with the negotiation of the Plan with the goal of achieving a consensual plan. The current members of the Creditors' Committee and their attorneys and advisors are as follows:

> Bank of America, N.A.
> Dresdner Kleinwort Wasserstein
> DZ Bank AG (Deutsche Zentral-Genossenschaftsbank)
> JPMorgan Chase Bank, N.A.
> R.R. Donnelley & Sons Company
> Simon Property Group

On May 16, 2003, the Bankruptcy Court entered an order authorizing the Creditors' Committee to retain Chadbourne & Parke LLP as its legal counsel.

On May 22, 2003, the Bankruptcy Court entered an order authorizing the Creditors' Committee to retain FTI Consulting, Inc. as its financial advisors. Senior advisors at FTI responsible for the Creditors' Committee engagement subsequently moved to Capstone Corporate Recovery, LLC. By order of the Bankruptcy Court entered March 18, 2004, Capstone Corporate Recovery, LLC replaced FTI Consulting, Inc. as the Creditors' Committee's financial advisors.

On August 29, 2003, the Bankruptcy Court entered an order authorizing the Creditors' Committee to retain McMillan Binch LLP as its Canadian counsel.

On November 18, 2003, the Bankruptcy Court entered an order authorizing the Creditors' Committee to retain Zuckerman Spaeder LLP as its special conflicts counsel.

On January 5, 2004, the Bankruptcy Court entered an order authorizing the Creditors' Committee to retain Hölters & Elsing as its special German litigation counsel.

On April 2, 2004, the Bankruptcy Court entered an order authorizing the Creditors' Committee to retain Peter J. Solomon Company, L.P. as its investment banker.

C.    Stabilization of Business

1.    The DIP Facility

On March 17, 2003, the Bankruptcy Court gave interim approval for $150 million of a $400 million senior secured debtor-in-possession financing facility (the "DIP Facility") from Bank of America, N.A., Fleet Retail Finance, Inc. and The CIT Group/Business Credit, Inc. to supplement the Debtors' existing cash flow during the reorganization process.  On April 30, 2003, the Bankruptcy Court granted final approval for the entire DIP Facility.  As of the date of this Disclosure Statement, there are no outstanding cash borrowings under the DIP Facility.

The DIP Facility is a revolving credit facility under which Spiegel, Eddie Bauer, Inc., Spiegel Catalog, Ultimate Outlet Inc. and Newport News are the borrowers and, together with the other debtor-in-possession subsidiaries, are guarantors.  Of the DIP Facility, $50 million constituted a Consumer Credit Card Account Facility, which permitted the Debtors to finance consumer receivables generated under credit cards issued directly by the Merchant Divisions.  On May 12, 2003, the Consumer Credit Card Account Facility was terminated by the Debtors and, accordingly, the amount available under the DIP Facility declined to $350 million.  On April 23, 2004, the Debtors elected to reduce the DIP Facility from $350 million to $250 million due to the fact that the Debtors had no cash borrowings under the DIP Facility and they have maintained a significant cash position throughout the Chapter 11 Cases.

Borrowings under the DIP Facility bear interest, at the option of the borrower, at prime plus 1.00% or at LIBOR plus 3.00%.  In order to test the DIP Facility borrowing systems, the Debtors borrowed approximately $5 million on March 20, 2003 as a prime loan under the DIP Facility and repaid it with interest on March 24, 2003.  As of the date of this Disclosure Statement, there have not been any other borrowings drawn under the DIP Facility.  However, there are $0.1 million in letters of credit outstanding.  The Debtors are obligated to pay an unused commitment fee of 0.5% per annum on the unused amount of the maximum committed amount.

The Debtors are in the process of amending the DIP Facility to reduce total availability from $250 million to $150 million and reduce its unused commitment fee to 0.25% per annum (as so amended, the "Second Amended DIP Facility").  As proposed the Second Amended DIP Facility will terminate upon the earlier of a confirmation of a plan of reorganization or July 15, 2005.  As part of the Second Amended DIP Facility, certain DIP Lenders have agreed to provide Eddie Bauer with a commitment for a post-Effective Date working capital facility (the "Working Capital Facility") upon confirmation of reorganization.

2.    First Day Orders

On March 17 and 18, 2003, the Bankruptcy Court approved other "first day" motions permitting the Debtors to, among other things:

- continue payments for employee wages, salaries and certain other benefits;

- honor customer programs and other obligations, such as gift certificates, returns and exchanges;

- maintain their cash management system;

- pay prepetition claims of a number of critical vendors;

- pay specified prepetition customs duties and shipping charges;

- maintain prepetition investment practices;

- pay prepetition obligations necessary to maintain current insurance coverage;

- pay specified non-property taxes;

- reject certain of their executory contracts, including their private label credit card agreement with FCNB;

- retain legal, financial and other professionals on an interim basis pending a final hearing; and

- extend the time to file a schedule of assets and liabilities and statements of financial affairs.

3.    Adequate Assurance to Utilities

Pursuant to section 366 of the Bankruptcy Code, utility companies may alter, refuse, or discontinue service if, within twenty days after the petition date, the debtor does not furnish "adequate assurance" of payment in the form of a deposit or other security for service after such date.  On the Petition Date, the Debtors filed a motion with the Bankruptcy Court seeking entry of an order (i) prohibiting their utility companies from altering, refusing or discontinuing services to the Debtors on account of any unpaid invoice for prepetition services, (ii) determining that the utility companies have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, without the need for payment of additional deposits or security, and (iii) establishing procedures for determining requests, if any, by their utility companies for additional adequate assurance beyond those set forth in the motion.  AT&T Corp. filed an objection to the motion.  The motion was approved by the Bankruptcy Court on April 4, 2004 with respect to all of the Debtors' utility companies with the exception of AT&T Corp.  On June 12, 2003, the Bankruptcy Court entered an order providing adequate assurance to AT&T Corp.

4.    Key Employee Retention Program and Employment Agreements with Certain Key Executives

In July 2003, the Debtors received Bankruptcy Court approval to implement a Key Employee Retention Program ("KERP") and to execute and perform under employment agreements with certain key executives (collectively, the "Key Employment Agreements").  The KERP, the terms of which were negotiated with the Creditors' Committee, provides cash incentives and enhanced severance payments to certain members of the management team and other employees.  The KERP was designed to encourage employees to continue their

employment with the Debtors through the reorganization process. The Key Employment Agreements were necessary to ensure that the following key executives would continue working for the Debtors: Fabian Månsson, Geralynn Madonna, Alexander Birken and James M. Brewster.

D.    Management and Corporate Governance Changes

  1.    Management Changes in the Months Immediately Preceding and Following the Petition Date

    a.    *Appointment of William Kosturos as Interim Chief Executive Officer*

On February 28, 2003, the Debtors announced that the Board of Directors had named William Kosturos, a managing director at Alvarez & Marsal, Inc., an international turnaround and management consulting firm, as Chief Restructuring Officer. The appointment followed the decision by Martin Zaepfel to retire from his positions as Vice Chairman, President and Chief Executive Officer, effective March 1, 2003. Mr. Kosturos assumed the additional position and duties of Interim Chief Executive Officer on that date. Mr. Kosturos worked with the Debtors' senior management team to strengthen the Debtors' financial position and improve operations.

Over the course of his nearly twenty-year career, Mr. Kosturos has helped numerous companies improve their operational performance and successfully navigate turnaround, restructuring and reorganization situations. His experience spans a range of industries, including retail, consumer products, food processing, technology and utilities.

    b.    *Appointment of James M. Brewster as Chief Financial Officer*

Effective February 12, 2003, James R. Cannataro, Spiegel's Executive Vice President and Chief Financial Officer, resigned from the Spiegel Group and the Board of Directors. On February 27, 2003, the Spiegel Group announced that it had appointed James M. Brewster Senior Vice President and Chief Financial Officer for the Spiegel Group on February 26, 2003. For the previous ten years, Mr. Brewster served as Senior Vice President and Chief Financial Officer for Newport News. As Senior Vice President and Chief Financial Officer of the Spiegel Group, Mr. Brewster reports to the Chief Executive Officer and has responsibility for the Spiegel Group's financial planning, reporting and controls, as well as the Spiegel Group's activities in the legal, tax, investor relations and loss prevention functions.

Mr. Brewster joined Newport News in 1986 as manager of financial systems and moved up through the organization, serving as Director of Finance, Director of Inventory Control, Vice President and Treasurer and Vice President and Chief Financial Officer before being promoted to Senior Vice President and Chief Financial Officer in 1992. Prior to joining the Spiegel Group, Mr. Brewster worked in various financial positions in banking and public accounting in Norfolk, Virginia.

On March 14, 2003, the Debtors announced that Geralynn Madonna had been named President and Chief Executive Officer of Spiegel Catalog and Newport News.  Ms. Madonna previously held the position of President and Chief Operating Officer of Newport News.

Ms. Madonna took over the management responsibilities of Melissa Payner-Gregor, former President and Chief Executive Officer of Spiegel Catalog, and George Ittner, former Chairman and Chief Executive Officer of Newport News, both of whom resigned from the Spiegel Group to pursue other interests.  Mr. Ittner agreed to provide consulting services to the Spiegel Group.  Ms. Madonna had been with the Spiegel Group for more than twenty-one years.  In her prior position as President and Chief Operating Officer of Newport News, she oversaw all company-wide operations, including merchandising, product design and development and financial management.  Ms. Madonna left the employ of the Debtors in connection with the sale of the Spiegel Catalog and Newport News businesses.

2.   Establishment of the Restructuring Committee

On April 24, 2003, the Board of Directors approved the creation of a restructuring committee (the "Restructuring Committee") to be comprised of at least two independent directors and the Debtors' Chief Restructuring Officer/Interim Chief Executive Officer.  In the interim period before qualified independent directors were selected, Dr. Winfried Zimmermann, Dr. Peer Witten and Dr. Wolfgang Linder were appointed to the Restructuring Committee.

The purpose of the Restructuring Committee is to approve and authorize transactions involving the Debtors and any director, officer or controlling shareholder of the Debtors and any family member or affiliate of any of them, and to make recommendations to the full Board of Directors regarding any other matters relating to or arising out of the restructuring or reorganization of the Debtors.

Effective September 19, 2003, Dr. Witten and Dr. Linder resigned from the Board of Directors, and Dr. Zimmermann resigned from the Restructuring Committee effective October 23, 2003.  There was no dispute or controversy associated with the resignation of Dr. Witten or Dr. Linder from the Board of Directors or the resignation of Dr. Zimmermann from the Restructuring Committee.

Following review and approval of the candidates by the Creditors' Committee, on October 23, 2003, the Debtors' sole voting shareholder elected Larry J. Gorrell and Hugh E. Sawyer to the Board of Directors to serve as independent directors.  On the same date, William Kosturos, the Debtors' Chief Restructuring Officer/Interim Chief Executive Officer, was elected to the Board of Directors.  Effective October 23, 2003, the Board of Directors appointed Messrs. Gorrell, Sawyer and Kosturos (collectively, the "Restructuring Committee Board Members") to serve as the sole members of the Restructuring Committee.

E.    Development and Execution of Restructuring Strategy

Subsequent to the chapter 11 filing, the Debtors completed a comprehensive business review of each of the Merchant Divisions and related support companies in order to develop a new business plan and restructuring strategy (the "Business Plan").  The Business Plan consisted of two main phases intended to maximize the value of the Debtors' estates.  First, the Debtors committed to continue to stabilize and improve the operations of the Merchant Divisions.  Second, the Debtors committed to pursue the separation and sale of the Merchant Divisions.

The Debtors have aggressively implemented the Business Plan.  As described in greater detail below, the Debtors have, during the course of the Chapter 11 Cases, significantly stabilized and improved the operations of the Merchant Divisions.  The Debtors have also sold the assets comprising the Spiegel Catalog and Newport News Merchant Divisions and certain assets of the Spiegel Group companies that supported their operations.  After marketing the Eddie Bauer business, the Debtors determined that it was in the best interests of their estates, their creditors and other interested parties to propose the Plan pursuant to which Eddie Bauer will be the primary operating company of the Reorganized Debtors.

1.    Stabilization and Improvement of the Merchant Divisions

a.    Store Closures

(1)    Closing of the Spiegel and Newport News Outlet and Clearance Stores

In April 2003, the Debtors announced their intent to close all 21 of their Spiegel and Newport News outlet and clearance stores as part of their reorganization efforts due to poor performance at these stores.  The store-closing plan received Bankruptcy Court approval on May 16, 2003 and all 21 of the Spiegel and Newport News outlet stores were closed by October 2003.

(2)    The Eddie Bauer Store Closures

In April 2003, the Debtors announced their intent to close 60 underperforming Eddie Bauer stores as part of their reorganization efforts.  The store-closing plan received Bankruptcy Court approval on May 22, 2003.  The Debtors closed 59 of these stores by August 2003 and decided to keep one of the stores open.

In December 2003, the Debtors announced their intent to close 29 additional underperforming Eddie Bauer stores, 14 of which had lease expirations, as part of their ongoing reorganization process.  This store-closing plan received Bankruptcy Court approval on January 7, 2004 and all 29 stores were closed by March 2004.

Since the Petition Date through December 2004, Eddie Bauer has also closed 15 stores as part of its normal-course operations.  The Debtors plan to close approximately 25 Eddie Bauer stores upon their natural lease expiration over the course of 2005.

(3)     Sales of Excess Inventory

On May 16, 2003, the Debtors obtained Bankruptcy Court approval to liquidate certain excess inventory in connection with the closure of the Spiegel and Newport News outlet and clearance stores.  On May 22, 2003 and on January 7, 2004, the Debtors obtained Bankruptcy Court approval to liquidate certain excess inventory in connection with the closure of the Eddie Bauer stores.  On June 25, 2003, the Debtors obtained Bankruptcy Court approval to engage in periodic sales of certain excess Spiegel inventory.  On July 25, 2003, the Debtors obtained Bankruptcy Court approval to conduct a one-time sale of certain excess Eddie Bauer inventory to certain independent "jobbers."  On October 9, 2003, the Bankruptcy Court approved certain procedures for the sale or abandonment of assets of a *de minimis* value.

b.     *Restructuring of Eddie Bauer Headquarters Organization*

On May 5, 2003, the Spiegel Group announced that Eddie Bauer had restructured its organization to gain greater organizational and operational efficiencies.  As a part of this restructuring, Eddie Bauer reduced its headquarters workforce in Redmond, Washington by approximately 180 associates effective May 9, 2003 and consolidated its remaining workforce from three buildings into a single building.  Eddie Bauer provided severance and other benefits to affected associates.

c.     *Realignment of Corporate Information Services Staff*

On May 5, 2003, the Spiegel Group announced that it had realigned its corporate information services organization (SGIS) in response to the company's redefined systems strategy, which included a significant reduction in systems development initiatives.  Prior to and throughout the Chapter 11 Cases, SGIS has provided systems support to all of the Spiegel Group's operations.  This realignment resulted in a headcount reduction of approximately 90 associates.  The majority of the associates affected worked at the Spiegel Group's headquarters and its data center, both of which are located in the Chicago, Illinois area.  The Spiegel Group provided severance and other benefits to affected associates.

d.     *Customer Contact Center Closings*

In May 2003, the Debtors announced their intent to close two of their five customer contact centers, including one center located in Bothell, Washington and one center located in Rapid City, South Dakota, to lower the Debtors' overall cost structure.  The Bothell customer contact center closed in July 2003.  The Rapid City facility continued to handle limited support activities until its closing in September 2004.

In February 2004, the Debtors relocated their Sydney, Nova Scotia contact center to New Waterford, Nova Scotia and continued to operate two additional contact centers in Hampton, Virginia and Saint John, New Brunswick.  In conjunction with the sales of the Newport News and Spiegel Catalog businesses, the New Waterford contact center was transferred to the purchaser of the Canadian assets of Spiegel Catalog and the Hampton contact center was transferred to the purchaser of the Newport News assets.  The Debtors provided severance and other benefits to affected associates.

e.      *Consolidation of Distribution Operations*

In September 2003, the Debtors consolidated all logistics functions performed at the Fisher Road Facility in Columbus, Ohio to the Groveport Facility in Groveport, Ohio, with the exception of Separate Ship services. The Debtors subsequently sold the Fisher Road Facility in March 2004. The Debtors continue to perform Separate Ship services in the Fisher Road Facility on a leased space basis.

f.      *Real Property Sales*

(1)      The Fisher Road Warehouse Sale

On February 3, 2004, the Debtors received Bankruptcy Court approval of a stalking horse purchaser and bidding procedures in connection with the sale of the Fisher Road Facility. The Debtors took this action as part of their initiative to streamline and consolidate their warehouse operations. The sale was approved by the Bankruptcy Court and the approximately 4 million square foot facility was sold for a total purchase price of $22 million in late April 2004. DFS subsequently entered into a lease agreement with the purchaser to lease back approximately 650,000 square feet of the facility for a monthly base rent of $120,417 plus a share of the monthly utility and operating costs. The lease has a term of April 30, 2004 through April 30, 2009 and grants DFS a right to provide six months' notice and terminate the lease after completion of eighteen months of the term. In addition, Eddie Bauer subsequently entered into a lease agreement with the purchaser to lease back approximately 36,000 square feet of the facility in which it has a warehouse outlet and an employee-only salvage store for a monthly base rent of $15,075.

(2)      Eddie Bauer Corporate Headquarters Sale

Eddie Bauer's owned real property consisted of three office buildings situated on approximately 20 acres of land located in Redmond, Washington. Eddie Bauer used the property to house its administrative and operational staff and commonly referred to it as the "Eddie Bauer Corporate Campus." In connection with their review of their business operations, the Debtors determined that ownership of the property was not necessary to support Eddie Bauer's current and future operational and administrative business requirements.

Accordingly, the Debtors hired CB Richard Ellis to begin marketing the property in December 2003. On August 3, 2004, the Bankruptcy Court approved the sale of the property to Microsoft Corporation for a total purchase price of $38 million. In connection with the sale of the property, Eddie Bauer entered into an agreement with Microsoft Corporation to lease the property for an initial term of three years, with an option to terminate at no cost after two years. This lease agreement affords Eddie Bauer a minimally disruptive operating environment, as well as a flexible and efficient timeframe within which to locate a cost-effective alternative facility. The monthly base rent called for under this lease agreement is $252,160 plus common area maintenance and other operating expenses, and it increases annually by approximately 3%.

(3)     Sale of Undeveloped Land Located in Hampton, Virginia

New Hampton Realty Corp., Inc. owned forty-six acres of undeveloped land located in Hampton, Virginia that was not being used by the Spiegel Group for any purpose. On September 16, 2004, the Debtors obtained Bankruptcy Court approval to sell this undeveloped property to American Port Services, Inc. for a total purchase price of $1.7 million.

g.      *The Private-Label Credit Cards*

(1)     Rejection of Private-Label Credit Card Agreements with FCNB

The Bankruptcy Code gives a debtor the power, subject to the approval of the bankruptcy court, to assume or reject executory contracts or unexpired leases. On March 17, 2003, the Debtors filed a motion with the Bankruptcy Court to reject their private-label credit card agreements with FCNB. This motion was approved by the Bankruptcy Court on March 18, 2003.

(2)     The New Private-Label Credit Card Program

The Merchant Divisions issued a limited number of private-label credit cards directly which were serviced by FCNB. As a result of the impending liquidation of FCNB, the Debtors determined to cease issuing new private-label credit cards internally and stopped honoring existing cards at the Merchant Divisions. In June 2003, the Debtors sold these merchant-issued credit card receivables, which had a balance of approximately $5 million, for approximately $4 million to First National Bank of Omaha.

On April 28, 2003, the Debtors entered into a ten-year agreement with Alliance Data Systems ("Alliance Data"), the terms of which were subsequently approved by the Bankruptcy Court, to establish a new private-label credit card program for the Merchant Divisions. Services provided by Alliance Data under this agreement include establishing credit criteria for customer acquisition, issuing and activating new cards, extending credit to new cardholders, authorizing purchases made with the new cards, customer care and billing and remittance services. The new Alliance Data credit card program is separate from and has no relation to the Debtors' prior credit card programs. Alliance Data began issuing cards under this program in May 2003.

Under the Alliance Data agreement, the Debtors are charged a customary fee on all credit transactions with Alliance Data. In addition, payments to the Debtors for customer purchases made with Alliance Data-issued cards are subject to a 20% "holdback." A portion of the holdback is returned to the merchants each month based on collection of the receivable balance. The holdback currently equals 20% of the principal portion of the receivable balance for merchant accounts financed by Alliance Data at each month-end. Alliance Data may draw against the holdback for reimbursement of a portion of its operating expenses and principal balance write-offs in connection with customers' failure to pay their credit card accounts under certain circumstances, including cessation of the Debtors' business or termination of the agreement or its funding arrangement. After the first anniversary date of the Alliance Data agreement, the agreement also contains certain restrictions limiting the Debtors' ability to make significant changes to their operations.

After the Effective Date, the holdback will be reduced to 10%, and thereafter would be eliminated if the Debtors satisfy certain financial criteria. The Eddie Bauer holdback balance was approximately $13.8 million (unaudited) as of January 1, 2005. The Debtors assess the collectability of the receivable balance each period based upon the collection rates on the credit cards and the likelihood that the Debtors will emerge from chapter 11 and will be able to meet the financial criteria contained in the agreement. In the event the agreement is terminated under certain circumstances, the Debtors are required to purchase a substantial portion of the unpaid and outstanding accounts including outstanding finance charges and fees.

> h.    *The New Spiegel Corporate Headquarters Leases and the Lease Satisfaction Agreement*

As of the Petition Date, Spiegel leased an office building located at 3500 Lacey Road, Downers Grove, Illinois (the "Building") from Esplanade at Locust Point-II limited Partnership (the "Landlord") for use as its corporate headquarters. Under the lease agreement (the "Headquarters Lease"), Spiegel arranged for the issuance of lease guaranty bonds for the benefit of the holder of the mortgage on the Building in the combined amount of approximately $8 million. These bonds provided a guarantee to the mortgage holder for payment of any rent differential if the Debtors did not meet their performance obligations under the Headquarters Lease and related parking lot lease agreement.

Following the Petition Date, the Debtors began exploring alternatives for addressing their office space needs because they were not utilizing all of the leased space in the Building. In the fall of 2003, the Debtors negotiated the terms of a new lease (the "First Postpetition Headquarters Lease") for a much smaller space within the Building to serve as their corporate headquarters. On November 25, 2003, the Bankruptcy Court entered an order, which, among other things, authorized the Debtors to reject the Headquarters Lease and enter into the First Postpetition Headquarters Lease.

The First Postpetition Headquarters Lease commenced on December 1, 2003 for a term of three years. Under the terms of that lease, Spiegel was obligated to pay $12.00 per rentable square foot (adjusted 3% annually) for 119,600 rentable square feet within the Building as well as its proportional share of the operating expenses for the Building.

In late 2004, due to the sales of the Spiegel Catalog and Newport News businesses and the transition of certain support functions from Spiegel corporate to the Eddie Bauer business, Spiegel was occupying only 16,800 rentable square feet in the Building and anticipated that it would need even less space on a going forward basis. Accordingly, Spiegel engaged in discussions with the Landlord, regarding, among other things, satisfaction of the First Postpetition Headquarters Lease and altering the lease arrangement for the space Spiegel was then occupying. Those discussions were successful, and the parties entered into a lease satisfaction agreement (the "Lease Satisfaction Agreement") and a new lease for an even smaller space within the Building to serve as Spiegel's corporate headquarters (the "Second Postpetition Headquarters Lease"). On December 15, 2004, the Debtors obtained Bankruptcy Court approval to enter into and perform under the Lease Satisfaction Agreement and the Second Postpetition Headquarters Lease.

Pursuant to the terms of the Lease Satisfaction Agreement, Spiegel paid the Landlord approximately $4.5 million in full satisfaction of its obligations under the First Postpetition Headquarters Lease. The Second Postpetition Headquarters Lease calls for a lease term of December 1, 2004 through April 30, 2006. Other than a nominal monthly rent, Spiegel is not obligated to make any payments to the Landlord whether on account of rent, taxes, common area maintenance, utilities, operations or any other charges.

### i. The Lease Renegotiation Program

On August 28, 2003, the Debtors filed a motion seeking Bankruptcy Court authority to renegotiate the terms of certain of their existing store leases pursuant to a lease renegotiation program (the "Lease Renegotiation Program"). The Bankruptcy Court entered an order on September 10, 2003, effective *nunc pro tunc* to April 26, 2003 granting the relief sought by this motion. Pursuant to the terms of that order, the Debtors, with the assistance of Keen Realty, LLC, their real estate consultants, have been successful in favorably renegotiating a significant number of their store leases.

### j. The New Eddie Bauer Store Openings

On November 5, 2003, the Debtors filed a motion seeking Bankruptcy Court authority to open seven new Eddie Bauer stores in specific locations (the "2004 Specified Stores") and up to ten new Eddie Bauer stores in unspecified locations (the "2004 Unspecified Stores"). The Bankruptcy Court entered an order on November 19, 2003 granting the relief sought by the motion. As of December 2004, in accordance with the terms of that order, Eddie Bauer has opened six 2004 Specified Stores and four 2004 Unspecified Stores. Eddie Bauer also opened one store in August 2003, based on a lease entered into prepetition, for a total of 11 stores opened since the Petition Date.

On November 12, 2004, the Debtors filed a motion seeking Bankruptcy Court authority to open up to 15 additional new Eddie Bauer stores in 2005. On November 23, 2004, the Bankruptcy Court entered an order granting the relief sought by that motion.

### 2. Separation and Sale of the Merchant Divisions

### a. Separation of the Merchant Divisions and Development of Eddie Bauer Stand-Alone

Throughout the course of the Chapter 11 Cases, the Debtors continued to aggressively implement the Business Plan, evaluate reorganization options and monitor the performance of the Merchant Divisions. In February 2004, the Debtors determined that a reorganization in which the Merchant Divisions continued to be operated as a group was highly unlikely and that maximum value for the estate would be achieved by marketing the assets of the Merchant Divisions separately.

Therefore, in early 2004, the Debtors began to separate the operations of the Merchant Divisions, which principally required development of a back-end support structure to sustain Eddie Bauer, the largest and most profitable Merchant Division, on a stand-alone basis. Customer contact center support (SGTS), information systems support (SGIS), logistics support,

along with other services provided by DFS, and certain corporate support functions had been provided to all Merchant Divisions on a shared group basis.

(1)     Customer Contact Center Services (SGTS)

As of early 2004, the Debtors had closed one customer contact center in Bothell, Washington and continued to operate four contact centers, two in the U.S., located in Rapid City, South Dakota and Hampton, Virginia, respectively, and two in Canada, located in New Waterford, Nova Scotia and Saint John, New Brunswick, respectively.  Customer sales and service calls for all three Merchant Divisions were routed between all four of the contact centers to optimally match customer call volume with operator availability.

In anticipation of the sale of the other Merchant Divisions and in order to support Eddie Bauer on a stand-alone basis in the most cost-effective manner, the Debtors began the labor training and technical and operational activities required to support the entirety of Eddie Bauer's customer contact requirements at the Saint John contact center.  The necessary transition activities were largely completed by July 2004, and by August 2004, the Saint John facility was supporting 100% of Eddie Bauer's customer call volume on a stand-alone basis.

The Newport News and Spiegel Catalog Merchant Divisions were sold in June 2004 and July 2004, respectively.  The contact centers in New Waterford and Hampton were transferred to the purchaser of the assets of Spiegel Catalog and the majority of the management team and employees at the New Waterford center and a portion of the management and employees at the Hampton center were offered employment by the purchaser(s).  After the sale, the Rapid City contact center continued to support Newport News and Spiegel Catalog through a transition period and was closed in September 2004.  The Spiegel Group provided severance and other benefits to affected associates.

In October 2004, the Debtors entered into an outsourcing relationship with a third-party vendor to provide ongoing call overflow and backup support for the Saint John contact center.  This arrangement minimizes potential customer service interruptions in the event of seasonally high call volume or an outage.

(2)     Information Services (SGIS)

In early 2004, SGIS began the technical and operational activities required to support Eddie Bauer on a stand-alone basis and to transition the required information systems capabilities to a purchaser of Newport News and Spiegel Catalog.

In April 2004, the Spiegel Group realigned the SGIS organization to better accommodate the transition requirements.  The realignment resulted in a headcount reduction of 59 employees and the creation of two teams within SGIS.  One team of 67 employees was identified as the "transition" team and would support the transition of required Newport News and Spiegel Catalog system capabilities to a purchaser.  Associates named to the transition team were notified that their employment with SGIS would terminate upon the conclusion of the transition effort.  A second team of approximately 135 employees was named as the "go forward" team and would continue to support Eddie Bauer.  Both teams also commenced activities to streamline and optimize the SGIS systems and networks for use by Eddie Bauer on a

stand-alone basis. The SGIS organization, located in Westmont, Illinois, was subsequently renamed Eddie Bauer Information Technology. The Spiegel Group provided severance and other benefits to all affected associates.

(3)      Logistics and Fulfillment Services (DFS)

Logistics and fulfillment services and other support activities provided by DFS for Eddie Bauer and Spiegel Catalog, with the exception of Separate Ship services, were consolidated within the Groveport Facility in September 2003.

Subsequent to the sale of Spiegel Catalog, DFS commenced the operational activities required to transition DFS to support Eddie Bauer on a stand-alone basis. The Groveport Facility also continued to support the logistics and fulfillment requirements of the Spiegel Catalog purchaser for seasonal merchandise located in the Groveport Facility at the time of the sale. Employee headcount at the Groveport Facility was reduced in conjunction with the fulfillment of (and therefore reduction of) the existing Spiegel inventory. Total headcount reduction was 136 associates between July and September 2004, and Spiegel Catalog merchandise was completely removed from the Groveport Facility in September 2004. DFS provided severance and other benefits to affected associates.

Subsequent to the sale of the Fisher Road Facility in April 2004, DFS continued to occupy the facility on a leased basis and continued to support Separate Ship requirements for both Eddie Bauer and Spiegel Catalog. Following the sale of Spiegel Catalog, DFS continued to provide Separate Ship services to the purchasers of Spiegel Catalog for a transition period. In October 2004, DFS and the purchasers of Spiegel Catalog entered into a sublease for space at the Fisher Road Facility for the period of November 1, 2004, through October 31, 2005 which will be used by the purchasers to fulfill their Separate Ship business. DFS expects to terminate its lease for the Fisher Road Facility in October 2005, following consolidation of the Eddie Bauer Separate Ship business into the Groveport Facility.

Prior to its sale, Newport News logistics and fulfillment services were supported by a separate facility in Hampton, Virginia, which was included in the sale of Newport News. As a result, activities required to separate the Newport News logistics and fulfillment function from the other Merchant Divisions were minimal.

(4)      Spiegel Group Corporate Support and Eddie Bauer Stand-Alone

As part of the Spiegel Group, certain of the Merchant Divisions' corporate support functions were performed on a group basis by the Spiegel Management Group at the Downers Grove, Illinois headquarters facility. These functions included certain finance, treasury, tax, payroll, legal and human resource functions. In order to support Eddie Bauer on a stand-alone basis, Eddie Bauer began developing the necessary capabilities and transitioning these functions to the Eddie Bauer corporate headquarters in Redmond, Washington. As of December 2004, the Spiegel Management Group was providing some legal and tax support and some transition assistance to Eddie Bauer related to the chapter 11 reorganization.

### b. Sale of Newport News and Spiegel Catalog

#### (1) Newport News

On June 22, 2004, Newport News and its related affiliates transferred substantially all of their operating and other assets used in the Newport News catalog and Internet business to Newport News Holdings Corporation ("NNHC"), a newly created wholly owned non-Debtor subsidiary of Newport News and its related affiliates. The stock of NNHC was then sold to Newport News International Limited, an unrelated third party. The consideration received for the stock purchase included $28.6 million in cash, subject to a post-closing working capital adjustment. In addition, NNHC assumed certain liabilities of Newport News incurred on or after the Petition Date that remained outstanding as of June 22, 2004. These transactions were approved by the Bankruptcy Court pursuant to orders dated May 14 and June 16, 2004.

A majority of the management team and employees of Newport News were offered employment with NNHC. The Debtors understand that NNHC intends to continue to use the acquired assets consistent with their use prior to the acquisition.

#### (2) Spiegel Catalog

In April 2004, following discussions with certain parties who expressed interest in purchasing Spiegel Catalog, the Debtors announced that they were making headcount reductions at their Spiegel Catalog division and its corporate support staff (i) to facilitate the sale of the Spiegel Catalog business or certain assets related thereto, and (ii) to minimize ongoing operating losses of the Spiegel Catalog business.

On May 24, 2004, the Debtors announced that, as part of their ongoing restructuring process, they reached an agreement with an unrelated entity to acquire substantially all of the assets of their Spiegel Catalog business. On June 16, 2004, the Bankruptcy Court approved the sale of substantially all of the assets of Spiegel Catalog to Spiegel Catalog International Limited, an unrelated third party. The purchase was consummated on July 16, 2004. Approval of the Ontario Superior Court of Justice (the "Canadian Court") was obtained for the sale of the New Waterford call center to the purchaser of Spiegel Catalog.

### c. Transition Services Agreements

In connection with the sales of Newport News and Spiegel Catalog, the Debtors provided certain support functions to allow the purchasers sufficient time to develop their operating capabilities without losing the functionality required to continue operating the purchased businesses. Pursuant to certain Transition Services Agreements ("TSAs"), transition support provided included (i) information systems support for both Newport News and Spiegel Catalog via SGIS/Eddie Bauer Information Technology, (ii) customer contact center services for both Newport News and Spiegel Catalog via SGTS and (iii) logistics and fulfillment support for Spiegel Catalog via DFS. The TSAs were structured so as to allow full recovery by the Debtors of both fixed and variable expenses incurred in providing the services.

Transition information systems support provided by SGIS included maintenance and operation of the existing systems and networks through the transition period as well as separation and transition of system functionality and data requirements to the purchaser's systems and networks. Transition customer contact center services provided by SGTS included supporting customer call volume through the transition period and supporting activities required to transition the New Waterford contact center to the purchaser. Services provided by DFS to the purchaser of Spiegel Catalog included fulfillment support for seasonal merchandise already located in the Groveport Facility at the time of the sale as well as continued support of Separate Ship functions in the Fisher Road Facility. In October 2004, DFS and the purchasers entered into a sublease of a portion of the Fisher Road Facility for the period of November 1, 2004, through October 31, 2005, to be used by Spiegel Catalog to fulfill their Separate Ship Business. All transition support for Newport News and Spiegel Catalog was completed by December 2004.

        *d.*     *Marketing of Eddie Bauer*

In April 2004, the Debtors announced that, as part of its ongoing restructuring, MBY would begin a marketing process for the sale of the Eddie Bauer business. As part of this process, MBY assisted the Debtors in the preparation of a sale memorandum and commenced the sale process by contacting over 100 strategic and financial buyers. The Eddie Bauer sale memorandum was sent to parties that had expressed an interest in a potential transaction involving Eddie Bauer, and first round indications of interest were due in May 2004. MBY and the Restructuring Committee and the Creditors' Committee reviewed the initial indications of interest and a select group of bidders was qualified to advance to the second round of due diligence, which included a brief management presentation and access to an online data room. Second round bidders were then asked to refine their initial indications of interest. MBY, the Restructuring Committee and the Creditors' Committee evaluated the second round bids and selected five qualifying parties to complete final due diligence, including access to the complete online data room, onsite due diligence and detailed management presentations. In August 2004, certain of these bidders submitted final round bid proposals.

As part of the review of these final round bids, MBY, the Restructuring Committee and the Creditors' Committee evaluated all of the Debtors' options to determine a strategy that would maximize recoveries for creditors. They ultimately determined that it was in the best interests of the Debtors' estates, their creditors and other interested parties to propose the Plan pursuant to which Eddie Bauer will be the primary operating company of the Reorganized Debtors.

    3.    <u>Employee Matters</u>

        *a.*     *Noncontributory Supplemental Retirement Program*

The Debtors sponsored a noncontributory supplemental retirement program for certain executives (the "<u>SERP</u>") and other defined contribution plans, including 401(k) plans, a profit sharing plan and thrift plans. Total expense for these plans approximated $4.6 million in fiscal year 2003.

Pursuant to the terms of the SERP, the Debtors had the right to terminate the SERP at any time upon giving notice to participants in the SERP and their beneficiaries. In June 2004, the Debtors made the determination that it was in the best interests of their estates, their creditors and other interested parties to terminate the SERP. As a result of attrition, various restructuring initiatives, and the sales of the Spiegel Catalog and Newport News businesses, only 14 of the 48 participants were still employed by the Debtors. In addition, these current employees were eligible for certain bonuses under either the KERP and/or employment agreements that have been approved by the Bankruptcy Court. Accordingly, on October 1, 2004, the Debtors filed a motion seeking authority to terminate the SERP. The Bankruptcy Court entered an order granting that motion on October 26, 2004.

#### b.     Split Dollar Life Insurance

In 1993, Spiegel implemented a split dollar life insurance program (the "Split Dollar Insurance Program") for the benefit of its senior level associates, including both officers and non-officers. In 2000, Spiegel updated the Split Dollar Insurance Program to offer a variable split dollar product for active senior level associates only. Spiegel provided each participant under the 1993 and 2000 plans with a brochure describing the particular plan and a Split Dollar Life Insurance Agreement (the "Split Dollar Agreement"). The agreements covering the plans for 1993 and 2000 are identical. By its terms, the Split Dollar Agreement was terminable by either party at any time.

On December 31, 2002, Spiegel terminated the Split Dollar Insurance Program for its active associates, and terminated their Split Dollar Agreements. However, at that time, Spiegel elected to continue the program for their retired associates and accordingly continued to pay the majority of the annual premiums payable under the life insurance policies of those retired associates. On December 18, 2003, the Debtors obtained Bankruptcy Court approval to terminate the Split Dollar Insurance Program and the Split Dollar Agreements with the remaining plan participants. Claims related to the termination of the Split Dollar Insurance Program are being resolved as part of the chapter 11 bankruptcy process.

#### c.     The Collective Bargaining Termination and Release Agreement

As of the Petition Date, Spiegel and Spiegel Catalog were party to a 2002-2005 Collective Bargaining Agreement (the "Collective Bargaining Agreement") with Teamsters Union 743, which is affiliated with the International Brotherhood of Teamsters. Employees of the Debtors that were members of Teamsters Union 743 (the "Union 743 Employees") primarily provided support services to Spiegel Catalog. On or about April 20, 2004, in light of certain rationalization efforts associated with the sale of Spiegel Catalog, which included the termination of employment for all Union 743 Employees, the Debtors notified Teamsters Union 743 of the pending dissolution of the bargaining unit and offered to engage in negotiations regarding (i) the termination of the Collective Bargaining Agreement, and (ii) providing additional compensation to Union 743 Employees adversely affected by the layoffs. The parties negotiated in good faith with respect to these matters and entered into a Collective Bargaining Agreement Termination and Release (the "CBA Termination Agreement") on July 1, 2004. On July 19, 2004, the Bankruptcy Court authorized the Debtors to enter into and perform under the CBA Termination Agreement effective as of July 13, 2004.

F.    Other Restructuring Matters

1.    The Directors' & Officers' Insurance Policies

SHI and National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("AIG"), a member company of American International Group, Inc., entered into a Directors, Officers and Corporate Liability Insurance Policy effective as of March 1, 2002 pursuant to which AIG provided certain insurance coverage to SHI, the Debtors, Spiegel's subsidiaries that are not debtors in the Chapter 11 Cases, and the directors, officers and employees of those entities (the "Prior D&O Policy").  The Prior D&O Policy has a coverage period of March 1, 2002 to March 1, 2003, which was extended to March 2, 2004.  The Prior D&O Policy has a $20 million aggregate limit of liability.  In addition, excess insurance policies (the "Prior Excess Policies") were purchased to increase the total aggregate limit of liability to $65 million during the period 2002-2003 and $60 million during the period 2003-2004.  The Debtors paid a total of $10,014,250 for the Prior D&O Policy and the Prior Excess Policies for the period March 1, 2000 through March 2, 2004.

On or about March 1, 2004, the Debtors and AIG entered into an agreement (the "D&O Policy Agreement") to purchase:  (i) directors' and officers' liability insurance for the Debtors (the "DIP D&O Policy"); (ii) directors' and officers' liability insurance for the entity that will emerge from chapter 11 (the "Emergent Entity D&O Policy," and together with the DIP D&O Policy, the "Go Forward D&O Coverage"); (iii) crime coverage; (iv) pension trust "fiduciary" liability insurance; and (v) a fidelity bond for FCNB from AIG for a premium of $6 million.  The DIP D&O Policy has a policy period from February 28, 2003 to March 1, 2005, together with an extended reporting period of six years within which claims may be brought under that policy, and the Emergent Entity D&O Policy has a policy period beginning the date from which Spiegel emerges from bankruptcy and running for twelve months thereafter.  The Go Forward D&O coverage provides an aggregate $25 million limit of liability conditioned on the entity that will emerge from chapter 11 not having any public equity or public debt.  In the event the emergent entity desires to issue public equity or debt, it will acquire new directors' and officers' liability insurance coverage.

Prior to the entry of the D&O Policy Agreement, AIG asserted various defenses to the coverage of certain claims under the Prior D&O Policy and asserted that the Prior D&O Policy should be rescinded.  Pursuant to the D&O Policy Agreement, AIG waived certain coverage defenses and made other agreements favorable to Spiegel with respect to those assertions.  On March 16, 2004, the Bankruptcy Court entered an order authorizing the Debtors to enter into and perform under the D&O Policy Agreement.

2.    The Canadian Proceedings

Two of the Debtors, Spiegel Group Teleservices-Canada, Inc. ("SGTS Canada") and Eddie Bauer of Canada, Inc. ("Eddie Bauer Canada"), were incorporated, respectively, under the laws of the Province of Ontario and the Dominion of Canada.

At the commencement of these proceedings, SGTS Canada operated call centers in the provinces of Nova Scotia and New Brunswick. Eddie Bauer Canada operated retail stores in 36 locations across Canada.

In view of the Canadian operations, management considered it necessary to have the proceedings under the Bankruptcy Code recognized in Canada, among other reasons, to prevent actions and proceedings which could interfere with the Canadian operations during the reorganization period.

Therefore, SGTS Canada and Eddie Bauer Canada (collectively, the "Canadian Debtors") applied for and obtained certain relief under the Companies' Creditors Arrangement Act (Canada) ("CCAA") by Order of the Canadian Court dated June 16, 2003 ("Initial CCAA Order").

In the Initial CCAA Order, the Canadian Debtors were granted certain relief pursuant to section 18.6 of the CCAA. This relief principally was as follows:

- the Chapter 11 Cases were recognized as foreign proceedings;

- a stay of proceedings in favor of the Canadian Debtors was granted until October 16, 2003 (the "Canadian Stay"); and

- the Canadian Debtors were authorized and empowered to enter into and perform their obligations under the DIP Facility.

Since the Initial CCAA Order the following Orders have been made by the Canadian Court:

- Order dated September 12, 2003 approving the claims procedure established by the Bankruptcy Court described in Section V.I. of this Disclosure Statement, as well as recognizing a claims bar date of October 1, 2003 ("Claims Order");

- Order dated October 15, 2003 extending the Canadian Stay until January 15, 2004;

- Order dated January 13, 2004 extending the Canadian Stay until April 15, 2004;

- Order dated January 16, 2004 granting approval to SGTS Canada to enter into a lease of new premises with the New Waterford & District Economic Renewal Association;

- Order dated April 14, 2004 extending the Canadian Stay to July 15, 2004;

- Order dated June 22, 2004 approving the entering into by SGTS Canada of an Amended and Restated Stock and Asset Purchase Agreement dated as of June 7, 2004 between SGTS Canada and several other Spiegel companies, and

Spiegel Catalog International Limited as purchaser. This Order authorized and approved the sale by SGTS Canada of certain of its assets in Nova Scotia and vested title in and to the Canadian assets of Spiegel Catalog in the purchaser subject to completion of the transaction. This Order also established a reserve of US$200,000 to be maintained by the Sellers to stand in the place of the Canadian assets being sold to the Purchaser, without prejudice to claims of creditors being advanced against them;

- Order dated July 14, 2004 extending the Canadian Stay until October 29, 2004;

- Order dated July 23, 2004 authorizing Eddie Bauer Canada to implement a lease renegotiation program, including amendments, modifications, extensions and related agreements in respect of its leased real property;

- Order dated October 28, 2004 extending the Canadian Stay to January 5, 2005;

- Order dated January 4, 2005, extending the Canadian Stay to February 4, 2005; and

- Order dated February 2, 2005 extending the Canadian Stay to March 4, 2005.

The rights of a Canadian entity that is (i) the Holder of a Claim against a Canadian Debtor and (ii) not subject to personal jurisdiction in the Bankruptcy Court will not be affected, solely with respect to such Claim, by the Plan, but such rights shall be subject to all orders and rulings of the Canadian Court regarding such Claim. Notwithstanding the foregoing, all such Canadian entities will be bound by all terms and provisions of the Plan, including but not limited to the SHI Settlement.

3.      Executory Contracts

As of the Petition Date, the Debtors were party to over 3,445 unexpired leases and executory contracts. The Debtors promptly commenced a review and analysis of these executory contracts and unexpired leases. In connection therewith, the Debtors have rejected over 111 executory contracts and 81 unexpired leases. The treatment of executory contracts and unexpired leases under the Plan which have not yet been assumed or rejected by the Debtors is described in Section VII.K of this Disclosure Statement.

4.      The NOL Notice Procedures

The Debtors' NOLs and certain other tax attributes are the property of the Debtors' estates and are protected by the automatic stay prescribed in Section 362 of the Bankruptcy Code. The unmonitored trading and accumulation of claims or shares by creditors in claims against, or stockholders in interest in, the Debtors could have severely limited the Debtors' ability to utilize their NOLs and certain other tax attributes for U.S. federal income tax

purposes. Accordingly, on January 20, 2004, the Bankruptcy Court entered an order establishing certain notice procedures to preserve those NOLs and other tax attributes (the "Trading Order").

G.     Operating Results During Chapter 11

Since the Petition Date, the Debtors have filed Monthly Operating Reports with the U.S. Trustee and the Bankruptcy Court. Spiegel also filed these Monthly Operating Reports with the SEC on Form 8-K until June 29, 2004. As described in greater detail in Section V.K.6 of this Disclosure Statement, as the result of an order entered by the SEC, on July 23, 2004, Spiegel was no longer required to make filings of annual, quarterly or other reports pursuant to section 13(a) of the Exchange Act.

These Monthly Operating Reports are public documents and are available at: (i) the Office of the U.S. Trustee; (ii) the Bankruptcy Court Clerk's Office; (iii) the official website of the Bankruptcy Court (http://pacer.psc.uscourts.gov); (iv) the SEC's public reference room; or (v) http://www.sec.gov. Additional public financial information can be found in the Form 8-Ks filed by Spiegel with the SEC.

Historical unaudited consolidated financial statements for Eddie Bauer as of January 3, 2004 and January 1, 2005 and for the three-year period ended January 1, 2005 are attached hereto as **Exhibit D**.

H.     Current Directors and Officers of Spiegel and Eddie Bauer, Inc.

1.     Spiegel

Set forth below is the name of each member of the board of directors of Spiegel as of the date of this Disclosure Statement:

| | |
|---|---|
| Dr. Michael Otto, Chairman | William Kosturos |
| James M. Brewster | Hans-Otto Schrader |
| Dr. Michael E. Crüsemann | Hans-Jörg Hammer |
| Dr. Winfried Zimmermann | Larry J. Gorrell |
| Horst R.A. Hansen | Hugh E. Sawyer |
| Dr. Rainer Hillebrand | |

Set forth below is the name and position with Spiegel of the senior executive officers of Spiegel as of the date of this Disclosure Statement:

| Name | Title |
|---|---|
| William Kosturos | Chief Restructuring Officer & Interim Chief Executive Officer |
| James M. Brewster | Senior Vice President, Chief Financial Officer |
| James B. Pekarek | Vice President, Corporate Controller |
| Robert H. Sorensen | Vice President, General Counsel & Secretary |

2. Eddie Bauer, Inc.

The members of the board of directors of Eddie Bauer, Inc. as of the date of this Disclosure Statement are William Kosturos, James M. Brewster, and Fabian Månsson.  Set forth below is the name and position with Eddie Bauer, Inc. of the senior executive officers of Eddie Bauer, Inc.:

| Name | Title |
|------|-------|
| William Kosturos | Chairman |
| Fabian Månsson | President & Chief Executive Officer |
| Samuel R. Gaston | Chief Operating Officer & Chief Financial Officer |
| Kathy Boyer | Senior Vice President, Chief Merchandising Officer |
| Ann Perinchief | Senior Vice President, Retail |

I.     Claims Process and Bar Date

1.     The Debtors' Schedules of Assets and Liabilities and Bar Date Order

On May 23, 2003, each of the Debtors filed a Statement of Financial Affairs and Schedule of Assets and Liabilities (collectively, and as amended from time to time, the "Schedules").

On July 17, 2003, the Bankruptcy Court entered an order setting a deadline of October 1, 2003 (the "Bar Date") for the filing of proofs of claim in the Chapter 11 Cases (the "Bar Date Order").  In accordance with the terms of the Bar Date Order, on July 23, 2003, the Debtors caused a notice of the Bar Date (the "Bar Date Notice"), a proof of claim form, and an instruction sheet to the proof of claim form to be mailed to, among others, all known holders of claims.  In addition, the Debtors caused a copy of the Bar Date Notice (as defined in the Bar Date Order) to be published on September 10, 2003 in *The New York Times*, *The Wall Street Journal*, and *USA Today*.  Pursuant to an Order of the Canadian Court, a further publication of the Bar Date Notice was made in *The Globe and Mail* (National Edition).

Pursuant to the Bar Date Order, any party that holds a claim arising from the rejection of an executory contract or unexpired lease must file a proof of claim based on such a rejection on or before the later of (i) the 30th day after the effective date of rejection of such executory contract or unexpired lease as set forth in the Bankruptcy Court order approving such rejection, (ii) the 30th day after the date of the entry of an order by the Bankruptcy Court approving the rejection of such executory contract or unexpired lease, or (iii) the Bar Date.  The Bar Date Order also provides that, among other things, any holder of a claim listed on the Schedules as liquidated, noncontingent, and undisputed, and to which the holder agrees with the claim amount set forth in the Schedules, need not file a proof of claim.  In the event that the holder of a claim listed on the Schedules choose to file a proof of claim, the amount on such filed proof of claim superseded the amount and classification of the claim in the Schedules, subject to further review, reconciliation and/or objection to by the Debtors.

From time to time, certain of the Debtors filed amendments and supplements to their respective Schedules (collectively, the "Schedule Amendments"). In accordance with the terms of the Bar Date Order, Holders of Claims affected by the Schedule Amendments have 30 days from the date notice of the Schedule Amendments was given within which to file proofs of claim.

2.      The Claims Reconciliation Process

As of the date of this Disclosure Statement, approximately 4,266 proofs of claims have been filed against the Debtors representing an aggregate filed amount of approximately $24.2 million in administrative claims, $35.7 million in priority tax claims, $117.6 million in secured claims, and $3.5 billion in unsecured claims.

Immediately following the Bar Date, the Debtors, with the assistance of their professionals, promptly commenced a thorough review of the claims and are well into the process of litigating and resolving them. The Debtors anticipate that this process will continue after the Confirmation Date. As of the date of this Disclosure Statement, the Debtors have filed 25 omnibus objections to approximately 1,900 claims. The Debtors estimate that the aggregate amount of Claims that will become Allowed Claims entitled to a Distribution under the Plan is approximately $1.5 billion representing approximately: $32.1 million in Administrative Claims, Reclamation Claims, and Professional Fees, $13.9 million in Priority Tax Claims, $55.5 million in Groveport Secured Claims, $1.46 billion in General Unsecured Claims (including the approximately $26.9 million in Otto KG Goods Unsecured Claims and the approximately $173.9 million in SHI Unsecured Claims), and $6.4 million in Convenience Claims.

**CLAIMANTS MAY DISAGREE WITH THE DEBTORS' ANALYSIS OF THEIR CLAIMS, AND THE AGGREGATE AMOUNT AND PRIORITY OF CLAIMS ULTIMATELY DETERMINED BY THE BANKRUPTCY COURT OR AFTER NEGOTIATIONS BETWEEN THE DEBTORS AND THE RESPECTIVE CLAIMANTS MAY DIFFER FROM THE FOREGOING ESTIMATES.**

3.      Reclamation Claims

In order to address reclamation claims asserted by vendors, the Bankruptcy Court approved certain procedures for the payment of reclamation claims to vendors, as set forth in the "Order under 11 U.S.C. §§ 105(a), 503(b), 546(c)(2) and 546(g) Establishing Procedures For Treatment of Reclamation Claims," which was entered on April 28, 2003 (the "Reclamation Order"). Pursuant to the Reclamation Order, on July 28, 2003, the Debtors filed a report of reclamation claims (the "Reclamation Report"). The Reclamation Report listed total allowed reclamation claims at approximately $4.3 million. On September 2, 2003, the Creditors' Committee filed a limited objection to the Reclamation Report that objected to all OIHK reclamation claims on the Reclamation Report. On September 8, 2003, OIHK filed a response to the Creditors' Committee's limited objection. On October 2, 2003, the Creditors' Committee submitted a response to OIHK's response to its limited objection. As part of the SHI Settlement all OIHK claims were reclassified as Allowed Otto KG Goods General Unsecured Claims.

The Debtors also received objections to the Reclamation Report from the following entities: Tainan Enterprises (USA) Corporation, OIHK, Corrales Designs, Inc., Experian Marketing Solution, Inc., Southport Furniture, Inc., and Sing Lun & Company. Three of those objections have been resolved as of the date of this Disclosure Statement. On December 7, 2004, the Bankruptcy Court entered a stipulation and order that, among other things, withdrew Southport Furniture, Inc.'s objection to the Reclamation Report and fixed Southport Furniture, Inc.'s reclamation claim against Eddie Bauer, Inc. On January 4, 2005, the Bankruptcy Court entered stipulations and orders that, among other things, (i) withdrew Sing Lun & Company's and Tainan Enterprises (USA) Corporation's objections to the Reclamation Report and (ii) fixed Sing Lun & Company's reclamation claim against Eddie Bauer, Inc., and Tainan Enterprises (USA) Corporation's reclamation claim against Eddie Bauer, Inc. and Eddie Bauer of Canada, Inc. The final reclamation claims are expected to be approximately $1.6 million.

4.      The Establishment of Alternative Dispute Resolution Procedures

On August 18, 2004, the Debtors obtained Bankruptcy Court approval to implement certain alternative dispute resolution procedures to resolve certain prepetition personal injury, employment litigation, and similar claims brought against the Debtors (the "ADR Procedures"). To date, the Debtors have included approximately 23 claims in the ADR Procedures. One of these claims has been settled through the ADR Procedures as of the date of this Disclosure Statement. Three claimants have elected to "opt out" of the ADR Procedures and proceed solely against the applicable insurance carrier.

5.      Preference Analysis

On the Effective Date, the Debtors and their estates shall transfer to the Creditor Trust all of their respective rights to prosecute avoidance or recovery actions under sections 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code. The Debtors anticipate that the Creditor Trust will elect not to prosecute substantially all of such avoidance or recovery actions because of (i) the significant costs of prosecuting such actions, (ii) the uncertainty of success in such prosecutions, particularly in light of defenses and/or counterclaims that may be available to the potential defendants in such actions, and (iii) the limitations on the benefits to the Creditor Trust of prosecuting such actions successfully because, among other things, substantially all of the defendants from whom the Debtors could recover property in such actions would have an Allowed Class 4 Claim to the extent of any such recovery and would be entitled to a Distribution on account of such Allowed Class 4 Claim. Pursuant to section 546(a) of the Bankruptcy Code, any such avoidance actions must be commenced not later than two years after the Petition Date.

6.      The Creditors' Committee Avoidance Action Motion

On June 25, 2003, the Creditors' Committee filed a motion seeking (i) Bankruptcy Court approval to bring an avoidance action on behalf of Spiegel's estate against SHI seeking to recover a $50 million transfer made by Spiegel to FCNB that the Creditors' Committee alleges is a preference or fraudulent transfer, (ii) attachment of certain of SHI's assets, and (iii) confirmation of an order of attachment or preliminary injunction. SHI contested the relief sought by the motion. On June 27, 2003, the Bankruptcy Court entered (i) an order

temporarily restraining Deutsche Bank Trust Company Americas from transferring certain assets to SHI, pending resolution of the Creditors' Committee's motion and (ii) an order denying stay pending appeal. SHI appealed these orders to the District Court for the Southern District of New York. On August 14, 2003, SHI withdrew this appeal.

As part of the SHI Settlement, as set forth in Article V.J of this Disclosure Statement, the Creditors' Committee and the Debtors have agreed to have the temporary restraining order vacated and use their reasonable best efforts to have the escrowed funds returned to SHI as soon as practicable after the Effective Date.

J.     SHI Settlement

During the course of the Chapter 11 Cases, counsel to the Debtors and the Creditors' Committee have each undertaken an independent in-depth review of potential causes of action that the Estates may hold against the following in any capacity (i) the SHI Released Parties; and (ii) the past or present officers, directors, employees, members, agents, financial advisors, auditors, heirs, successors or attorneys of any of the Debtors (collectively, and excluding the Excluded Defendants, the "Released Parties"). These causes of action are based upon alleged breach of fiduciary duty, and that various transfers involving the Debtors and certain Released Parties are allegedly avoidable preferential transfers or are otherwise avoidable under the Bankruptcy Code.

The Debtors' counsel has independently reviewed the potential causes of action against the Released Parties and has conducted due diligence with respect to the factual assertions made by the Creditors' Committee with respect to these claims. The Debtors' advisors have held numerous meetings with the Creditors' Committee's advisors and SHI's advisors with respect to the merits of these claims, and the claims and defenses that the Released Parties would assert. During the course of the Chapter 11 Cases, the Debtors' counsel has advised the Restructuring Committee with respect to the merits of the Creditors' Committee's assertions, as well as of the Released Parties' claims and defenses. Over the past year, the parties have held numerous settlement meetings, both in person and telephonically, with respect to reaching a good faith settlement of the claims that may be asserted by the Debtors' estates and the Debtors' creditors against the Released Parties as well as the claims of the Released Parties.

As a result of these efforts, the parties have reached agreement on a settlement of all such claims (the "SHI Settlement"), which settlement is incorporated into the Plan. As described in greater detail below, the SHI Settlement incorporates the compromise and settlement of all claims existing or arising on or before the Effective Date that may be held by (i) the Estates and the Debtors' subsidiaries that are not chapter 11 debtors against the Released Parties and (ii) the creditors of the Debtors (but not shareholders of the Debtors or former shareholders of Spiegel solely in their capacity as shareholders or former shareholders of Spiegel, or any governmental agency) against the Released Parties related to the Debtors or their direct or indirect subsidiaries.

The SHI Settlement has been approved by the Restructuring Committee of the Spiegel Board of Directors and by the Creditors' Committee. On February 3, 2005, respective counsel for the Debtors, the Creditors' Committee, SHI, Otto KG, OSF, OIHK, Dr. Michael

Otto, and Dr. Michael Crüsemann executed a term sheet that memorialized the terms and conditions of the SHI Settlement that are described below and incorporated in the Plan (the "SHI Settlement Term Sheet").  The following is a summary of the SHI Settlement Term Sheet and to the extent such summary or the SHI Term Sheet conflicts with the Plan, the Plan shall control.

The SHI Settlement is the compromise of disputed claims and a good faith settlement and release of those claims and associated alleged injuries.  The consideration to be provided pursuant to the SHI Settlement is not to be construed as an admission of liability or wrongdoing on the part of any of the Released Parties.

1.      Cash Payment and Allocation

Pursuant to the SHI Settlement, and in consideration of the terms and conditions of such settlement that are incorporated in the Plan, SHI or its designee shall pay the Cash Settlement Payment to the Debtors as provided below.  There is no financing condition for payment of the Cash Settlement Payment on the Effective Date.

Pursuant to the SHI Settlement Term Sheet, it has been agreed that $1 million of the Cash Settlement Payment shall be allocated to the settlement and release of claims for alleged injury to the Debtors consisting of diminution in value/deepening insolvency and increased company insurance payments allegedly caused by breaches of fiduciary duty, and $1 million to the settlement and release of claims allegedly held by creditors relating thereto (including Contribution Claims (as hereinafter defined)).  It has also been agreed that the remaining allocations, as set forth below in this paragraph, expressly exclude any consideration for the foregoing alleged injury to the Debtors.  These parties have agreed that the remaining amount of the Cash Settlement Payment shall be allocated to the settlement and release of claims as follows:  (i) claims held by the Estates with respect to payments to FCNB, $5 million; (ii) claims held by the Estates under sections 547(b) and/or 548(a)(1)(B) of the Bankruptcy Code, $46 million; and (iii) the Creditor Release, $52 million (of which $1 million shall be allocated as set forth in the first sentence of this paragraph).  Pursuant to the SHI Settlement Term Sheet, the value of the settlement with respect to the claims allowances and the treatment of such claims pursuant to the Plan (described in the following section "Claim Allowance and Treatment"), is to be allocated to the settlement and release of the dispute over each of those claims, and the claims held by the Estates under sections 547(b) and/or 548(a)(1)(B) of the Bankruptcy Code against certain of the Released Parties.

2.      Claim Allowance and Treatment

Pursuant to the SHI Settlement, the following claims shall be allowed in the following amounts, with such allowed claims not to be subject to setoff, recoupment, subordination or any other challenge and none of the parties holding allowed claims against the Debtors as described herein hold any other claims against the Debtors except as provided in the Plan.

        a.      *Assumption of Executory Contracts and Payment of Cure Claims*

Certain Debtors shall assume the Buying Agency Agreements and the Debtors shall pay cure claims in respect of such assumed agreements in the aggregate amount of

$2,294,700 on the Effective Date, and Eddie Bauer shall (i) assume that certain Joint Venture Agreement by and between Eddie Bauer, Inc., Handelsgesellschaft Heinrich Heine GmbH, and Sport-Scheck GmbH, dated June 6, 1995 (the "Germany Joint Venture Agreement"); (ii) assume that certain Joint Venture Agreement by and between Eddie Bauer, Inc. and Otto-Sumisho Inc., dated September 28, 1993 (the "Japan Joint Venture Agreement"), and (iii) pay a cure claim of $846,800 under the Germany Joint Venture Agreement in full on the Effective Date. After the Effective Date, the parties will perform in accordance with the terms of the assumed Buying Agency and the German and Japan Joint Venture Agreements.

> b.      *Secured or Reclamation Claims*

None of the claims asserted by OIHK or any other affiliate of Otto KG will be treated as a secured prepetition claim or as a reclamation claim.

> c.      *Prepetition Claims for Goods and Services of Otto KG, OIHK, and Other Affiliates of Otto KG*

Pursuant to the SHI Settlement, claims in the following amounts asserted by Otto KG, OIHK or any other affiliate of Otto KG will be allowed in the cases of the following Debtors as general unsecured claims:  (i) Eddie Bauer – $16,866,100; (ii) Spiegel Catalog – $7,698,600; (iii) Newport News – $2,047,900; and (iv) Spiegel – $259,300 (collectively, the "Otto KG Goods Unsecured Claims").  The SHI Settlement further provides that the Otto KG Goods Unsecured Claims shall receive a distribution equal to what would be provided under a plan of reorganization pursuant to which the Debtors' estates are substantively consolidated, but that the Otto KG Goods Unsecured Claims will not receive any distribution in respect of the Cash Settlement Payment.

Accordingly, the Plan provides that the Otto KG Goods Unsecured Claims, which total $26,871,900 in the aggregate, shall be Allowed Class 4 Claims but shall not receive any distribution in respect of the Cash Settlement Payment.

> d.      *Prepetition Claims of OSF and SHI*

The (i) $160,469,900 claim against Spiegel held by OSF and (ii) indemnification claim in the amount of $15,127,300 asserted by SHI against Spiegel will be allowed as general unsecured claims against Spiegel in the amounts of $160,469,900 and $13,443,140, respectively (collectively, the "SHI Unsecured Claims").  The SHI Unsecured Claims shall be treated as Claims solely against Spiegel on a non-substantively consolidated basis and each shall only receive a Distribution of not less than 2.3% of the amount of such Claim in Cash on the Effective Date, with the ultimate amount of such Distribution to be determined by the Debtors based on the distributions on General Unsecured Claims that would have been made by Spiegel if it had not been substantively consolidated with the other Debtors, and without regard to the Cash Settlement Payment.  The Plan classifies the SHI Unsecured Claims in Class 4.

3.     SHI Settlement Releases

The SHI Settlement provides for the following claims to be released and enjoined pursuant to the Plan and Confirmation Order (as defined below) (the "SHI Settlement Releases").

The Releases set forth in the Plan incorporate these releases.  The definitions set forth in this Section V.J.3. of this Disclosure Statement shall only apply to this Section.

(a)     Any and all claims of the Debtors and any of the Debtors' direct or indirect non-debtor subsidiaries or of the Creditors' Committee or any other entity on their behalf (including, without limitation, derivative claims) existing or arising on or before the Effective Date, against any of all of the following:  SHI; Otto KG, formerly known as Otto Versand (GmbH & Co); OSF; OIHK; and against any of their respective affiliates (excepting the Debtors and FCNB and each of their respective subsidiaries), past and present shareholders, officers, directors, employees, members, agents, financial advisors, auditors, heirs, successors or attorneys of any of them or of any of the Debtors, expressly including, but not by way of limitation, Dr. Michael Otto, Dr. Michael Crüsemann, and Dr. Urs Aschenbrenner (collectively, the "Released Parties" and the release of such claims, the "Estate Release"); provided, however, that such released claims shall not include any claims asserted by FCNB against SHI in the lawsuit between such parties pending in the United States District Court for the District of Oregon;

(b)     All claims of all creditors of the Debtors (but not shareholders or former shareholders of Spiegel, solely in their capacity as shareholders or former shareholders of Spiegel, or any governmental agency) existing or arising on or before the Effective Date against the Released Parties related to the Debtors or their direct or indirect subsidiaries, including, but not limited to, Contribution Claims (the "Creditor Release");

(c)     All claims existing or arising on or before the Effective Date of the Released Parties against the Debtors and their respective subsidiaries for reimbursement or indemnification under the by-laws of such entities or applicable statute (including, but not limited to, claims that relate to pre-Effective Date activity and, therefore, arose before the Effective Date, but involve expenses actually incurred after the Effective Date); provided, however, such released claims shall not include claims to the extent covered by insurance or SHI's claims in its lawsuit against FCNB in the United States District Court for the District of Oregon; and further provided, however, that individuals who are members of the postpetition independent Restructuring Committee or officers of Spiegel or any of its subsidiaries shall not be granting any release for purposes of this subparagraph (c);

(d)     All claims existing or arising on or before the Effective Date of the Released Parties against the Creditors' Committee, each of the Creditors' Committee's members, and the Creditors' Committee's

professionals, including the Creditors' Committee's attorneys, financial advisors and investment banker (but only to the extent such claims relate to a Creditors' Committee member's acts in its official capacity as a Creditors' Committee member or such professional's acts as a professional for the Creditors' Committee); and

(e)     All claims existing or arising on or before the Effective Date of the Released Parties against the Debtors, and the Debtors' direct and indirect non-debtor subsidiaries, and each of their respective officers, directors, employees, members, agents, brokers, financial advisors, restructuring advisors, investment bankers, auditors or attorneys (but only to the extent such claims relate to acts or omissions in such person's capacity with respect to a Debtor or non-debtor subsidiary prior to or on the Effective Date); provided, however, that such released claims shall not include (i) the Otto KG Goods Unsecured Claims and the SHI Unsecured Claims, (ii) any claims against the Excluded Defendants, (iii) the claims under each proviso included in subparagraph (c) above, (iv) SHI's claims in its lawsuit against FCNB in the United States District Court for the District of Oregon, and (v) any claims held by any members of the postpetition independent Restructuring Committee, officers, employees, members, agents, financial advisors, or attorneys of any of the Debtors that are allowed claims pursuant to the Plan or any order of the Bankruptcy Court; provided, however, that claims released pursuant to subparagraph (c) above are not affected by this clause (v).

Notwithstanding anything to the contrary, none of such releases shall include claims against, and the Released Parties shall not include, the Excluded Defendants.  Dr. Aschenbrenner is expressly excepted from the Excluded Defendants.  This exception is not intended to, and does not, release the Excluded Defendants of any liability, including any liability for any alleged acts and omissions of Dr. Aschenbrenner.  The Debtors, the Debtors' direct and indirect non-debtor subsidiaries, the Creditors' Committee and the successors or assignees of any of them expressly reserve their rights to bring claims against the Excluded Defendants, which are not being released at all pursuant to the Plan.

4.     <u>Claims Over Protection</u>

The SHI Settlement provides that the Released Parties shall receive the following "claims over" protection.  As a condition of the settlement and the Released Parties' support for the Plan, the Plan shall release the Released Parties from all liability for any judgment obtained by the Creditor Trust against an Excluded Defendant which is a creditor of the Debtors to the extent, if any, that a court determines that the Excluded Defendant would have had (absent this settlement) a claim against any Released Party for contribution, indemnification, or any other basis to contribute to satisfy that judgment (any such claim being herein called a "<u>Contribution Claim</u>").  If the Creditor Trust obtains a judgment against any Excluded Defendant (the "<u>Creditor</u>

Trust Judgment") and if, notwithstanding the release described in the previous sentence and any bar to Contribution Claims arising under applicable law by reason of this good faith settlement, such Excluded Defendant (whether or not such Excluded Defendant is a creditor) in turn obtains a judgment or finding against a Released Party based on a Contribution Claim requiring such Released Party to satisfy all or any part of the Creditor Trust Judgment (a "Claims Over Determination"), then and in such event, the Creditor Trust shall reduce the Creditor Trust Judgment for the benefit of the Released Party and in satisfaction of the Claims Over Determination by an amount or to an extent equal to the Claims Over Determination. As described in this paragraph, a Released Party will not incur any liability to an Excluded Defendant in connection with any Creditor Trust Judgment. These provisions are not intended to release the Excluded Defendants from liability or limit in any way the recovery of damages by the Creditor Trust from the Excluded Defendants, except as may result from such express provisions.

5.    Post-Effective Date Litigation

In accordance with the terms of the SHI Settlement, the Plan provides that the Excluded Claims will be transferred to the Creditor Trust. The SHI Settlement further provides that neither the Estate Release nor the Creditor Release will prevent any of the Excluded Defendants or the Creditor Trust (i) from taking discovery from the Debtors or from any Released Party or (ii) from joining any Released Party to such litigation solely to the extent, if any, such Released Party is a necessary third-party defendant; provided, however, that: (a) the Creditor Trust may not recover any amounts against any Released Party; (b) the Plan will include claims over protection as discussed above so that a Released Party will not incur any liability to an Excluded Defendant in connection with any judgment that the Creditor Trust obtains against any Excluded Defendant; and (c) nothing in the Plan or Confirmation Order shall authorize the Creditor Trust or any other person to take discovery from any Released Party, except in accordance with applicable law, without regard to the existence of the SHI Settlement Term Sheet, including, without limitation, the Hague Convention.

6.    Conditions Precedent to Effective Date

The SHI Settlement requires that a condition precedent to the Effective Date (in addition to such other conditions precedent set forth in the Plan) shall be the entry of an order that is final and non-appealable (the "Confirmation Order") of the Bankruptcy Court in form and substance satisfactory to the Debtors, the Creditors' Committee and SHI (i) approving the provisions herein (including the Estate Release and the other releases and the related claims over provisions) as a good faith settlement; and (ii) confirming a plan of reorganization that incorporates the terms of the SHI's Settlement and is otherwise consistent with the SHI Settlement; provided, however, that SHI's satisfaction with the form and substance of the Confirmation Order and the Plan shall be limited to whether such documents are consistent with the provisions of the SHI Settlement. The SHI Settlement further provides that a condition precedent to the Effective Date is the absence of any court ordered stay of consummation of the Plan.

7.    Contents of Documents

The Released Parties (including SHI) retain and reserve all rights to object to the Plan and/or Confirmation Order on the basis that the Plan and/or Confirmation Order, as the case may be, are not consistent with the SHI Settlement or may be materially adverse to a Released Party (including SHI) due to a matter or matters not contemplated by the SHI Settlement.

Pursuant to the SHI Settlement, SHI had the right to review and comment in advance upon the draft Disclosure Statement and the draft Plan. If the parties did not agree with respect to SHI's comments on the Disclosure Statement with respect to matters contemplated by the SHI Settlement, SHI had the right to include an insert in the Disclosure Statement setting forth its position with respect to such matters. In the event that the Debtors and/or the Creditors' Committee filed a Plan and/or Disclosure Statement that did not incorporate the SHI Settlement or was otherwise inconsistent as to a matter of substance of the SHI Settlement, SHI's obligations under such settlement would have terminated upon such filing.

The SHI Settlement further provided that the Debtors and/or the Creditors' Committee were required to provide to SHI the draft Disclosure Statement and the draft Plan as soon as practicable and SHI was required to provide notice to the Debtors and/or the Creditors' Committee as soon as practicable of any problem with the draft Disclosure Statement and/or the draft Plan that would in the opinion of SHI potentially give rise to termination of SHI's obligations in accordance with the preceding paragraph. The Debtors have complied with this requirement and did not receive any such notice prior to filing this Disclosure Statement and the accompanying Plan.

The parties further agreed that, in the event that SHI advised the Debtors that the draft Disclosure Statement or draft Plan included descriptions or provisions that are materially adverse to a Released Party (including SHI) with respect to a matter or matters not contemplated by the SHI Settlement, the parties would work together in good faith to attempt to consensually resolve SHI's concerns; provided, however, that the Debtors are under no obligation to revise either the Plan or the Disclosure Statement to address such concerns, and no provision of this paragraph alters or impairs the Released Parties' right to object to the Plan and/or Confirmation Order pursuant to the first paragraph of this section "Contents of Documents."

8.      Additional Provisions

The SHI Settlement also includes the following provisions:

- The Debtors, the Creditors' Committee, and SHI (at no cost or adverse impact to any Released Party) shall cooperate with respect to the development and implementation of the appropriate corporate structure for the Reorganized Debtors that, among other things, maximizes tax attributes (*e.g.*, net operating losses).

- Effective as of the Effective Date, the order enjoining the release of the approximately $30 million currently held in the SHI escrow related to FCNB will be vacated. The Debtors and the Creditors' Committee will use their reasonable best efforts to facilitate the return to SHI of that sum as soon as practicable after the Effective Date.

- SHI's obligations under the SHI Settlement will terminate on the date the Debtors or the Creditors' Committee either commences or files a motion seeking authority to commence: (i) any action against any Released Party; or (ii) to take discovery from any Released Party.

- Each of (i) the Debtors, (ii) the Creditors' Committee, and (iii) SHI, Otto KG, OSF and OIHK were obligated to promptly seek, and use their reasonable best efforts to obtain, all necessary approvals and consents for the term sheet setting forth the terms and conditions of the SHI Settlement as soon as practicable and will promptly inform the other parties in writing of the receipt thereof. These parties agreed that, after such approvals and consents were obtained, each of the foregoing would not object to or oppose confirmation of a plan or plans of reorganization for the Debtors that were consistent with the SHI Settlement and not otherwise materially adverse to any such party on any grounds related to the settlements, claims, issues, and matters covered thereby.

- All terms of the SHI Settlement are terminable by any of the Debtors, the Creditors' Committee, SHI, Otto KG, OSF, OIHK, Dr. Michael Otto, or Dr. Michael Crüsemann on notice to the others if: (i) a plan and disclosure statement consistent with the SHI Settlement are not filed by February 28, 2005; (ii) such disclosure statement, as amended, is not approved by the Bankruptcy Court by an order entered on or before April 30, 2005; (iii) such plan is not confirmed by the Bankruptcy Court in an order entered on or before June 30, 2005; and (iv) such plan is not effective on or before July 31, 2005. SHI may terminate all terms of the SHI Settlement if either the Debtors or the Creditors' Committee take any action inconsistent with consummating the settlement and Plan contemplated by the settlement.

- Notwithstanding any other provision of the SHI Settlement, SHI and the Debtors will be entitled to their respective shares of all funds generated by past and future state and federal tax refunds, calculated in accordance with that certain Tax Reimbursement Agreement between SHI and Spiegel, effective as of September 30, 1998 for all taxable years beginning on or after January 1, 1986, and that certain Supplemental Tax Reimbursement Agreement effective as of November 1, 1996.

In addition, as contemplated by the SHI Settlement term sheet, on February 3, 2005, respective counsel for Dr. Michael Otto, Dr. Michael Crüsemann, SHI, Otto KG, OSF, and OIHK on behalf of clients as well as Dr. Urs Aschenbrenner personally executed tolling agreements with respect to sections 108(a), 546(a), and 549(d) of the Bankruptcy Code.

K.    Postpetition Material Events with Respect to Securities and Exchange Commission Action

1.    Motion for Clarification of the Securities and Exchange Commission Judgment

As a result of the investigation by the Independent Examiner, Spiegel's CEO and CFO were not in a position to certify the Debtors' financial statements as required by sections 302 and 906 of the Sarbanes-Oxley Act of 2002. In addition, the Debtors' former outside auditors, KPMG LLP, advised the Debtors that they would not be able to complete the audit of the Debtors' 2002 financial statements until the Debtors were able to provide the required officer certifications and KPMG LLP had an opportunity to review and consider the report of the Independent Examiner appointed under the terms of the SEC Judgment.

As a result, Spiegel notified the SEC that it would not, as a practical matter, be able to file its 2002 Form 10-K and one or more Form 10-Qs that complied with the SEC's rules and regulations in a timely manner as required by the SEC Judgment. On March 31, 2003, Spiegel filed with the Chicago District Court a motion for clarification of the SEC Judgment in order to request limited relief from the obligation to file reports, subject to certain conditions. On April 10, 2003, the Chicago District Court entered an order providing that Spiegel and its officers, directors, employees and agents are not, and will not be in the future, in contempt of the SEC Judgment as a result of Spiegel's inability to timely file its 2002 Form 10-K and one or more Form 10-Qs with the SEC as required; provided that, among other things, (1) Spiegel file the financial statements that would have been included in its 2002 Form 10-K and a management's discussion and analysis covering the financial statements on or before May 15, 2003 and (2) Spiegel file the financial statements that would have been included in any such Form 10-Qs in a timely manner.

2.    Authorization to Compensate Counsel to Certain Former and Current Directors and Officers of the Debtors in Connection with the Investigation by the Independent Examiner

On June 20, 2003, the Bankruptcy Court entered an order authorizing the Debtors to compensate Crowell & Moring LLP and Latham & Watkins as counsel to certain former officers of Spiegel in connection with the investigation by the Independent Examiner for the period beginning May 1, 2003 and ending July 15, 2003. The Debtors have not compensated Crowell & Moring LLP or Latham & Watkins for services rendered on behalf of those former officers because those officers did not provide an undertaking in accordance with the terms of that order.

On September 13, 2003, the Bankruptcy Court entered an order that authorized the Debtors to compensate Crowell & Moring LLP and LeClair Ryan, P.C. as counsel to certain current Spiegel officers in connection with the investigation by the Independent Examiner and proceedings in connection with the Chapter 11 Cases.

3.    The Report of the Independent Examiner

The report of the Independent Examiner was issued on September 5, 2003 and delivered to the Chicago District Court on September 12, 2003. Spiegel filed the report of the

Independent Examiner with the SEC under cover of Form 8-K on September 12, 2003.  The Independent Examiner's report questions Spiegel's accounting policies and procedures regarding, among other matters, the securitization transactions, valuation of its retained interest in their securitization transactions, covenant defaults, internal controls over its credit underwriting process and revenue recognition.  The report also questions the timeliness and adequacy of Spiegel's disclosures about its financial condition and operating results.

4.      Dismissal of KPMG LLP

On November 17, 2003, the Debtors determined to dismiss their independent auditors, KPMG LLP.  The Debtors also announced that they had reached an agreement with BDO Seidman, LLP to serve as their independent public accountants and, on December 18, 2003, obtained Bankruptcy Court approval to employ and retain them.

5.      Modification of the Amended Partial Final Judgment

The Chicago District Court entered an order on December 4, 2003 granting relief in response to Spiegel's motion to modify the Amended Partial Final Judgment and Order of Permanent Injunction and Other Equitable Relief (the "Amended Partial Final Judgment") entered on March 27, 2003.  The Amended Partial Final Judgment was modified previously by the Order Granting Spiegel, Inc. Partial Relief From Permanent Injunction, entered April 15, 2003, which provides, among other things, that Spiegel would not be in contempt of the Amended Partial Final Judgment as a result of its inability to file its periodic reports with the SEC until after the completion of the report of the Independent Examiner appointed by the Chicago District Court, but no later than December 3, 2003.

On November 25, 2003, Spiegel filed with the Chicago District Court a motion requesting an extension until April 7, 2004 to file its 2002 fiscal year annual report on Form 10-K and their three quarterly reports for the 2003 fiscal year on Forms 10-Q with the SEC.  The Order provides that Spiegel and its officers, directors, employees and agents are not, and will not in the future be, in contempt of the Amended Partial Final Judgment as a result of Spiegel's inability to timely file its 2002 Form 10-K and its quarterly reports for the 2003 fiscal year on Forms 10-Q with the SEC.  The Order requires that Spiegel, among other things, continue to comply with the additional reporting obligations on Form 8-K specified in the Order Granting Spiegel, Inc. Partial Relief From Permanent Injunction entered April 15, 2003 and file any past due Form 10-K or Forms 10-Q with the SEC as soon as possible and not later than April 7, 2004.  On April 7, 2004, Spiegel filed with the Chicago District Court a motion requesting relief from that portion of the injunction that requires Spiegel to meet its periodic reporting obligations under the federal securities laws.  On April 29, 2004, the motion for modification of the Partial Final Judgment was granted.

6.      The Section 12(j) Order

On July 26, 2004, Spiegel announced that, on July 23, 2004, the SEC entered an order, pursuant to section 12(j) of the Securities Exchange Act of 1934, as amended, that immediately revokes the registration of the Class A common shares (the "Shares") of Spiegel.

The SEC entered this order pursuant to an Offer of Settlement submitted by Spiegel in connection with the pending lawsuit by the SEC against Spiegel

As a result of the entry of the order, no member of a national securities exchange, broker, or dealer shall make use of the mails or any means of instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, the Shares. A copy of the order is available on the SEC's web site at www.sec.gov.

7.     <u>Future of the SEC Investigation</u>

The SEC's investigation into these matters is ongoing and likely will continue until well after the conclusion of the Chapter 11 Cases. Spiegel intends to continue to cooperate with that investigation to the greatest extent possible. However, Spiegel intends to seek an agreed-upon resolution of the Chicago District Court action prior to the conclusion of the Chapter 11 Cases.

8.     <u>The Federal Securities Class Actions</u>

In December 2002 and January 2003, four lawsuits were filed in the United States District Court for the Northern District of Illinois, Eastern Division against the Debtors and certain of their current and former officers alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. The plaintiffs purport to represent shareholders who purchased Spiegel's common stock between April 24, 2001 and April 19, 2002. The lawsuit was subsequently amended to add certain directors of the Debtors as defendants, and Spiegel is no longer a named defendant. Nonetheless, while the Debtors do have directors' and officers' insurance that they believe will cover any related officer and director expenses related to this matter, it remains possible that such persons may ultimately have valid claims against the Debtors' estates.

L.     <u>The Liquidation of FCNB and Related Events</u>

FCNB is in the process of liquidating its business. FCNB submitted a liquidation plan to the OCC and has begun its formal liquidation. In addition, in March 2003 the Debtors discontinued charging privileges on all of its private-label credit cards. FCNB, in addition to its own bankcard operations, has issued substantially all of the Debtors' private label credit cards and stopped all receivable servicing efforts on June 30, 2003.

FCNB is not a Debtor in the Chapter 11 Cases. However, in light of the fact that Spiegel is the sole shareholder of FCNB and expects to receive a distribution in connection with the liquidation of FCNB, as described in greater detail below, the following is a description of the material events that have taken place since the Petition Date with respect to the liquidation of FCNB.

1.     <u>The FCNB/MBIA Settlement Agreement and the OCC Consent Order</u>

On April 11, 2003, FCNB entered into a settlement agreement with MBIA in the FCNB Action. The terms of the settlement are consistent with the OCC consent order described below. The FCNB Action was dismissed with prejudice. On April 15, 2003, FCNB executed a

stipulation and consent to the issuance of a permanent consent order, accepted by the OCC. The terms of the consent order, dated April 15, 2003, require FCNB to:

- cease performing its duties as servicer of the bankcard and private-label securitization trusts upon the appointment of a successor servicer for each trust no later than June 30, 2003;

- perform the duties and responsibilities of servicer under the relevant servicing agreements until a successor servicer is appointed in accordance with the terms of the consent order;

- withhold, on a daily basis, its servicing fee, calculated in accordance with the terms of the consent order, from the funds it collects;

- deposit its servicing fee in a segregated account designated for this purpose; and

- submit, on a weekly basis, a written progress report from its board of directors to the OCC detailing the actions taken to comply with the terms of the consent order and the results of those actions.

The Debtors have been informed that FCNB has complied with the provisions of the consent order described above. In addition, the trustee of each securitization trust appointed a successor servicer for the securitizations. Cardholder Management Services ("CMS"), a subsidiary of Cardworks, was appointed the successor servicer for the private-label receivables portfolio and assumed servicing responsibilities at the end of June 2003. The Debtors have been informed that The Bank of New York, as securitization trustee, appointed First National Bank of Omaha the successor servicer for the bankcard receivables portfolio at the end of June 2003.

2.  The FCNB Liquidation Plan

In June 2003, FCNB submitted a liquidation plan to the OCC, which supercedes the previous disposition plan approved in November 2002. The terms of the plan require FCNB to cease its credit card servicing and all other operating activities on or before June 30, 2003 and to proceed to final liquidation of its assets and final satisfaction of its liabilities beginning in July 2003. Further, the liquidation plan provides for the appointment of the President of FCNB as liquidating agent, who will assume responsibility for carrying out the plan of liquidation. A formal liquidation notice was issued providing that all claims needed to be received by the liquidating agent by September 14, 2003. The Debtors have been advised that, as of December 2004, FCNB has resolved nearly all of its claims and anticipates completing its liquidation in the first quarter of 2005.

3.  Potential Recovery from the Liquidation of FCNB

Spiegel anticipates receiving a return of intercompany loans and equity of a minimum of $30 million prior to the Effective Date or soon thereafter as a result of the liquidation of FCNB. As the liquidation of FCNB is not complete as of the date of this

Disclosure Statement, there can be no assurance that any such distribution will occur. This statement has been made pursuant to the safe harbor provisions of section 1125 of the Bankruptcy Code that reflect expectations or beliefs concerning future events that invoke risks and uncertainties.

M.    The MBIA Action and Related Securities Litigation

1.    The MBIA Action

MBIA filed a lawsuit (the "MBIA Action") in the United States District Court for the Southern District of New York against certain subsidiaries of the Debtors, including FCNB and SCCIII, on or about September 16, 2003, seeking damages, imposition of a constructive trust, and declaratory relief arising out of several alleged breaches of contract and other conduct by the defendants. MBIA alleged, among other things, that certain amounts were owed to MBIA as a result of certain actions taken by the Debtors with respect to the pay-out events that occurred in March 2003.

On or about November 18, 2003, MBIA filed its Amended Complaint and Jury Demand that, among other things, added SAC as a defendant, and asserted additional factual allegations. In part, the Amended Complaint states that it is an action for damages, imposition of a constructive trust, indemnification, declaratory relief, and injunctive relief arising out of several breaches of contract, fraud, and other conduct by the defendants.

2.    Defense of SAC and SCCIII in the MBIA Action

SAC and SCCIII are wholly owned subsidiaries of Spiegel. Each participated in the securitization transactions described in greater detail in Section III.D.1 of this Disclosure Statement.

FCNB provided its own defense to the MBIA Action. SCCIII and SAC could not do so because they are special purpose entities without funds to pay the defense costs of the MBIA Action. SCCIII and SAC's Charters and By-laws prohibited them from borrowing funds to pay those costs.

Given the substantial assets held by SCCIII, Spiegel determined that it was in the best interests of its estate and creditors to fund SCCIII's and SAC's defense of the MBIA Action. Spiegel obtained Bankruptcy Court approval to do so on December 24, 2003. As of the date of the settlement of the MBIA Action described below, Spiegel had expended over $600,000 to defend SAC and SCCIII in the MBIA Action.

Among SCCIII's assets are two prepetition $15 million demand Promissory Notes payable to SCCIII by Spiegel. Historically, these notes have been carried on Spiegel's books as inter-company debt. There are no material assets recorded for SAC as of December 2004. The liabilities of SAC totaled approximately $1 million at December 2004 and represent primarily accrued expenses.

3.    The Securities Litigation

On December 19, 2003, MBIA, on behalf of the investors in the Spiegel Credit Card Master Note Trust Series 2000-A and the First Consumers Credit Card Master Note Trust Series 2001-A, commenced an action against SHI, Dr. Michael Otto, Otto KG , and certain of Spiegel's directors (the "Securities Litigation") alleging several violations of the Securities Act of 1933 and the Securities Exchange Act of 1934.

4.    Settlement of the MBIA Action and the Securities Litigation

In November 2004, the parties to the MBIA Action and the Securities Litigation reached agreement on the terms of a settlement of MBIA Action and the Securities Litigation. On December 3, 2004, the parties entered into a settlement agreement (the "MBIA Settlement Agreement") subject to the approval of the Bankruptcy Court.  The Settlement Agreement provided for, among other things, the release of approximately $20 million of disputed funds being held in an escrow account to be paid to SAC and the release of MBIA's claims against the Debtors and their affiliates regarding the MBIA Action and the Securities Litigation.  In consideration therefor, the parties agreed not to object to the reimbursement of certain expenses of MBIA from the private-label securitization trusts.  On December 15, 2004, the Bankruptcy Court entered an order authorizing the Debtors to enter into and perform under the MBIA Settlement Agreement.

N.    The Bank Group Plan Presentation

On December 9, 2004, the Debtors made a presentation to certain of the financial institutions who hold claims under the Debtors bilateral and syndicated credit facilities that contained, among other things, (i) a brief history of the Chapter 11 Cases, (ii) an overview of the Eddie Bauer Business, and (iii) restructuring strategies.  In accordance with an order of the Bankruptcy Court entered on December 17, 2003, the creditors attending that meeting executed confidentiality agreements, which, among other things, restricted such creditors from trading their claims.  The Debtors believe that all material information discussed at that meeting is either contained or superceded by the information in this Disclosure Statement.

## VI.    FUTURE BUSINESSES OF THE REORGANIZED DEBTORS

A.    Organizational Structure and Business Operations of the Reorganized Debtors

1.    Organizational Structure of the Reorganized Debtors

Eddie Bauer, Inc. will be the Reorganized Debtors' primary operating company, and Eddie Bauer Holdings will be the parent company of the Reorganized Debtors.  An organization chart of the Reorganized Debtors is shown in **Exhibit B**.  All Debtors that are part of the Eddie Bauer business but are not presently Eddie Bauer subsidiaries will transfer their assets to Eddie Bauer Holdings or one of its subsidiaries.

2.    <u>Business Operations of the Reorganized Debtors</u>

Reorganized Eddie Bauer intends to continue to conduct the Eddie Bauer business essentially as restructured and consolidated during the pendency of the Chapter 11 Cases except for the Debtors which have liquidated pursuant to the Plan.  In addition, the Reorganized Debtors will be subject to fresh-start accounting rules.

Reorganized Eddie Bauer will continue to source, market and distribute premium, high-quality, private label men's and women's apparel, accessories and, field and gear merchandise to customers through its existing channels (stores, catalog and e-commerce).  The Reorganized Debtors will also continue with the licensing and joint venture arrangements described in Section III.C.5 of this Disclosure Statement.  As further described below, Eddie Bauer expects to discontinue operating its home concept over the course of 2005.

As of December 2004, Eddie Bauer employed approximately 11,970 associates, including its back-end services operations.

*a.    Retail Stores*

Reorganized Eddie Bauer's core retail stores will continue to be generally located in upscale regional shopping malls or in high traffic metropolitan areas.  Reorganized Eddie Bauer also will continue to maintain and open stores in certain smaller markets where it believes a concentration of its target customers exists.  As of the Petition Date, Eddie Bauer operated 431 retail stores.

Eddie Bauer closed and liquidated the inventory associated with 88 underperforming stores as part of its restructuring strategy in 2003 and 2004.  Since the Petition Date, as part of its normal-course operations, Eddie Bauer has closed 15 additional stores upon natural expiration of those stores' leases.  Of the total 103 stores closed since the Petition Date, 98 were retail stores.  Eddie Bauer has also opened seven new retail stores since the Petition Date.

As of December 2004, Eddie Bauer operated 340 retail stores, which was comprised of 304 apparel stores in the U.S. and Canada and 36 home concept stores in the U.S. Over the course of 2005, Eddie Bauer expects to close 22 additional retail apparel stores upon the natural expiration of those stores' lease terms and to open approximately 16 new retail apparel stores.  Reorganized Eddie Bauer will, as a part of its normal-course operations, continue to open new apparel stores in advantageous locations and close underperforming stores upon natural expiration of store leases.

Reorganized Eddie Bauer also expects to discontinue operating its home concept over the course of 2005 in order to focus on its core apparel concept.  Comparable same store sales for the home concept were approximately -15% in fiscal 2004.  On February 18, 2005, the Debtors filed a motion with the Bankruptcy Court seeking authority to, among other things, close their Eddie Bauer home stores.  The financial projections shown in **<u>Exhibit F</u>** incorporate the estimated financial impact associated with discontinuing both the retail and direct home concepts.  In the future, Reorganized Eddie Bauer may include key home categories in its portfolio of licensed merchandise.

Approximately 52% of Eddie Bauer's fiscal 2004 net merchandise sales of $1,119 million (unaudited) were generated by its retail channel, which included $48.0 million of sales generated by the retail home concept. As of December 2004, approximately 7,640 associates were employed by Eddie Bauer as retail store associates. The number of employees and labor-hours in retail stores varies seasonally with sales.

b.      Outlet Stores

Reorganized Eddie Bauer outlet stores will continue to be located primarily in outlet malls and value strip centers, generally in areas not serviced by its core specialty retail stores. Reorganized Eddie Bauer's outlet stores also will continue to offer predominantly merchandise sourced exclusively for the outlet stores while also liquidating excess retail inventory. As of the Petition Date, Eddie Bauer operated 102 outlet stores.

Eddie Bauer closed and liquidated the inventory associated with 88 underperforming stores as part of its restructuring strategy in 2003 and 2004. Since the Petition Date, as part of its normal-course operations, Eddie Bauer has closed 15 additional stores upon natural expiration of those stores' leases. Of the total 103 stores closed since the Petition Date, five were outlet stores. Eddie Bauer has opened three new outlet stores since receiving bankruptcy court approval to open new stores in November 2003. Eddie Bauer also opened one outlet store in August 2003, based on a lease entered into prepetition, for a total of four outlet stores opened since the Petition Date.

As of December 2004, Eddie Bauer operated 101 stores, two warehouse stores and one employee-only salvage store. Reorganized Eddie Bauer expects, as part of its normal-course continuing operations, to open new stores in advantageous locations and close underperforming stores upon natural expiration of store leases. Over the course of 2005, Reorganized Eddie Bauer expects to close one additional outlet store upon the natural expiration of that store's lease term and to open approximately eight new outlet stores.

Approximately 21% of Eddie Bauer's fiscal 2004 net merchandise sales of approximately $1.1 billion (unaudited) was generated by its Outlet channel. As of December 2004, approximately 2,160 associates were employed by Eddie Bauer as outlet store associates. The number of employees and labor hours in Outlet stores varies seasonally with sales.

c.      Direct (Catalog and E-commerce)

Reorganized Eddie Bauer's direct business will continue to consist of its catalog and Internet operations and to offer a larger style, color and size assortment than its retail stores. In fiscal 2004, Eddie Bauer distributed approximately 94 million catalogs to existing and prospective customers and its e-commerce site had over 40 million customer visits.

Reorganized Eddie Bauer will continue to operate two main websites, www.eddiebauer.com and, www.eddiebaueroutlet.com. Eddie Bauer's websites have won several industry awards for performance and user experience. Reorganized Eddie Bauer also will continue its email contact strategy, which provides the company a low-cost means of contact customers who elect to receive the service.

Historically, Eddie Bauer has issued approximately 48 major media and clearance catalogs annually. Reorganized Eddie Bauer will continue its catalog circulation program and to operate its customer contact center, offering its customers both the telephone and Internet as a means of placing orders and providing customer service.

Reorganized Eddie Bauer also will continue to pursue new customers actively through initiatives such as list rentals, utilizing names of its store customers and e-commerce marketing programs. Eddie Bauer maintains an extensive customer file database by which circulation and marketing data are analyzed. This database allows Eddie Bauer to continually refine its circulation and mailing strategy to generate demand from its existing customers and prospect for new customers.

Over the course of 2005, Reorganized Eddie Bauer expects to discontinue operating its home concept in order to focus on its core apparel concept. Year-over-year sales performance in the direct Home concept was approximately -21% in fiscal 2004. The financial projections shown in **Exhibit F** incorporate the estimated financial impact associated with discontinuing both the retail and direct home concepts. In the future, Reorganized Eddie Bauer may include key home categories in its portfolio of licensed merchandise.

Approximately 27% of Eddie Bauer's fiscal 2004 net merchandise sales of $1,119 million (unaudited) were generated by its direct channel, which included $25 million of sales generated by the direct home concept.

### d. Licensing

Reorganized Eddie Bauer will continue to capitalize on select licensing opportunities, including a rich history with Ford Motor Company, which uses the Eddie Bauer name and logo on special series Ford vehicles. Eddie Bauer uses licensing agreements to establish new relationships, enhance brand awareness, attract new customers, utilize new distribution channels and manufacture new products. Existing licenses include The Lane Company (a division of Furniture Brands International), American Recreation Products, Inc. and Cosco, Inc., a manufacturer of infant and juvenile car seats and strollers, among others.

In fiscal 2004, Eddie Bauer generated licensing royalties of approximately $18.5 million (unaudited).

### e. Joint Ventures

Eddie Bauer currently maintains two joint venture relationships in Japan and Germany, both of which it entered into in the mid-1990s. As of December 2004, Eddie Bauer Japan operated 35 retail stores, nine outlet stores, a direct business with six major catalogs annually and an Internet site. As of December 2004, Eddie Bauer Germany operated 10 retail stores, one outlet store, a direct business with eight major catalogs annually and an Internet site.

Reorganized Eddie Bauer expects to continue supporting its joint ventures after the Effective Date. Eddie Bauer provides each joint venture with access to its full product line, sourcing network, marketing materials, catalog photography/page layouts and general operational knowledge. For these services, Eddie Bauer receives a royalty payment plus its

equity share in the earnings of each joint venture. Joint venture partners can develop new products but Eddie Bauer has the contractual right to approve all products and marketing materials. The majority of each of the joint venture's assortments has historically been the same as the assortment in the United States.

In fiscal 2004, Eddie Bauer generated joint venture royalties of approximately $6.3 million (unaudited) and its equity share in its joint ventures generated income of approximately $3.6 million (unaudited).

### f. Private Label Credit

Subsequent to the shut down of the FCNB private-label credit program, Eddie Bauer entered into a new private label agreement with Alliance Data to offer private label credit to Eddie Bauer customers. Eddie Bauer is focused on rebuilding its private label credit customer file in order to grow sales, maintain brand traction and build customer loyalty. Since the agreement's inception in May 2003, Eddie Bauer has steadily grown its private label credit customer file from zero customers to approximately 977,000 active customer accounts as of December 2004. During Eddie Bauer's fiscal month of December 2004, private label credit sales as a percentage of total merchandise sales were approximately 12%. Reorganized Eddie Bauer will continue using the Alliance Data credit agreement as described in Section V.E.1.g.(2) of this Disclosure Statement.

### g. Sourcing

After the Effective Date, Reorganized Eddie Bauer's sourcing operation will effectively continue in its current manner. Eddie Bauer's network consists of approximately 500 vendors (apparel, accessories, field and gear and home), approximately half of which are handled through indirect vendor relationships. On a purchase value basis, in fiscal 2004, Eddie Bauer sourced approximately 81% of its merchandise through its main sourcing agents, EBI and EBI America, while the remainder was sourced through direct-managed vendors (15%) and other buying agents (4%).

EBI maintains an office in Hong Kong, China and EBI America maintains an office in Miami, FL. Their sole customer is Eddie Bauer. EBI and EBI America provide various sourcing services for Eddie Bauer including vendor screening, quality control, labor compliance reviews, negotiation of payment terms, control over product delivery times, product development and vendor stability pursuant to the Buying Agency Agreements. The Buying Agency Agreements are on a commission-rate basis and are automatically renewed on March 1st of each year. Eddie Bauer can provide a one-year termination notice on February 28th of each year.

Eddie Bauer's top 30 vendors supply approximately 48% of its products, and no single vendor supplies more than 4% of Eddie Bauer's total vendor purchases. Eddie Bauer's top 30 vendors have supplied Eddie Bauer for an average of over seven years. Approximately 20% of Eddie Bauer's total vendors change annually. Eddie Bauer retains close control over its product quality, design and costs by directly negotiating product cost and establishing vendor operating policies.

### h. Back Office Support

Reorganized Eddie Bauer's back-end operations will include the Groveport Facility and an information technology facility in Westmont, Illinois ("<u>Westmont Facility</u>"), both of which will continue to be owned. Reorganized Eddie Bauer also will continue to lease a retail distribution center in Vaughn, Ontario, Canada ("<u>Vaughn Facility</u>"), a customer contact center in Saint John, New Brunswick, Canada ("<u>Saint John Contact Center</u>") and a small portion of the Fisher Road Facility.

#### (1) Logistics Support

Distribution and Fulfilment Services, Inc. (DFS) ("<u>DFS</u>"), which, after the Effective Date, will be a wholly owned subsidiary of Reorganized Eddie Bauer, will continue to support U.S. distribution, fulfillment and inbound/outbound transportation requirements. As of December 2004, DFS operated two main facilities: the Groveport and Fisher Road Facilities.

The Groveport Facility, which is owned and consists of approximately 1.8 million square feet, handles logistics and distribution for Eddie Bauer's U.S. retail, outlet and direct operations. The Fisher Road Facility is leased and handles logistics and distribution for Eddie Bauer's separate ship (large) items. DFS' lease is for approximately 650,000 square feet of this facility.

Due to excess space in its Groveport Facility, Reorganized Eddie Bauer expects to terminate its lease of the Fisher Road Facility in October 2005 after consolidating all U.S. logistics and fulfillment functions in to the Groveport Facility. Following the termination of its separate-ship transition service obligations to the Spiegel Catalog purchasers, DFS has subleased approximately 100,000 square feet of the Fisher Road facility to the Spiegel Catalog purchasers through the planned termination date of the lease in October 2005. Reorganized Eddie Bauer expects to continue to lease the outlet/salvage store at the Fisher Road location.

Reorganized Eddie Bauer's Canadian logistics requirements currently will continue to be supported by the Vaughn Facility. The Vaughn Facility consists of 82,000 square feet and provides distribution services for Eddie Bauer's Canadian retail stores. The Vaughn Facility's lease expires in April 2007.

As of December 2004, approximately 800 associates were employed by the Groveport, Fisher Road and Vaughn Facilities. The number of employees and labor-hours are adjusted with processing volume and, therefore, varies seasonally with sales.

#### (2) Saint John Contact Center

Reorganized Eddie Bauer will continue to operate the Saint John Call Center to support its customer contact requirements. Eddie Bauer supported approximately 3.4 million customer calls (17.1 million minutes) in 2004. The center has 396 seats in 37,815 square feet, and its lease expires in May 2011.

As of December 2004, approximately 610 associates were employed in the Saint John Contact Center. The number of employees is adjusted with call volume and, therefore, varies seasonally with sales.

(3) Eddie Bauer Information Technology

Eddie Bauer Information Technology will continue to manage all systems and network services for Reorganized Eddie Bauer, including those related to product development, merchandising, marketing, planning, store operations, sourcing, finance, accounting, call centers, Internet, inventory and order fulfillment. The information systems and network services are currently and will continue to be operated out of the owned Westmont Facility.

As of December 2004, approximately 160 associates were employed by the Westmont Facility. Approximately 135 of these employees are designated as the go-forward team and will continue as employees of Reorganized Eddie Bauer. Transition employees are expected to be terminated in February 2005. Eddie Bauer will provide severance and other benefits to affected employees.

*i.* *Corporate Headquarters*

Reorganized Eddie Bauer currently resides in a 241,511 square foot corporate headquarters campus in Redmond, WA, that is leased. The facility was sold as part of the restructuring plan to Microsoft Corp., and, as part of the sale agreement, Reorganized Eddie Bauer entered into a three-year lease agreement with the option to terminate in two years without penalty.

The following functions are performed at Eddie Bauer's corporate headquarters:

- Merchandising & Sourcing

- Marketing & Creative Services

- Store Operations & Field Management

- International/Joint Venture Management

- Real Estate & Corporate Services

- Finance

- Legal

- Human Resources

- Corporate Affairs

- Miscellaneous Sales, Service and Administrative

As of December 2004, Eddie Bauer employed approximately 600 associates at its corporate headquarters, which included approximately 40 associates performing regional field management functions.

B.        Projected Financial Information

The Debtors have prepared the projections for the years December 31, 2005 through January 3, 2009, which are attached hereto as **Exhibit F** (the "Projections") in connection with the development of the Plan.  The projections include a pro-forma reorganized balance sheet at May 31, 2005, including estimated reorganization and fresh start adjustments.

THE PROJECTIONS ASSUME THAT THE PLAN WILL BE SUCCESSFULLY IMPLEMENTED ON THE TERMS DESCRIBED IN THIS DISCLOSURE STATEMENT.  THE PROJECTIONS, WHICH WERE PREPARED AS DESCRIBED HEREIN, ARE SUBJECT TO BUSINESS, ECONOMIC AND OTHER UNCERTAINTIES INHERENT IN DEVELOPING PROJECTIONS, AS DISCUSSED BELOW.

The Projections have been made pursuant to the safe harbor provisions of section 1125 of the Bankruptcy Code that reflect expectations or beliefs concerning future events that invoke risks and uncertainties.  Any statements contained herein (including, without limitation, statements to the effect that the Debtors or their management or board of directors "believe," "anticipate," "expect," "plan," "estimate," "project," "will be," "will continue," "will likely result" and similar expressions) that are not statements of historical fact should be considered forward-looking statements.  Forward-looking statements and the Debtors' plans and expectations are subject to a number of risks and uncertainties that could cause actual results to differ materially from those expressed in any forward-looking statements made by, or on behalf of, the Debtors, or their management or board of directors.  The assumptions underlying the Projections and forward-looking statements are subject to significant business, economic and competitive uncertainties and contingencies, including, but not limited to, those set forth in the Risk Factors set forth below, many of which are beyond the Debtors' control.  These other uncertainties, contingencies and factors include but are not limited to, factors relating to Eddie Bauer's ability to successfully implement its business plan; general consumer spending levels; regulatory and legal developments, the cost of being a publicly traded company; and weather conditions, including those which affect consumer buying patterns.  Eddie Bauer does not undertake any obligation to release publicly the results of any revisions to these forward-looking statements to reflect events or circumstances after the date such statements are made.  There generally will be a difference between projections of future performance and actual results because certain events and circumstances may not occur as expected.  These differences could be material.

All forward-looking statements are cautionary statements and the Debtors cannot assure that the anticipated results or developments will be realized or that they will have the expected effects upon our business and operations.  The forward-looking statements contained herein or that are made by the Debtors or others authorized to speak for the Debtors speak only as to the date of this Disclosure Statement, or if not contained in this Disclosure Statement, as to the date when made, and we do no undertake to update these risk factors or such forward-looking statements.

1.      Risk Factors

        a.      *Adverse Retail Industry Conditions*

        Reorganized Eddie Bauer will sell the majority of its products directly to its customers, predominantly in shopping malls.  There can be no assurance that Reorganized Eddie Bauer will not be adversely affected by general retail industry conditions, such as weather, mall traffic, consumer economy, among others, in the future.

        b.      *Changing Fashion Trends*

        The apparel industry is subject to rapidly changing consumer demands and preferences.  The Debtors believe that Reorganized Eddie Bauer's success depends on its ability to anticipate, gauge and respond in a timely manner to changing consumer demands and fashion trends.  There can be no assurance that Reorganized Eddie Bauer will be successful in this regard.  If fashion trends shift away from Reorganized Eddie Bauer's products, or if Reorganized Eddie Bauer otherwise misjudges the market for its product lines, Reorganized Eddie Bauer may be faced with conditions that could have a negative effect on Reorganized Eddie Bauer's financial condition and results of operations.

        c.      *Substantial Competition*

        The Debtors' products compete with those offered by many specialty retailers, department stores and mass market/value stores.  The Debtors' products compete primarily on the basis of quality, price, brand perception, value and relevance to the customer.  Many of the Debtors' competitors have a larger store presence and/or greater financial, manufacturing and distribution resources than the Debtors.  If other retailers become more successful in competing with Reorganized Eddie Bauer, it could have a material adverse effect on Reorganized Eddie Bauer's businesses, results of operations and financial condition.

        d.      *Fluctuations in Price, Availability and Quality of Raw Materials*

        The principal fabrics used in the Debtors' apparel consist of cotton, wool, silk, synthetic and cotton-synthetic blends of fabrics and yarns.  The price paid for these fabrics is mostly dependent on the market prices for the raw materials used to produce them, namely cotton, wool, silk, rayon and polyester.  Depending on a number factors, including crop yields and weather patterns, the market price of these raw materials may fluctuate significantly.  While raw materials are available to Reorganized Eddie Bauer and its vendors from various sources of supply, any disruption in Reorganized Eddie Bauer's and its vendors' abilities to obtain raw materials of usable quality in sufficient quantity and price could have a material adverse effect on Reorganized Eddie Bauer's businesses, operating results, and financial condition.

        e.      *International Sourcing Operations*

        Reorganized Eddie Bauer's ability to successfully source merchandise in foreign countries will depend on many factors beyond its control.  Sourcing in foreign countries will require Reorganized Eddie Bauer to order products further in advance to account for transportation time.  If Reorganized Eddie Bauer overestimates customer demand, it may have to

hold goods in inventory and may be unable to sell these goods at the same margins as in the past. If Reorganized Eddie Bauer underestimates customer demand, it may be under-inventoried and may miss sales.

Other problems Reorganized Eddie Bauer may encounter by sourcing in foreign countries include, but are not limited to, work stoppages, transportation delays and interruptions, delays and interruptions from natural disasters, political instability, economic disruptions, expropriation, nationalization, imposition of tariffs, imposition of import and export controls and changes in government policies.

### f. Relationships with Sourcing Agents, Suppliers and Vendors

In order to maintain sufficient product flow throughout the Chapter 11 Cases, the Debtors have been effectively pre-paying or paying "cash on delivery" to the majority of their suppliers and vendors through a vendor payment services program. After the Effective Date, the Reorganized Debtors expect to continue their sourcing agent and vendor payment services agreement essentially as conducted by the Debtors through the pendency of the Chapter 11 Cases. While the Debtors have not experienced any significant disruption in their relationships with their sourcing agents, suppliers or vendors, Reorganized Eddie Bauer may have difficulty maintaining existing or creating new relationships with suppliers or vendors as a result of the Chapter 11 Cases. There can be no assurance that Reorganized Eddie Bauer's suppliers, vendors or its sourcing agents will continue to perform in a consistent manner.

### g. Import Restrictions

Reorganized Eddie Bauer's import operations may continue to be subject to bilateral textile agreements between United States and a number of other countries. Agreements exist which establish quotas for the amount and type of goods that can be imported into the United States from these countries. These agreements also allow the United States, in certain circumstances, to impose restraints at any time on the importation of additional or new categories of merchandise. Though quota restrictions are generally supposed to disappear in 2005, they may be reinstated at any time. Future bilateral textile agreements may or may not contain similar restraints.

In many cases the Debtors' imported products are also subject to U.S. or Canadian customs duties. The United States and Canada and the countries from which Reorganized Eddie Bauer sources its products may adjust existing or impose new duties, tariffs or other restrictions. There can be no assurance that any adjustments would benefit Reorganized Eddie Bauer. Though trade agreements exist with certain designated countries, there is no guarantee that these agreements will exist in the future. The United States may also withdraw the "most favored nation" status of certain countries which could result in the imposition of higher tariffs on products imported from these countries. Any of these changes could result in the imposition of higher tariffs on imported products and could have a material adverse effect on Reorganized Eddie Bauer's business, results of operations and financial condition.

Subsequent to the terrorist attacks in the United States on September 11, 2001, United States Customs began to evaluate its screening and security procedures. There can be no

assurance that future procedures imposed will not impair Reorganized Eddie Bauer's ability to import products in a timely and cost-efficient manner.

### h.    Fluctuations in Foreign Exchange Rates

Fluctuations between the U.S. dollar and the currencies of each of the countries in which the Debtors operate have affected and will continue to affect the results of international operations reported in U.S. dollars and the value of such operations' net assets reported in U.S. dollars.  The results of operations and financial condition of Reorganized Eddie Bauer's businesses will be affected by the relative strength of the currencies in countries where its products are sold.  Reorganized Eddie Bauer's results of operations and financial condition may be adversely affected by fluctuations in foreign currencies and by translations of the financial statements of Reorganized Eddie Bauer's foreign subsidiaries from local currencies into U.S. dollars.

### i.    International Joint-Venture Operations

Eddie Bauer provides its joint venture partners with access to its full product line, sourcing network, marketing materials, catalog photography/page layouts and general operational knowledge.  For these services, Eddie Bauer receives a royalty payment plus its equity share in the earnings of each joint venture.  Eddie Bauer does not directly manage or control the sales, marketing or operational execution of its joint ventures partners.  Reorganized Eddie Bauer's results of operations and financial condition may be adversely affected by its joint venture partners' inability to market and sell merchandise and operate the business effectively and in a manner consistent with its projections.

### j.    Licensing Risks

Eddie Bauer currently receives a significant royalty revenue stream as a result of its arrangements with third parties which are licensed to manufacture, distribute and sell merchandise carrying the Eddie Bauer brand name.   The inability of these third-party licensees to perform as projected and consistent with the terms of their agreements could have a material adverse effect on Reorganized Eddie Bauer's businesses, results of operations and financial condition.

Certain of Eddie Bauer's licensing agreements with third parties will expire by their terms over the next several years.  There can be no assurance that Reorganized Eddie Bauer will be able to negotiate and conclude either new licensing agreements or extensions of existing licensing agreements on economically favorable terms.

### k.    Trademark Risks

Reorganized Eddie Bauer's use of its trademarks may subject Reorganized Eddie Bauer to claims or challenge.  The Debtors use many trademarks and product designs in their businesses, many of which have been registered with the United States Patent and Trademark Office.  The Debtors believe these registered and common law trademarks, designs and other proprietary rights are important to Reorganized Eddie Bauer's competitive position and success.

The use and registration of the Debtors' trademarks, patents and product designs may be challenged periodically.

Despite efforts to the contrary, Reorganized Eddie Bauer's trademarks, patents, designs and proprietary rights may violate the proprietary rights of others. If any of Reorganized Eddie Bauer's trademarks or other proprietary rights are found to violate the proprietary rights of others, or are subjected to some other challenge, there can be no assurance that Reorganized Eddie Bauer will be permitted to continue using these particular trademarks or other proprietary rights. Furthermore, if Reorganized Eddie Bauer is sued for alleged infringement of another's proprietary rights, the party claiming infringement might have greater resources than Reorganized Eddie Bauer to pursue its claims and Reorganized Eddie Bauer could be forced to incur substantial costs to defend the litigation. Moreover, if the party claiming infringement were to prevail, Reorganized Eddie Bauer could be forced to discontinue the use of the related trademark, patent or design and/or pay significant damages, or to enter into expensive royalty or licensing arrangements with the prevailing party.

Additionally, Reorganized Eddie Bauer may experience difficulty in effectively limiting unauthorized use of its trademarks, patents and product designs, worldwide. Unauthorized use of such trademarks or other proprietary rights, particularly, but not limited to, third-party business representation using Eddie Bauer trademarks and/or the manufacturing and distribution of unauthorized product displaying Eddie Bauer trademarks, may cause significant damage to the Eddie Bauer brand name and its ability to effectively represent itself to its agents, suppliers, vendors and/or customers. While Reorganized Eddie Bauer will, to the best of its ability, enforce its trademark and patent authority, there can be no assurance Reorganized Eddie Bauer is adequately protected in all countries or that Reorganized Eddie Bauer will prevail when defending its trademark and proprietary rights.

### l.     Real Estate Negotiations

Eddie Bauer's real estate negotiations greatly affect both its ability to generate sales as well as its ability to control expense. The ability to maintain and increase the profitability of existing stores as well as profitably open and operate new stores is dependent on the availability of suitable store locations, Eddie Bauer's financial resources, Eddie Bauer's ability to control the operational aspects and personnel requirements of its stores and the landlord's willingness to negotiate. Throughout the Chapter 11 Cases, the Debtors have renegotiated lease terms and closed underperforming stores. Reorganized Eddie Bauer's results of operations and financial condition may be adversely affected by its inability to negotiate new store leases or negotiate extensions of existing leases on economically favorable terms or control the sales and operational performance of its existing or new stores. Reorganized Eddie Bauer expects to assume leases for existing stores as part of the Plan.

### m.     Back-end Operations

As part of their restructuring plan, the Debtors have altered their back-end operations (information services, logistics and contact center support) as they existed prepetition to support Eddie Bauer on a standalone basis. The systems, networks, facilities and other infrastructure associated with these back-end functions were originally designed to support

multiple merchant division requirements. No assurance can be given that Reorganized Eddie Bauer will be able to execute its future back-end operations with an acceptable level of efficiency, quality, cost or redundancy. Since many back-end activities are perceptible to Reorganized Eddie Bauer's customers, differences in future operational performance could have a material adverse effect on Reorganized Eddie Bauer's businesses, results of operations and financial condition.

### n. Dependence on Key Personnel

The Debtors believe that Reorganized Eddie Bauer's success will be dependent upon Reorganized Eddie Bauer's ability to attract and retain skilled senior executives, managers and other personnel. Since the Petition Date, the Debtors have been able to retain many of their key employees through retention programs and have attracted new employees to several key positions. However, no assurance can be given that Reorganized Eddie Bauer will be able to continue to attract and retain such personnel in the future. Professional search firms have been engaged to identify candidates for required positions, as well as for directors of Reorganized Eddie Bauer.

### o. Executory Contracts

The assumption of any executory contracts or unexpired leases, including store leases, is subject to the entry of the Confirmation Order by the Bankruptcy Court or other order of the Bankruptcy Court authorizing assumption of such executory contracts or unexpired leases. There can be no assurance that Reorganized Eddie Bauer will be successful in its efforts to assume executory contracts or unexpired leases.

## C. Executive Officers and Directors of the Reorganized Debtors

### 1. Description of Directors and Officers of the Reorganized Debtors

William Kosturos, the Debtors' current Chief Restructuring Officer/Interim Chief Executive Officer will be returning to his restructuring advisory firm, Alvarez & Marsal, Inc., upon the consummation of the Debtors' reorganization in the Chapter 11 Cases, and after a period in which he will ensure a smooth and orderly transition to senior management. Eddie Bauer's current senior management, as set forth in Section V.H.2 of this Disclosure Statement, is expected to remain with the Reorganized Debtors. Professional search firms have been engaged to identify internal and external candidates for vacant senior management positions, as well as for directors of Eddie Bauer Holdings and the Reorganized Debtors.

Pursuant to the terms of the Plan, the Debtors will file with the Bankruptcy Court no later than ten days prior to the Voting Deadline on the Plan, a schedule setting forth (i) the identity of the proposed senior officers and directors of Eddie Bauer Holdings and (ii) the identity and compensation of any insiders to be retained or employed by Eddie Bauer Holdings. On and after the Effective Date, each Reorganized Debtor will be governed in accordance with such Reorganized Debtor's Certificate of Incorporation.

2. <u>Management Incentives for Directors and Officers of the Reorganized Debtors</u>

Pursuant to Section 7.14 of the Plan, or as soon as practicable after the Effective Date, Eddie Bauer Holdings will adopt a stock incentive stock incentive plan (the "<u>Management Stock Incentive Program</u>"), pursuant to which, among other things, Eddie Bauer Holdings will reserve 2.1 million shares of the Eddie Bauer Holdings Common Stock for award to certain members of the management and directors of the Eddie Bauer Holdings and its subsidiaries, on a date and in a manner to be determined in the sole discretion of the Board of Directors of Eddie Bauer Holdings.

D. <u>Creditor Trust</u>

As is described more fully in Section VII.H.9 of this Disclosure Statement, assets of the Debtors that are not part of the Eddie Bauer business will be put into the Creditor Trust and distributed to Holders of Allowed General Unsecured Claims in accordance with the terms of the Plan and the Creditor Trust Agreement. These assets will include (i) the Creditor Trust Debtors, (ii) the Debtors' claims against certain of their former officers, directors and professionals (other than those included in the Released Parties except to the extent required for the Creditor Trust to add necessary parties as provided by Section 2.6 of the Plan), (iii) cash to meet the projected expenses of the Creditor Trust, (iv) the Securitization Note, and (v) certain unresolved claims. An organization chart of the Creditor Trust Debtors is shown in **Exhibit C**. The Creditor Trust will manage such assets for the benefit of Holders of Allowed General Unsecured Claims and distribute the proceeds as provided in the Creditor Trust Agreement, which will be filed not less that ten days prior to the Voting Deadline or such other date established by the Bankruptcy Court.

All Creditor Trust Debtors will be liquidated as soon as practicable after the Effective Date, as determined by the Managing Trustee and the Plan Oversight Committee in a manner consistent with the Creditor Trust Agreement.

## VII. SUMMARY OF THE PLAN OF REORGANIZATION

A. <u>Introduction</u>

The following summary and other descriptions in this Disclosure Statement are qualified in their entirety by reference to the provisions of the Plan and its exhibits, a copy of which is annexed hereto as **Exhibit A**. Each Holder of a Claim or Equity Interest is urged to carefully review the terms of the Plan and its exhibits. In the event of any inconsistency between the provisions of the Plan and the summary contained herein, the terms of the Plan shall govern. Moreover, all capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings set forth in the Plan.

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan and (iii) contains other provisions necessary to the reorganization or liquidation of the debtor. Under the Bankruptcy Code, "claims" and "equity interests" are classified rather than "creditors" and "shareholders" because such entities may hold claims or equity interests in more than one class.

For purposes of this Disclosure Statement, the term "<u>Holder</u>" refers to the holder of a Claim or Interest, respectively, in a particular Class under the Plan.

A chapter 11 plan may specify that certain classes of claims or equity interests are either to be paid in full upon effectiveness of the plan or are to remain unchanged by the plan. Such classes are referred to as "unimpaired," and, because of such favorable treatment, the holders in such classes are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution or property or retain any claim against a debtor. Such classes are deemed to have rejected the plan and, therefore, need not be solicited to vote to accept or reject the plan.

B.      <u>Securities to Be Issued Pursuant to the Plan and Other Post-Reorganization Indebtedness</u>

1.      <u>Reorganization Value</u>

The Debtors have been advised by MBY with respect to the range of the estimated reorganization value of Eddie Bauer Holdings. The estimated midpoint reorganization value of Eddie Bauer Holdings was assumed to be approximately $865 million as of an assumed Effective Date of May 31, 2005. The midpoint reorganization equity value, which takes into account the estimated debt balances of the Reorganized Debtors at the Effective Date, was estimated by MBY to be approximately $565 million. The foregoing reorganization equity value (ascribed as of the date of this Disclosure Statement) reflects, among other factors discussed below, current financial market conditions and the inherent uncertainty as to the achievement of the Projections.

Based on the assumed reorganization equity value set forth above, the approximately 30 million shares of Eddie Bauer Holdings Common Stock to be issued to the holders of Allowed Claims under the Plan, the midpoint equity value per share is estimated to be approximately $18.83. The foregoing valuations also reflect a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, the forecasts reflected in the Projections, the amount of available cash, market conditions, Reorganized Eddie Bauer's ability to utilize NOLs, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.

In preparing the estimated reorganization equity value, MBY: (i) reviewed certain historical financial information of Eddie Bauer for recent years and interim periods; (ii) reviewed certain internal financial and operating data of Eddie Bauer and evaluated financial projections relating to its businesses and prospects; (iii) met with certain members of senior management of Eddie Bauer to discuss Reorganized Eddie Bauer's operations and future prospects; (iv) reviewed publicly available financial data and considered the market values of public companies that MBY deemed generally comparable to Reorganized Eddie Bauer; (v) reviewed the financial terms, to the extent publicly available, of certain acquisitions of companies that MBY believes were comparable to Eddie Bauer; (vi) considered certain economic and industry information relevant to Reorganized Eddie Bauer; (vii) considered the tax attributes of Reorganized Eddie Bauer, including the utilization of NOLs; and (viii) conducted

such other analyses as MBY deemed appropriate.  Although MBY conducted a review and analysis of Reorganized Eddie Bauer's businesses, operating assets and liabilities, and business plans, MBY assumed and relied on the accuracy and completeness of all (a) financial and other information furnished to it by the Debtors and by other firms retained by the Debtors and (b) publicly available information.  In addition, MBY did not independently verify the assumptions underlying the Projections in connection with such valuation.  No independent evaluations or appraisals of the Debtor's assets were sought or were obtained in connection therewith.

Estimates of reorganization equity value do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were to be sold.  The estimates of reorganization equity value prepared by MBY assume that the Reorganized Debtors will continue as the owner and operator of their businesses and assets.  Such estimates were developed solely for purposes of formulation and negotiation of a plan of reorganization and analysis of implied relative recoveries to creditors thereunder.  Such estimates do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different from the amounts set forth herein.  Such estimates reflect computations of the estimated reorganization equity value of Reorganized Eddie Bauer through the application of various valuation techniques, including, among others:  (i) a comparable company analysis, in which MBY analyzed the enterprise value of public companies that MBY deemed generally comparable to Reorganized Eddie Bauer as a multiple of earnings before interest, taxes, depreciation and amortization ("EBITDA") and then applied multiples provided by such analysis to the projected EBITDA of Eddie Bauer Holdings; (ii) a discounted cash flow analysis, in which MBY, using a weighted average cost of capital, computed the present value of free cash flows and terminal value of Reorganized Eddie Bauer; and (iii) a comparable acquisitions analysis, in which MBY analyzed the financial terms of certain acquisitions of companies that MBY believed were comparable to Reorganized Eddie Bauer and then applied the EBITDA multiples provided by such analysis to the projected EBITDA of Eddie Bauer Holdings.  An estimate of reorganization equity value is not entirely mathematical, but rather it involves complex considerations and judgments concerning various factors that could affect that value of an operating business.  Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business.  As a result, the estimate of reorganization equity value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein.  Because such estimates are inherently subject to uncertainties, none of the Debtors, MBY nor any other person assumes responsibility for their accuracy.  Depending on the results of the Debtors' operations or changes in the financial markets, MBY's valuation analysis, as of the Effective Date, may differ from that disclosed herein.

In addition, the valuation of newly-issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holding of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors that generally influence the prices of securities.  Actual market prices of such securities also may be affected by the Debtors' history in chapter 11, conditions

affecting the Debtors' competitors or the industry generally in which the Debtors participate or by other factors not possible to predict. Accordingly, the reorganization equity value estimated by MBY does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets. The equity value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value. Such trading value may be materially different from the reorganization equity value ranges associated with MBY's valuation analysis. Indeed, there can be no assurance that a trading market will develop for the Eddie Bauer Holdings Common Stock.

2.   Eddie Bauer Holdings Common Stock

As of the Effective Date, Eddie Bauer Holdings will be authorized to issue 100 million shares of Eddie Bauer Holdings Common Stock, par value $0.01 per share, of which (i) approximately 30 million shares will be distributed to holders of Allowed Claims in Class 4; and (ii) 2.1 million shares will be reserved for issuance under the Management Stock Incentive Program.

The holders of Eddie Bauer Holdings Common Stock will be entitled to one vote for each share held of record on all matters submitted to a vote of stockholders and will not have cumulative voting rights. Holders of Eddie Bauer Holdings Common Stock will be entitled to receive ratably such dividends as may be declared by Eddie Bauer Holdings' Board of Directors out of funds legally available for payment of dividends. In the event of a liquidation, dissolution or winding up of Eddie Bauer Holdings, holders of Eddie Bauer Holdings Common Stock will be entitled to share ratably in all assets remaining after payment of liabilities. Holders of Eddie Bauer Holdings Common Stock will have no preemptive, subscription, redemption or conversion rights.

Eddie Bauer Holdings will seek to have the Eddie Bauer Holdings Common Stock listed on an exchange as soon as practical after the Effective Date.

Creditors who, pursuant to the Plan, receive less than 4.75% of the Eddie Bauer Holdings Common Stock pursuant to the Plan will be restricted from selling Eddie Bauer Holdings Common Stock, without prior notice to, and approval from, Eddie Bauer Holdings, to any person who holds, or would accumulate as a result of the sale, 4.75% or more of the outstanding shares. Stock ownership is determined under complex attribution rules pursuant to the Internal Revenue Code and generally includes stock held directly, through intervening entities and by certain related parties.

Creditors who receive 4.75% or more of the Eddie Bauer Holdings Common Stock pursuant to the Plan will be restricted from purchasing any additional Eddie Bauer Holdings Common Stock, without prior notice to and approval from Eddie Bauer Holdings, and would be restricted from selling Eddie Bauer Holdings Common Stock, without such prior notice and approval, to any person who holds, or would accumulate as a result of the sale, 4.75% or more of the outstanding shares. Furthermore, such holders will be required to place 10% of their shares into escrow with Eddie Bauer Holdings, pursuant to an escrow arrangement that will be included the Plan Supplement, and the prior notice and approval restrictions would apply to such escrowed shares.

Eddie Bauer Holdings could deny approval for any proposed sale if, in its reasonable assessment, the sale could jeopardize realization of the full benefits of unrestricted use of the net operating losses of Eddie Bauer Holdings or its subsidiaries.

3.    The New Eddie Bauer Holdings Working Capital Facility

In connection with the Second Amended DIP Facility, the Debtors negotiated the Working Capital Facility that will become effective on or after a confirmation of reorganization. The Working Capital Facility will be a $150 million revolving credit facility, including the ability to issue letters of credit. Borrowings under the Working Capital Facility will bear interest at a floating rate based on the London Interbank Offered Rate plus a specified margin to be determined based upon the amount of Eddie Bauer borrowings outstanding. Borrowings under the Working Capital Facility will be secured by a first lien on all inventory and receivables and a second lien on all other assets. The projections assume that there will be no borrowings under the Working Capital Facility as of the Effective Date.

4.    Eddie Bauer Holdings Senior Debt Facility or Creditor Notes

On the Effective Date, or as soon as practicable thereafter, Eddie Bauer Holdings will enter into definitive documentation with respect to the $300 million Senior Debt Facility with the respective lender(s) thereunder. The principal terms and conditions with respect to such financing arrangements will be included in the Plan Supplement; provided, however, that Eddie Bauer Holdings may, in consultation with the Creditors' Committee, elect not to enter definitive documentation with respect to the Senior Debt Facility if it makes a determination that then existing market conditions are such that entering into the Senior Debt Facility would not be favorable to Eddie Bauer Holdings or in the best interest of Eddie Bauer Holdings and its shareholders. In the event that Eddie Bauer Holdings enters into definitive documentation with respect to the Senior Debt Facility, then, on the Effective Date, Eddie Bauer Holdings will borrow funds thereunder which funds will be distributed to Holders of Allowed General Unsecured Claims.

In the event that Eddie Bauer Holdings elects, after consultation with the Creditors' Committee and after making the determination described in Section 7.6(a) of the Plan, not to enter into definitive documentation with respect to the Senior Debt Facility, then, on the date of the Initial Distribution, Eddie Bauer Holdings will issue $300 million of Creditor Notes to certain Holders of Allowed Class 4 Claims and the Creditor Trust to be held in the Disputed Claims Reserve, in each case in accordance with the terms of the Plan. If the Creditor Notes are issued pursuant to Section 7.6 of the Plan, then Eddie Bauer Holdings will use commercially reasonable efforts to refinance the Creditor Notes as soon as practicable after the date of the Initial Distribution.

5.    Creditor Trust Interests

The Plan provides that Holders of Allowed Class 4 Claims (other than the Holders of the SHI Unsecured Claims) will receive their Pro Rata share of the beneficial interests in the Creditor Trust (defined in the Plan as the "Creditor Trust Interests"). The principal assets of the Creditor Trust are the Securitization Note that will be issued by Eddie Bauer Holdings, and the

Rights of Action against the Excluded Defendants that are being transferred to the Creditor Trust.

Pursuant to the Plan, SAC and FSAC, will become subsidiaries of Eddie Bauer Holdings. SAC and FSAC are special-purpose companies that hold the "seller's interest" in respect of certain pre-petition securitization transactions to which Spiegel and certain of its subsidiaries were party. These interests are more precisely defined as "Securitization Interests" in the Plan.

The Debtors understand that, pursuant to the MBIA Settlement Agreement and the terms and conditions of the agreements governing the applicable securitization transactions, distributions would only be made, if at all, to SAC and FSAC in respect of the Securitization Interests after approximately $500 million of outstanding liabilities and certain additional contingent claims arising under those transactions are first paid in full. In other words, SAC and FSAC's Securitization Interests are deeply subordinated to the prior right of payment of other parties to such securitization transactions. In light of the inability to accurately forecast how the numerous obligors under the various receivables that have been securitized will perform (or default) in respect of such obligations, the value of such Securitization Interests is highly speculative and, in any event, it is not anticipated that any value would be received in respect of such interests for several years, if at all.

On the Effective Date, Eddie Bauer Holdings will issue the Securitization Note to the Creditor Trust pursuant to which Eddie Bauer Holdings will be obligated to pay to the Creditor Trust 90% of the funds indefeasibly received by SAC and FSAC in respect of any Securitization Interests held by either entity. The form of the Securitization Note will be included in the Plan Supplement. In view of the foregoing, the Disclosure Statement does not include any valuation of the Securitization Note.

With respect to the rights of action against the Excluded Defendants that will be pursued by the Creditor Trust, the Debtors understand that any recovery that may ultimately be obtained by the Creditor Trust depends on the results of future legal action against the Excluded Defendants. Accordingly, the Disclosure Statement does not include any valuation of these causes of action.

## C.    Compromise and Settlement of Disputes

### 1.    Introduction

Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates the compromise and settlement of all claims existing or arising on or before the Effective Date that may be held by (i) any of the Debtors, their Estates, or any of the Debtors' subsidiaries that are not chapter 11 debtors, or of any Person on any of their behalves, against the Released Parties and (ii) the creditors of the Debtors (but not shareholders of the Debtors or former shareholders of Spiegel solely in their capacity as shareholders or former shareholders of Spiegel, or any Governmental Unit) against the Released Parties that are related to the Debtors or their direct or indirect subsidiaries (such settlement, together with all of its terms and conditions that are incorporated in the Plan, the "SHI Settlement").

The SHI Settlement is the compromise of disputed claims and a good faith settlement and release of those claims and associated alleged injuries. The consideration to be provided pursuant to the SHI Settlement is not to be construed as an admission of liability or wrongdoing on the part of any of the Released Parties.

2.      Cash Settlement Payment

SHI or its designee will pay the Cash Settlement Payment to the Debtors on the Effective Date as provided below.

3.      Assumption of Certain Executory Contracts

Pursuant to Section 11.2 of the Plan, (i) Eddie Bauer, Inc. will assume the Buying Agency Agreements and the Debtors will pay in Cash cure claims in respect of such assumed agreements in the aggregate amount of $2,294,700 on the Effective Date (to be allocated as agreed by the non-Debtor parties to such agreements) and (ii) Eddie Bauer will assume the Germany Joint Venture Agreement and Japan Joint Venture Agreement, and will pay in Cash a cure claim of $846,800 under the Germany Joint Venture Agreement in full on the Effective Date. No Person will hold any Allowed Claim arising prior to the Petition Date in respect of an executory contract that is assumed pursuant to Section 2.3 of the Plan and Section 11.2 of the Plan except as expressly provided by Section 2.3 of the Plan.

4.      Allowance of Claims

Otto KG, OIHK and other affiliates of Otto KG will hold Allowed Class 4 Claims in the aggregate amount of $26,871,900 (the "Otto KG Goods Unsecured Claims"). The Otto KG Goods Unsecured Claims will receive the treatment set forth in Section 4.5 of the Plan (with the Distributions to be allocated as agreed by such creditors).

OSF will hold an Allowed Class 4 Claim in the amount of $160,469,900, and SHI will hold an Allowed Class 4 Claim in the amount of $13,443,140 (each, an "SHI Unsecured Claim"). The SHI Unsecured Claims will receive the treatment set forth in Section 4.5 of the Plan.

The Otto KG Goods Unsecured Claims and the SHI Unsecured Claims will not be subject to setoff, recoupment, subordination or any other challenge. No Holder of an Otto KG Goods Unsecured Claim or SHI Unsecured Claim will hold Allowed Class 4, Class 5 Claims, Allowed Secured Claims, Allowed Priority Claims, Allowed Administrative Claims, or Allowed Reclamation Claims except (i) as provided in Sections 2.4 or 2.7 of the Plan, and (ii) Claims covered by insurance pursuant to Section 13.4(c) of the Plan, which Claims will not receive any Distribution under the Plan. The Released Parties, including the SHI Released Parties, have agreed not to object to or otherwise oppose Distributions upon the SHI Unsecured Claims that are consistent with the treatment set forth in Section 4.5(a) of the Plan.

5.      Releases and Claims Over Protection

The Released Parties will receive the benefit of the applicable releases set forth in Section 13.4 of the Plan and the Confirmation Order, and the permanent injunction set forth in

the Confirmation Order to effectuate such releases. The Released Parties will grant the applicable releases set forth in Section 13.4 of the Plan and will be subject to the permanent injunction set forth in the Confirmation Order to effectuate such release.

The Released Parties will receive the benefit of the provisions of Section 13.5 of the Plan.

6.    Post-Effective Date Litigation

None of the provisions of the Plan, including, but not limited to, the releases and injunctions granted pursuant to Article XIII thereof, will prevent any of the Excluded Defendants or the Creditor Trust (i) from taking discovery from the Debtors, the Reorganized Debtors, the Creditor Trust or from any Released Party, or (ii) from joining any Released Party to such litigation solely to the extent, if any, such Released Party is a necessary third party defendant; provided, however, that (a) the Creditor Trust may not recover any amounts against any Released Party; and (b) no provision of the Plan or the Confirmation Order will authorize the Creditor Trust or any other Person to take discovery from any Released Party except in accordance with applicable law, without regard to the existence of the SHI Settlement incorporated in the Plan, including, without limitation, the Hague Convention.

7.    Tax Reimbursement Agreements

SHI and the Debtors will be entitled to their respective shares of all funds generated by past and future state and federal tax refunds, calculated in accordance with that certain Tax Reimbursement Agreement between SHI and Spiegel, effective as of September 30, 1998 for all taxable years beginning on or after January 1, 1986, and that certain Supplemental Tax Reimbursement Agreement effective as of November 1, 1996.

8.    Termination of Temporary Restraining Order

The Confirmation Order will provide that the temporary restraining order set forth in the Order of the Bankruptcy Court, dated June 27, 2003, will be terminated as of the date of receipt of the Cash Settlement Payment. The Reorganized Debtors and the Creditor Trust will use their reasonable best efforts to facilitate the return to SHI of the funds held in an escrow account created pursuant to that certain Deposit Escrow and Custody Agreement among FCNB, SHI, and Deutsche Bank Trust Company Americas, dated on or about May 14, 2002, to SHI as soon as practicable after the Effective Date.

D.    Administrative Claims, Reclamation Claims, Professional Fees and Priority Tax Claims

1.    Introduction

Certain types of Claims are not placed into voting Classes. Such Claims are not considered Impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. These non-voting Claims and their treatment are described in Article III of the Plan.

2.     Administrative Claims

On or before the Effective Date, the Debtors will pay in full, without interest and in Cash, the amount of Allowed Administrative Claims as of such date, and, after the Effective Date, Eddie Bauer Holdings will pay each Administrative Claim in full, without interest and in Cash (except for Professional Fees to the extent that their treatment, which is set forth below, differs) when and to the extent the Administrative Claim is or becomes Allowed.  The Holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon by such Holder and the respective Debtor.

Holders of Administrative Claims that have not been paid as of the Effective Date must file a written request for payment of Administrative Claims with the Bankruptcy Court and serve the same upon counsel to Eddie Bauer Holdings such that it is received no later than the Administrative Claim Bar Date.  If an Administrative Claim is not timely filed by the Administrative Claim Bar Date, then such Administrative Claim will be forever barred and will not be enforceable against the Debtors, the Reorganized Debtors, the Creditor Trust Debtors, Eddie Bauer Holdings, their successors, their assigns or their property, or the Creditor Trust or the Trustees.  The foregoing will not apply to (i) Professional Fee Claims, (ii) Administrative Claims arising in the ordinary course of the Debtors' business, and (iii) Administrative Claims held by current or former employees of the Debtors for wages or pursuant to any Benefit Program.  An objection to an Administrative Claim Filed pursuant to this provision must be Filed within ninety days from the later of the date such Administrative Claim is Filed and properly served or ninety days after the Effective Date.  Eddie Bauer Holdings reserves the right to seek an extension of such time to object.

3.     Reclamation Claims

On or before the Effective Date, the Debtors will pay in full, without interest and in Cash, the amount of Allowed Reclamation Claims as of such date, and, after the Effective Date, the Creditor Trust will pay each Reclamation Claim in full, without interest and in Cash when and to the extent the Reclamation Claim is or becomes Allowed.  The Holder of an Allowed Reclamation Claim may be paid on such other date and upon such other terms as may be agreed upon by such Holder and the respective Debtor or the Creditor Trust.

4.     Statutory Fees

Without limiting the foregoing, all fees due and payable under 28 U.S.C. § 1930 as of the Effective Date that have not been paid will be paid on or before the Effective Date by the Debtors.  Payments after the Effective Date will be made as required by statute and will be paid by the Reorganized Debtors.

5.     Professional Fees

On or as soon as reasonably practicable after the Effective Date, Eddie Bauer Holdings will establish the Professional Fee Reserve.

Eddie Bauer Holdings will pay Professionals who are entitled to allowance of fees and reimbursement of expenses as of the Effective Date from the Professional Fee Reserve in accordance with Section 3.5 of the Plan.

The Bankruptcy Court must rule on each request for payment of Professional Fees before the fees will be paid, except as such fees have been paid pursuant to the Interim Compensation Order. For all Professional Fees, the Professional in question must file and serve a properly noticed fee application and the Bankruptcy Court must rule on the application. Only the amount of fees allowed by the Bankruptcy Court will be required to be paid under the Plan; provided that nothing herein will be deemed a waiver by the Professionals of the unpaid portions of their Allowed but unpaid Professional Fee Claims.

Except as otherwise provided by a Bankruptcy Court order for a specific Professional, Professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 363, 503(b) and/or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date must file and serve, pursuant to the notice provisions of the Interim Compensation Order and the Bankruptcy Code, an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court. Holders of Administrative Claims (including Professionals) requesting compensation or reimbursement of expenses that do not file such requests by the applicable bar date will be forever barred from asserting such claims against the Debtors, the Reorganized Debtors, the Creditor Trust Debtors, Eddie Bauer Holdings, or their successors, their assigns or their property, or the Creditor Trust or the Trustees. Any objection to Professional Fee Claims will be written and filed on or before the fifteenth (15th) day after the date such application for final compensation or reimbursement has been filed.

Notwithstanding anything in the Plan to the contrary, following the occurrence of the Effective Date, Professionals will be authorized to retain any funds held on retainer for payment of fees and expenses authorized to be paid pursuant to the Plan, including fees and expenses approved by the Bankruptcy Court in connection with such Professionals' final applications for allowance of compensation and reimbursement of expenses. Thereafter (i) Shearman & Sterling LLP, counsel for the Debtors, will be authorized to continue to hold a retainer in the amount of $75,000 until the earlier of (a) six months after the Effective Date or (b) entry of the Final Decree and will be authorized without further order of the Bankruptcy Court to apply such retainer to fees and expenses incurred in connection with services rendered on behalf of the Debtors, the Reorganized Debtors, Eddie Bauer Holdings, or the Creditor Trust Debtors on or after the Effective Date, and (ii) all Professionals will return the unapplied balance of any retainer to Eddie Bauer Holdings within sixty days of the Effective Date.

Following dissolution of the Creditors' Committee, the Creditor Trust will be deemed a party in interest with respect to all requests for Professional Fees pursuant to Section 3.5 of the Plan and may, at the Managing Trustee's discretion, prosecute an objection or otherwise participate with respect to the Professional Fee review process.

Subject to the provisions of the Plan, all reasonable fees for services rendered on behalf of the Debtors and the Reorganized Debtors in connection with the Chapter 11 Cases and the Plan after the Effective Date will be paid by Eddie Bauer Holdings after the submission of a monthly fee statement with service upon the Managing Trustee, the Creditor Trust, provided that no written objections are received within ten days of such service. If no written objections are received, Eddie Bauer Holdings will be authorized to pay such amounts requested without further Bankruptcy Court authorization. If objections are received and such objections are not capable of being resolved between the parties in a timely manner, the Bankruptcy Court will reserve jurisdiction to resolve such disputes.

To the extent there is surplus Cash in the Professional Fee Reserve after Eddie Bauer Holdings has satisfied all Professional Fees approved by the Bankruptcy Court in accordance with Section 3.5 of the Plan and there are no outstanding requests for allowance of Professional Fees before the Bankruptcy Court, Eddie Bauer Holdings will transfer such surplus Cash to the Creditor Trust within ten days from the date that Eddie Bauer Holdings determines there is such surplus Cash.

6.      Priority Tax Claims

Each Allowed Priority Tax Claim will be paid by Eddie Bauer Holdings or the Reorganized Debtors, or if Allowed after the Effective Date, by the Creditor Trust in full, in Cash, upon the later of (i) the Effective Date, (ii) the date upon which there is a Final Order allowing such Allowed Priority Tax Claim, (iii) the date such an Allowed Priority Tax Claim would have been due and payable if the Chapter 11 Cases had not been commenced, or (iv) as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the Debtors; provided, however, that: (a) Eddie Bauer Holdings, the Reorganized Debtor or the Creditor Trust, as applicable, may, at its option, in lieu of payment in full of an Allowed Priority Tax Claim on the Effective Date, make Cash payments on account of such Allowed Priority Tax Claim, deferred to the extent permitted pursuant to section 1129(a)(9)(C) of the Bankruptcy Code and, in such event, interest will be paid on the unpaid portion of such Allowed Priority Tax Claim at a rate to be agreed upon by the Debtors and the applicable Governmental Unit or as determined by the Bankruptcy Court; (b) in the Event an Allowed Priority Tax Claim may also be classified as an Allowed Secured Claim, Eddie Bauer Holdings, the Reorganized Debtor or the Creditor Trust, as applicable, may, at its option, elect to treat such Allowed Priority Tax Claim as an Allowed Class 2 Other Secured Claim; and (c) any Allowed Priority Tax Claims subject to section 18.2 of the CCAA will be paid in full within six months of the date the Canadian Confirmation Order is entered on the docket maintained by the Canadian Court.

E.      Classification and Treatment of Classified Claims and Equity Interests

1.      Summary

The classes listed below classify Claims and Equity Interests (other than Administrative Claims and Priority Tax Claims) for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest will be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class

and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

The classification of Claims and Equity Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| Class 1 | Groveport Secured Claims | Unimpaired | Not entitled to vote |
| Class 2 | Other Secured Claims | Unimpaired | Not entitled to vote |
| Class 3 | Non-Tax Priority Claims | Unimpaired | Not entitled to vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to vote |
| Class 5 | Convenience Claims | Impaired | Entitled to vote |
| Class 6 | Equity Interests | Impaired | Not entitled to vote (deemed to have rejected Plan under the Bankruptcy Code) |

2.  Class 1 – Groveport Secured Claims

   a.  *Classification:*  Class 1 consists of the Allowed Groveport Secured Claims against the Debtors in the amount of $55.5 million.

   b.  *Treatment:*  Each Holder of an Allowed Class 1 Claim will receive, on account thereof, on the Effective Date, Cash equal to the Allowed amount of such Class 1 Claim, except to the extent that any Holder of an Allowed Class 1 Claim agrees to less favorable treatment thereof.

   c.  *Voting:*  Class 1 is an Unimpaired Class and Holders of Class 1 Claims are, therefore, not entitled to vote to accept or reject the Plan and will be deemed to have conclusively accepted the Plan.

3.  Class 2 – Other Secured Claims

a. *Classification:*  Class 2 consists of Secured Claims against the Debtors other than the Class 1 Secured Claims.

b. *Treatment:*  Each Holder of an Allowed Class 2 Claim will receive, on account thereof, on the Effective Date, either (i) the return of such Assets on which the Holder has a senior perfected and indefeasible Lien or security interest, or (ii) Cash equal to the Allowed amount of such Class 2 Claim except to the extent that any Holder of an Allowed Class 2 Claim agrees to less favorable treatment thereof.

c. *Voting:*  Class 2 is an Unimpaired Class and Holders of Class 2 Claims are, therefore, not entitled to vote to accept or reject the Plan and will be deemed to have conclusively accepted the Plan.

4.  Class 3 – Non-Tax Priority Claims

a. *Classification:*  Class 3 consists of Holders of Priority Claims specified under section 507(a) of the Bankruptcy Code other than Priority Tax Claims.

b. *Treatment:*  On the Effective Date, each Holder of an Allowed Class 3 Claim will be entitled to receive, on account thereof, Cash equal to the Allowed amount of such Priority Claim, except to the extent that any Holder of an Allowed Class 3 Claim agrees to less favorable treatment thereof.

c. *Voting:*  Class 3 is an Unimpaired Class, and Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan and will be deemed to have conclusively accepted the Plan.

5.  Class 4 – General Unsecured Claims

a. *Classification:*  Class 4 consists of the General Unsecured Claims other than the Convenience Claims.

b. *Treatment:*  Each Holder of an Allowed Class 4 General Unsecured Claim will be entitled to receive, on account of such Allowed General Unsecured Claim, Distributions in an aggregate amount equal to such Holder's Pro Rata Share of (i) 100% of the Eddie Bauer Holdings Common Stock, subject to Dilution, (ii) the Class 4 Distributable Cash, (iii) the Cash Settlement Payment, (iv) the Creditor Trust Interests and (v) either (a) the Senior Facility Proceeds or (b) the Creditor Notes; provided, however, that (x) each Holder of an Otto KG Goods Unsecured Claim will not receive any Distribution on account of the Cash Settlement Payment; and (y) notwithstanding the foregoing, each Holder of an SHI Unsecured Claim will only be entitled to receive Cash equal to not less than 2.3% of such Claim, with the ultimate amount of such Distribution to be determined by the Debtors based on the distributions on General

Unsecured Claims that would have been made by Spiegel if it were not substantively consolidated with the other Debtors, and without regard to the Cash Settlement Payment.

c.   *Voting:*  Holders of Class 4 Claims are Impaired and therefore are entitled to vote to accept or reject the Plan.

6.   Class 5 – Convenience Claims

a.   *Classification:*  Class 5 consists of all Convenience Claims.

b.   *Treatment:*  Each Holder of an Allowed Claim in Class 5 will receive, on the Effective Date, Cash in an amount equal to one-hundred percent (100%) of the Allowed amount of its Convenience Claim.

c.   *Voting:*  Holders of Class 5 Claims are Impaired and therefore are entitled to vote to accept or reject the Plan.

7.   Class 6 – Equity Interests

a.   *Classification:*  Class 6 consists of all Equity Interests in Spiegel

b.   *Treatment:*  All Equity Interests of Spiegel will be cancelled on the Effective Date, and Holders of such Equity Interests will not receive or retain any property or Distributions under the Plan.

c.   *Voting:*  Class 6 Equity Interests will receive no Distribution under the Plan and are, therefore, deemed to have rejected the Plan.  Accordingly, Class 6 Equity Interests are not entitled to vote to accept or reject the Plan.

F.   Acceptance or Rejection of the Plan

1.   Voting Classes

Each Holder of a Claim in Class 4 and Class 5 will be entitled to vote to accept or reject the Plan.  Only those votes properly cast by Holders of Allowed Claims at the time the vote on the Plan is solicited will be counted in determining whether acceptances have been received sufficient in number and amount to obtain confirmation.  Class 6 is conclusively deemed to have rejected the Plan and is not entitled to vote on the Plan.  Classes 1, 2 and 3 are conclusively deemed to have accepted the Plan and are not entitled to vote on the Plan.

2.   Acceptance by Class of Creditors and Holders of Interests

Under the Bankruptcy Code, an Impaired Class of Holders of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds (? ) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

3.      Cramdown

If all applicable requirements for confirmation of the Plan are met as set forth in sections 1129(a)(1) through (13) of the Bankruptcy Code, except subsection (8) thereof, the Debtors intend to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims that is Impaired under, and has not accepted, the Plan.

G.      Effect of Confirmation

1.      Reorganized Debtors and Creditor Trust Debtors as Separate Corporate Entities; Vesting and Revesting

The Debtors will continue to exist after the Effective Date, with each Reorganized Debtor and Creditor Trust Debtor being a separate corporate entity with all the powers of a corporation or limited liability company under applicable law, as the case may be, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law on or after the Effective Date.  Except as otherwise provided in the Plan, pursuant to sections 1123(a)(5) and 1141 of the Bankruptcy Code, (i) the Equity Interests in or common stock of Eddie Bauer, Inc., FSAC and SAC will vest in Eddie Bauer Holdings or its successor, (ii) the Equity Interests in Distribution Fulfillment Services, Inc. (DFS) and Spiegel Group Teleservices-Canada, Inc. will vest in Reorganized Eddie Bauer, (iii) the Equity Interests in each of the Debtors that becomes a Creditor Trust Debtor, S.I. Reinsurance Limited, East Coast Collection Agency, Inc., SCCIII, FCNB, The Spiegel Foundation, Spiegel Cares, Spiegel General Service, LLC and Together Retail U.S.A., Inc. will vest in the Creditor Trust, (iv) all the Assets of the Debtors that will become Reorganized Debtors will vest in each Reorganized Debtor or its successor, free and clear of all Claims, Liens, charges, encumbrances and interests of Creditors and Holders of Equity Interests on the Effective Date, and (v) all property comprising the Estates of each Debtor that will become a Creditor Trust Debtor, (other than the Creditor Trust Rights of Action), will vest in such Creditor Trust Debtor, and (vi) the Creditor Trust Rights of Action will vest in the Creditor Trust, in each case free and clear of all Claims, Liens, charges, encumbrances and interests of Creditors and Holders of Equity Interests on the Effective Date.  As of the Effective Date, Eddie Bauer Holdings, the Reorganized Debtors, and the Creditor Trust Debtors may operate their businesses and use, acquire and dispose of property and settle and compromise Claims or Equity Interests, without the supervision or approval of the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

2.      Binding Effect

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan and all exhibits thereto will bind all Holders of Claims and Equity Interests.

3. Corporate Action

Each of the matters provided for under the Plan involving any corporate action to be taken or required by the Debtors will, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and will be authorized and approved in all respects without any requirement of further action by stockholders, officers, directors or members of any of the Debtors.

4. Dissolution of Creditors' Committee; Plan Oversight Committee

On the Effective Date, the Creditors' Committee will dissolve and members will be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.

On the Effective Date, the Plan Oversight Committee will be created. The Plan Oversight Committee will have the right to direct and control the Trustees with respect to the liquidation of the Creditor Trust Assets, prosecution, settlement and abandonment of the Creditor Trust Rights of Action and the prosecution and resolution of claims pursuant to the terms of the Plan as provided in the Creditor Trust Agreement. Persons who served as Professionals to the Creditors' Committee prior to the Effective Date may also continue to serve as professionals to the Plan Oversight Committee and/or the Trustees, and the fees of such professionals will be paid by the Creditor Trust. The Plan Oversight Committee will consist of any member of the Creditors' Committee that notifies the counsel to the Creditors' Committee in writing no later than ten days prior to the Confirmation Hearing of its intention to serve on the Plan Oversight Committee. The Plan Oversight Committee will be dissolved upon the termination of the Creditor Trust. In the event of the resignation of a member of the Plan Oversight Committee, the remaining members may, but need not, designate a successor from among the Holders of Allowed General Unsecured Claims other than the Allowed Class 4 Claims described in Section 2.4 of the Plan. Unless and until such vacancy is filled, the Plan Oversight Committee will function with such reduced membership. Neither the Plan Oversight Committee nor any of its members, nor any of its employees, professionals or agents, will in any way be liable for any acts or for any acts of any of its members, except for acts constituting willful misconduct or gross negligence, in the performance of their duties as members of the Plan Oversight Committee. The Creditor Trust will indemnify and hold harmless the Plan Oversight Committee, its members, and its professionals (each an "Indemnified Person") from and against any and all liabilities, expenses, claims, damages or losses (collectively, "Losses") arising out of the Creditor Trust Agreement or their capacities as members or agents for the Plan Oversight Committee except for Losses arising as a direct result of such Indemnified Person's willful misconduct or gross negligence.

5. Late Claims

In accordance with the Bar Date Order, unless otherwise specifically ordered by the Bankruptcy Court, any Entity that was required to but did not file a proof of claim in respect of a Claim in compliance with the procedures and deadlines established by the Bar Date Order will not be treated as a Creditor with respect to such Claim for the purposes of voting and Distributions under the Plan.

H.    Implementation of the Plan

     1.    Substantive Consolidation of the Debtors

Entry of the Confirmation Order will constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors for all purposes related to the Plan, including for purposes of voting, confirmation, and Distribution.  On and after the Effective Date and except with respect to SHI Unsecured Claims, (i) all assets and liabilities of the Debtors will be treated as though they were merged, (ii) no Distributions will be made under the Plan on account of any Claim held by any Debtor against any other Debtor, (iii) all guarantees of any Debtor of any obligation of any other Debtor will be eliminated so that any Claim against any Debtor and any guarantee thereof expected by any other Debtor and any joint or several liability of any of the Debtors will be one obligation of the Debtors, and (iv) each and every Claim filed or to be filed in the Chapter 11 Case of any of the Debtors will be deemed filed against the Debtors, and will be one Claim against and obligation of the Debtors.

The substantive consolidation effected pursuant to Section 7.1(a) of the Plan will not (other than for purposes related to funding Distributions under the Plan and as set forth in Section 7.1(a) of the Plan) affect:  (i) the legal and organizational structure of the Debtors (which structures will be reorganized in the manner set forth in Section 7.7 of the Plan), (ii) defenses to any Right of Action or requirements for any third party to establish mutuality in order to assert a right of setoff, (iii) Distributions out of any insurance policies or proceeds of such policies, and (iv) the obligation of any Debtor, Reorganized Debtor or Creditor Trust Debtor to pay quarterly fees to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) until such time as such Debtor's particular case is closed, dismissed or converted.

     2.    The Cash Settlement Payment

SHI or its designee will pay the Cash Settlement Payment to the Debtors on the Effective Date.

     3.    Cancellation of Intercompany Claims

On the Effective Date, all Intercompany Claims will be eliminated and extinguished.

     4.    Cancellation of Notes, Instruments, Common Stock and Stock Options

On the Effective Date, except to the extent provided otherwise in the Plan or the Confirmation Order, and provided that the treatments provided for in the Plan and the Distributions contemplated by Article IV of the Plan are made and transactions in Section 7.7 of the Plan are consummated, (i) all notes, instruments, certificates, guaranties and other documents evidencing Claims in any of the Debtors and all Equity Interests in Spiegel will be canceled and deemed terminated; (ii) all Equity Interests in Spiegel will be cancelled and deemed terminated; and (iii) all options, warrants, conversions, privileges or other legal or contractual rights to acquire any Equity Interests in any of the Debtors will be canceled and deemed terminated.

5.      Eddie Bauer Holdings Working Capital Facility

On the Effective Date, or as soon as practicable thereafter, Eddie Bauer Holdings will enter into definitive documentation with respect to the $150 million Working Capital Facility with the respective lender(s) thereunder.  The Working Capital Facility will be secured by a first Lien on certain of the assets of Eddie Bauer Holdings.  The principal terms and conditions with respect to such financing arrangements will be filed with the Bankruptcy Court by the Debtors as a component of the Plan Supplement.

6.      Eddie Bauer Holdings Senior Debt Facility or Creditor Notes

On the Effective Date, or as soon as practicable thereafter, Eddie Bauer Holdings will enter into definitive documentation with respect to the $300 million Senior Debt Facility with the respective lender(s) thereunder.  The principal terms and conditions with respect to such financing arrangements will be included in the Plan Supplement; provided, however, that Eddie Bauer Holdings may, in consultation with the Creditors' Committee, elect not to enter definitive documentation with respect to the Senior Debt Facility if it makes a determination that then existing market conditions are such that entering into the Senior Debt Facility would not be favorable to Eddie Bauer Holdings or in the best interest of Eddie Bauer Holdings and its shareholders.  In the event that Eddie Bauer Holdings enters into definitive documentation with respect to the Senior Debt Facility, then, on the Effective Date, Eddie Bauer Holdings will borrow funds thereunder which funds will be distributed to Holders of Allowed General Unsecured Claims.

In the event that Eddie Bauer Holdings elects, after consultation with the Creditors' Committee and after making the determination described in Section 7.6(a) of the Plan, not to enter into definitive documentation with respect to the Senior Debt Facility, then, on the date of the Initial Distribution, Eddie Bauer Holdings will issue $300 million of Creditor Notes to certain Holders of Allowed Class 4 Claims pursuant to Section 4.5(a) of the Plan and the Creditor Trust to be held in the Disputed Claims Reserve, in each case in accordance with the terms of the Plan.  If the Creditor Notes are issued pursuant to Section 7.6 of the Plan, then Eddie Bauer Holdings will use commercially reasonable efforts to refinance the Creditor Notes as soon as practicable after the date of the Initial Distribution.

7.      Restructuring Transactions

On the Effective Date, the following transactions will be effectuated:  (i) Spiegel will form a Delaware corporation named "Eddie Bauer Holdings, Inc." to serve as the holding company for the Reorganized Debtors and certain non-debtor subsidiaries of Spiegel; (ii) Spiegel will transfer 100% of its ownership interest in Eddie Bauer, Inc., FSAC, and SAC to Eddie Bauer Holdings; (iii) Spiegel will transfer 100% of its ownership interest in DFS and Spiegel Group Teleservices-Canada, Inc. to Eddie Bauer, Inc.; (iv) a Delaware limited liability company named "Eddie Bauer Information Technology, LLC" will be formed by and as the wholly owned subsidiary of Eddie Bauer, Inc.; (v) Spiegel Management Group will transfer all of its Assets that do not comprise or support its information services capability to Spiegel; (vi) Spiegel Management Group will merge with and into Eddie Bauer Information Technology, LLC, with Eddie Bauer Information Technology, LLC surviving; (vii) Spiegel will transfer 100% of its

ownership interest in the Creditor Trust Debtors and in each of Spiegel's non-Debtor subsidiaries that are not transferred to Eddie Bauer Holdings (including, but not limited to, FCNB) to the Creditor Trust; and (viii) upon the cancellation of the Spiegel Equity Interests on the Effective Date, 100% of the common stock of reorganized Spiegel will be distributed to the Creditor Trust. Furthermore, on the Effective Date, the Debtors will waive and release any and all claims they may hold against the Debtors' direct and indirect non-Debtor subsidiaries other than FCNB and First Consumers Credit Corporation; provided, however, that such waiver and release is not intended to, and will not, release any other Entities or Persons, including the Excluded Defendants, of any liability, including any liability for any alleged acts and omissions relating to the Debtors. The Debtors, the Debtors' direct and indirect non-debtor subsidiaries, the Creditors' Committee, and the successors or assignees of any of them expressly reserve all of their respective rights to assert claims which are not being released pursuant to the Plan.

On or as of the Effective Date, with the prior approval of the Creditors' Committee, the Debtors may, notwithstanding any other transactions described in Section 7.7 of the Plan, (i) cause any or all of the Debtors to be merged into one or more of the Debtors, dissolved, or otherwise consolidated, (ii) cause the transfer of assets between or among the Debtors, or (iii) engage in any other transaction in furtherance of the Plan. Any such transaction will be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders or directors of any of the Debtors, the Reorganized Debtors or the Creditor Trust Debtors. The Debtors may utilize this provision to merge, dissolve, or otherwise consolidate certain of their companies, including, but not limited to, numerous Debtor entities involved in the Debtors' Eddie Bauer business, and transfer certain executory contracts, unexpired leases, and other assets to Eddie Bauer Holdings or the Reorganized Debtors. A list of the subsidiaries that will be merged or dissolved will be included in the Plan Supplement.

On the Effective Date, Eddie Bauer Holdings will issue the Securitization Note to the Creditor Trust.

8.    Violations of Claims Trading Order

In the event that any person or group of persons is in violation of the Trading Order and such person or group of persons, but for the application of this Section of the Plan, would become a "5% shareholder" (within the meaning of section 382 of the Tax Code and the Treasury Regulations promulgated thereunder) of Eddie Bauer Holdings as a result of the implementation of the Plan, such person(s) (and, to the extent necessary, any other person whose ownership would be attributed to any such person for purposes of section 382 of the Tax Code) will not be entitled to and will not receive distributions of Eddie Bauer Holdings Common Stock pursuant to the Plan (i) in excess of 1.425 million shares of Eddie Bauer Holdings Common Stock, if such violation was a failure to notify the Debtors of ownership of $65 million or more of Claims, or (ii) in respect of any Claims acquired in violation of the Trading Order. If the Debtors or Eddie Bauer Holdings only become aware of such circumstances after the Distribution Notification Date, then, except as provided below, no Distribution will be made in lieu of the Eddie Bauer Holdings Common Stock that is not distributable by reason of Section 7.8 of the Plan.

9.      Creation of the Creditor Trust

On the Effective Date, (i) the Creditor Trust will be created and established by the execution and delivery of the Creditor Trust Agreement and any other necessary action, subject to the provisions of the Plan, and (ii) the Creditor Trust Assets will be transferred to the Creditor Trust, free of all Claims, Liens and interests, including without limitation, escrows, charges, pledges, encumbrances, and/or security interests of any kind; provided, however, that the property comprising the Disputed Claims Reserve will be transferred to the Creditor Trust on the date of the Initial Distribution pursuant to Section 9.2(b) of the Plan.  The costs and expenses incurred by the Creditor Trust on and after the Effective Date will be paid from the Creditor Trust Operating Expense Fund.  The Creditor Trust will be terminated and dissolved without further action by the Trustees five (5) years from the Effective Date; provided, however, that, if warranted by the facts and circumstances and subject to the entry of a Final Order upon a finding by the Bankruptcy Court that an early termination of the Creditor Trust is appropriate or that an extension of the term of the Creditor Trust is necessary to the liquidating purpose of the Creditor Trust, the term of the Creditor Trust may be terminated early or may be extended for a finite term based on the particular facts and circumstances.  For any such extension, entry of a Final Order must be obtained within six months of the beginning of the extended term.

As of the Effective Date, the Creditor Trust will be responsible for:  (i) filing, prosecuting and settling the Creditor Trust Rights of Action; (ii) making Distributions, after the Initial Distributions are made, to Holders of Allowed Claims (other than Administrative Claims) in the manner described in the Plan and the Creditor Trust Agreement; (iii) settling, resolving, and objecting to all Disputed Claims and Unresolved Claims (other than Administrative Claims) and making Distributions to all Holders of any such Claims that become Allowed Claims; (iv) filing any 2004 and 2005 federal and state tax returns and pursuing any federal and state tax refunds for the Creditor Trust Debtors that are necessary or appropriate; (v) preserving certain documents that may be necessary to respond to requests from Governmental Units; and (vi) holding, managing, overseeing, protecting, administering, selling, liquidating, transferring, prosecuting, resolving, settling or otherwise disposing of the Creditor Trust Assets.  The Creditor Trust will have the authority without further Bankruptcy Court approval to liquidate any unliquidated Creditor Trust Assets, to hire counsel, other professional advisors and consultants and to pay the fees and expenses of such Persons, to pursue any preserved Creditor Trust Rights of Action and otherwise to take such other actions as will be necessary to administer the Creditor Trust Assets.  The Creditor Trust will be substituted as successor to the Debtors (i) in all actions and proceedings pending or thereafter commenced in the Bankruptcy Court or elsewhere in respect of the Creditor Trust Assets, (ii) in all actions and proceedings pending or thereafter commenced in the Bankruptcy Court with respect to Disputed Claims and Unresolved Claims (other than Administrative Claims), and (iii) in any agreement in respect of the Creditor Trust Assets.  The Creditor Trust will dissolve Spiegel no later than six months after the Effective Date.

The Creditor Trust Interests are not transferable by any Beneficiary except (i) to any corporation, partnership or other entity of which such Beneficiary beneficially owns a majority of the equity interests; (ii) to any Person or entity that owns, directly or indirectly, a majority of the equity interests of such Beneficiary; or (iii) upon the death of a Beneficiary (by will or pursuant to the law of intestacy) or otherwise by operation of the law.

The Creditor Trust is intended to be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of U.S. Treasury Regulation section 301.7701-4(d), and the Plan, the Creditor Trust and the Disclosure Statement are intended to comply with the advance-ruling guidelines contained in Rev. Proc. 94-45, 1994-2 C.B. 684.

The transfers by the Creditor Trust Debtors of Creditor Trust Assets to the Creditor Trust will be treated for all federal income tax purposes as a distribution of the Creditor Trust Assets directly to the Creditors at the time of creation of the Creditor Trust, followed by the immediate transfer by the Creditors of the Creditor Trust Assets to the Creditor Trust in exchange for beneficial interests in the Creditor Trust. Creditors will be treated as the grantors and direct owners of a specified undivided interest in the Creditor Trust Assets for all U.S. federal income tax purposes.

The Managing Trustee will file all returns for the Creditor Trust as a grantor trust pursuant to U.S. Treasury Regulation section 1.671-4(a) (or successor provisions). The Managing Trustee will provide to the Creditors an annual statement that will list items of income, deduction and credit applicable to the Creditor Trust in the taxable year. The Managing Trustee will comply with all withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. As soon as practicable after the Effective Date, but in no event later than thirty days after the Effective Date, the Managing Trustee will determine the valuations of the transferred property, such valuations will be used for all U.S. federal income tax purposes, and all Creditors shall be bound by such valuations.

From and after the Effective Date and until such time as all Disputed Claims or Unresolved Claims for which property is held in the Disputed Claims Reserve (collectively, the "Section 7.9 Disputed Claims") are resolved, a portion of the assets of the Creditor Trust will be retained on account of such claims and, as discussed below, will be treated for federal income tax purposes as if held in a separate trust (the "Separate Trust"). Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury regulations, the receipt by the Managing Trustee of a private letter ruling if the Managing Trustee so requests one (or the receipt of an adverse determination by the IRS upon audit if not contested by the Managing Trustee), the Managing Trustee will:

    (1)    treat all the assets of the Creditor Trust allocable to, or retained on account of, the Section 7.9 Disputed Claims, as held in the Separate Trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each disputed claim, in accordance with the trust provisions of the Tax Code (section 641 et seq. of the Tax Code);

    (2)    treat as a taxable income or loss of the Separate Trust with respect to any given taxable year the portion of the taxable income or loss of the Creditor Trust that would have been allocated to the holders of such Section 7.9 Disputed Claims had such claims been allowed on the Effective Date (but only for the portion of the taxable year with respect to which such claims are unresolved);

(3)      treat as a distribution from the Separate Trust any increased amounts distributed by the Creditor Trust as a result of any Section 7.9 Disputed Claim against Spiegel being resolved earlier in the taxable year, to the extent such distribution related to taxable income or loss of the Separate Trust determined in accordance with the provisions hereof; and

(4)      to the extent permitted by applicable law, report consistently for state and local income tax purposes.

The Managing Trustee will be responsible for payments, out of the Creditor Trust Assets, of any taxes imposed on the Creditor Trust or the Creditor Trust Assets, including the Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Section 7.9 Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Section 7.9 Disputed Claims, such taxes will be (1) reimbursed from any subsequent Cash amounts retained on account of Section 7.9 Disputed Claims, or (2) to the extent such Section 7.9 Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Managing Trustee as a result of the resolutions of such Section 7.9 Disputed Claims.

The Managing Trustee may request an expedited determination of taxes of the Creditor Trust, including the Section 7.9 Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Creditor Trust for all taxable periods through the dissolution of the Creditor Trust.

10.    The Trustees

Not later than ten days prior to the Voting Deadline, the Creditors' Committee will identify the Delaware Trustee and the Managing Trustee. The identities of the Delaware Trustee and the Managing Trustee will be set forth in the Creditor Trust Agreement as part of the Plan Supplement. A Trustee, once appointed by the Creditors' Committee, will act as a Trustee on behalf of the Creditor Trust to carry out its obligations and exercise its rights in accordance with, and subject to, the Plan, the Confirmation Order and the Creditor Trust Agreement. The Managing Trustee will be initially compensated as set forth in the Creditor Trust Agreement (which compensation may be revised by the Creditor Trust with the consent of the Managing Trustee and the Plan Oversight Committee) and will not be required to file a fee application to receive compensation. The Managing Trustee's compensation will, however, be subject to the review and oversight of the Plan Oversight Committee. The Delaware Trustee will be paid as set forth in the Creditor Trust Agreement. Such annual fee may be revised with the consent of the Delaware Trustee and the Plan Oversight Committee. Any objection to the appointment of a Trustee will be raised at the Confirmation Hearing. The Confirmation Order will state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding will be commenced against either Trustee in its official capacity, with respect to its status, duties, powers, acts or omissions as a Trustee in any forum other than the Bankruptcy Court. The Trustees will be vested with the rights, powers and benefits set forth in the Creditor Trust Agreement. The Trustees will be subject to the directions of the Plan

Oversight Committee as set forth in the Creditor Trust Agreement. Subject to the provisions of the Creditor Trust Agreement, the Trustees will be entitled to hire such professionals as the Trustees may deem necessary to assist them in carrying out their duties, with the fees and expenses of such professionals to be borne by the Creditor Trust.

The Managing Trustee will monitor the liquidation of the Creditor Trust Assets and the Managing Trustee will make all personnel, books and records relating to the Creditor Trust available to the Plan Oversight Committee, upon written request. Any disputes concerning the administration of the Creditor Trust may be brought before the Bankruptcy Court for resolution.

All funds held by the Creditor Trust will be invested in Cash or short-term, highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Creditor Trust Agreement.

In accordance with the Plan, the Creditor Trust will be authorized and empowered to pursue and prosecute, to settle, or to decline to pursue, the Creditor Trust Rights of Action constituting the Creditor Trust Assets, including all pending adversary proceedings and contested matters, whether or not such causes of action have been commenced prior to the Effective Date, and will be substituted as the real party in interest in any such action, commenced by or against the Debtors, Debtors' Estates or the Creditors' Committee. The Creditor Trust may pursue or decline to pursue the Rights of Action and may settle, release, sell, assign, otherwise transfer or compromise such Rights of Action, in the Managing Trustee's business judgment, subject to the provisions of the Plan and the Creditor Trust Agreement, without Bankruptcy Court approval.

The Plan Oversight Committee may at any time remove either Trustee, as provided under the Creditor Trust Agreement. In the event of the death or incompetency (in the case of a Trustee that is a natural person), dissolution (in the case of a Trustee that is a corporation or other entity), bankruptcy, insolvency, resignation, or removal of the Trustee, the Plan Oversight Committee will have the authority to appoint a successor trustee as set forth in the Creditor Trust Agreement.

11.     Release of Liens and Perfection of Liens

Except as otherwise provided in the Plan or in any contract, instrument or other agreement or document entered into in connection with the consummation of the Plan: (i) each Holder of (a) a Secured Claim, (b) a Claim that is purportedly secured and/or (c) a judgment, mechanics, or similar Lien, will on or immediately before the Effective Date: (x) turn over and release to the Debtors any and all property of the Debtors that secures or purportedly secures such Claim, as it pertains to the properties currently owned or leased by the Debtors or such Liens will automatically, and without further action by the Debtors, the Reorganized Debtors, or the Creditor Trust Debtors be deemed released; and (y) execute such documents and instruments as the Debtors, the Reorganized Debtors or the Creditor Trust Debtors request to evidence such Claim Holder's release of such property or Lien; and (ii) on the Effective Date, as set forth in Section 7.1 of the Plan, all right, title and interest in any and all property of the Debtors' Estates other than the Creditor Trust Assets will be transferred to the Eddie Bauer Holdings free and clear of all Claims and interests, including, without limitation, Liens, escrows, charges, pledges,

encumbrances and/or security interests of any kind.  No Distribution hereunder will be made to or on behalf of any Claim Holder unless and until such Holder executes and delivers to the Debtors or Eddie Bauer Holdings, as the case may be, such release of Liens or otherwise turns over and releases such Cash, pledge, or other possessory Liens.  Any such Holder that fails to execute and deliver such release of Liens within 120 days of the Effective Date will be deemed to have no further Claim against the Debtors, the Reorganized Debtors, the Creditor Trust Debtors, the Creditor Trust or their assets or property in respect of such Claim and will not participate in any Distribution hereunder.  Notwithstanding the immediately preceding sentence, any such Holder of a Disputed Claim will not be required to execute and deliver such release until such time as the Claim is Allowed or Disallowed.

12.    Corporate Governance, Directors and Officers, and Corporate Action

a.    *Amended and Restated Certificates of Incorporation*

On or as soon as reasonably practicable after the Effective Date, each of the certificates of incorporation and bylaws for each of the Reorganized Debtors and the Creditor Trust Debtors will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code, including, without limitation, the prohibition against the issuance of nonvoting equity securities set forth in section 1123(a) of the Bankruptcy Code (with respect to each entity, the "Amended Certificate of Incorporation and Bylaws"; and collectively, the "Amended Certificates of Incorporation and Bylaws").  After the Effective Date, each of the Reorganized Debtors and the Creditor Trust Debtors may amend, modify and restate its Amended and Restated Certificate of Incorporation and Bylaws as permitted by applicable law.

b.    *Eddie Bauer Holdings Certificate of Incorporation and Bylaws*

The Eddie Bauer Holdings Certificate of Incorporation and the Eddie Bauer Holdings Bylaws will contain provisions necessary (i) to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of such certificates of incorporation and bylaws as permitted by applicable law, and (ii) unless the Debtors and Creditors' Committee deem it unnecessary or inadvisable, to impose restrictions on the direct or indirect transferability of the Eddie Bauer Holdings Common Stock or other equity of Eddie Bauer Holdings ("Eddie Bauer Holdings Equity") such that (A) no persons or "entity" may acquire or accumulate 4.75% or more (as determined under tax law principles covering the application of section 382 of the Tax Code) of the Eddie Bauer Holdings Equity and (B) no persons or entity owning directly or indirectly (as determined under such tax law principles) on the Effective Date, after giving effect to the Plan, 4.75% or more of the Eddie Bauer Holdings Equity may acquire additional shares of Eddie Bauer Holdings Equity or sell any shares held in escrow pursuant to Section 7.12(b) of the Plan, unless certain prescribed notice requirements are met and Eddie Bauer Holdings has not objected within a specified period after receipt of the prescribed notice to the proposed transaction.  (such restrictions on the transferability of the Eddie Bauer Holdings Equity described under clause (ii) of this sentence, the "Equity Transfer Restrictions").  The Equity Transfer Restrictions (i) will expire no earlier than January 1, 2008 absent a vote of the shareholders of Eddie Bauer Holdings to the contrary in accordance with applicable law or a determination pursuant to (iii) of this sentence; (ii) will expire on January 4, 2009 unless the Board of Directors of Eddie Bauer Holdings in good faith

determines that it is in the best interests of Eddie Bauer Holdings and its shareholders for the Equity Transfer Restrictions to expire as of an earlier date, but subject to clause (iii) of this sentence, not earlier than January 1, 2008; or (iii) may expire on any date after the Effective Date if the Board of Directors of Eddie Bauer Holdings in good faith determines that the requirements under section 382(l)(5) of the Tax Code will not be satisfied with respect to the ownership change occurring directly as a result of the consummation of the Plan. Eddie Bauer Holdings will use good faith efforts to make the determination of whether a reasonable basis exists for taking the position that the requirements of section 382(1)(5) of the Tax Code have been satisfied, at the earliest date following the Effective Date, that adequate information regarding the ownership of Eddie Bauer Holdings Equity is reasonably available, and from time to time thereafter as additional information or developments relevant to this determination are reasonably available or occur. Any objection raised by Eddie Bauer Holdings on the transferability of shares of Eddie Bauer Holdings Equity described under clause (ii) above will be based on its reasonable assessment that allowing the proposed transaction to be consummated would jeopardize substantial NOLs or other tax attributes available to it; and any such objection by Eddie Bauer Holdings will be subject to appeal to the Bankruptcy Court for review under the same standard of reasonableness. Any transfer in violation of the above restrictions will be void *ab initio* and will be treated as having no effect. 10% percent of Eddie Bauer Holdings Common Stock issued to person or entities that will acquire 4.75% or more of Eddie Bauer Holdings Common Stock on the Effective Date will be held in escrow in order to effectuate the restrictions described above; provided, however, that the Debtors and the Creditors' Committee may together elect to reduce such 10% to not less than 5% and will announce any such election at the Confirmation Hearing.

### c. *Directors and Officers of the Reorganized Debtors*

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial officers of each of the Reorganized Debtors will be the officers of the relevant Debtor immediately prior to the Effective Date. Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, a total of seven directors will serve as the initial directors of Eddie Bauer Holdings (the "Initial Directors"). Six of the Initial Directors (the "Independent Directors") will be nominated by the Creditors' Committee. The members of the board of directors will serve for a term of two years (the "Initial Term") and the Amended and Restated Eddie Bauer Certificate of Incorporation will provide that the Independent Directors cannot be removed without "cause" during their Initial Term. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, on or prior to the Confirmation Date, the identity and affiliations of any Person proposed to serve on the initial board of directors, board of managers or as the managing member, as applicable, of each of the Reorganized Debtors and the Creditor Trust Debtors or employed as an officer of the Reorganized Debtors, and, to the extent such Person is an insider, the nature of any compensation for such Person. The classification and composition of the board of directors or managing members, as appropriate, of each of the Reorganized Debtors and the Creditor Trust Debtors will be consistent with the applicable Amended Certificate of Incorporation and Bylaws. Each such director, officer and managing member will serve from and after the Effective Date pursuant to the terms of the applicable Amended Certificate of Incorporation and Bylaws or other applicable constituent documents or law.

d.       *Corporate Action*

On the Effective Date, all actions contemplated by the Plan will be authorized and approved in all respects.  On the Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors or any of the Reorganized Debtors and the Creditor Trust Debtors and any corporate action required by the Debtors, the Reorganized Debtors or the Creditor Trust Debtors in connection with the Plan, will be deemed to have occurred and will be in effect, without any requirement of further action by the security holders, officers, directors or members of the Debtors, the Reorganized Debtors or the Creditor Trust Debtors.  On the Effective Date, the appropriate officers of the Reorganized Debtors and the Creditor Trust Debtors, members of the boards of directors or boards of managers of the Reorganized Debtors and the Creditor Trust Debtors and the managing members, as applicable, of the Reorganized Debtors and the Creditor Trust Debtors are authorized and directed in the name of and on behalf of the Reorganized Debtors and the Creditor Trust Debtors to issue, execute, deliver, file or record the agreements, documents, contracts, securities, instruments, releases and other agreements, and take such other actions as may be necessary, to effectuate and further evidence the terms and conditions of the Plan.  The Reorganized Debtors, the Creditor Trust Debtors, the Creditor Trust and the Managing Trustee are expressly authorized to sell or dispose of any and all unliquidated Assets and to pay all costs and expenses associated with such sale or disposition without further order of the Bankruptcy Court, subject to the provisions of the Plan, including Article VI of the Plan.

13.       Sources of Cash for Plan Distribution

All Cash necessary for the Debtors and Eddie Bauer Holdings to make payments pursuant to the Plan will be obtained from existing Cash balances, the Cash Settlement Payment, the operations of the Debtors, the Reorganized Debtors or Eddie Bauer Holdings, or post-Confirmation Date borrowings and/or financings including the Senior Facility Proceeds. The existing Cash balances as of the Effective Date are projected to include the anticipated $30 million return on intercompany loans and equity resulting from the liquidation of FCNB as described in Section VI.L.3 of this Disclosure Statement.  Eddie Bauer Holdings may also make such payments using Cash received from its subsidiaries through its consolidated cash management system and from advances or dividends from such subsidiaries in the ordinary course.

All Cash necessary for the Creditor Trust to make payments pursuant to the Plan will be obtained from the Creditor Trust Assets as funded pursuant to the Plan on the Effective Date.

14.       Issuance of Eddie Bauer Holdings Common Stock

On or as soon as is practicable after the Effective Date, Eddie Bauer Holdings will issue 30 million shares of Eddie Bauer Holdings Common Stock for distribution in accordance with the Plan.  The issuance of the Eddie Bauer Holdings Common Stock and the distribution, transfer or exchange thereof in accordance with the Plan will be exempt from registration under applicable securities laws (including, without limitation, section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security or registration or

licensing of an issuer of a security) pursuant to section 1145 of the Bankruptcy Code, and may be sold without registration to the extent permitted under section 1145 of the Bankruptcy Code.

15.     Management Stock Incentive Program

After the Effective Date, the board of directors of Eddie Bauer Holdings will have the authority to adopt the Management Stock Incentive Program.

16.     Listing of Eddie Bauer Holdings Common Stock; Registration of Securities

Eddie Bauer Holdings will use its commercially reasonable best efforts to become a reporting company under the Exchange Act and cause, on or as soon as reasonably practicable after the Effective Date, the shares of Eddie Bauer Holdings Common Stock issued hereunder to be listed on the national market system of the National Association of Securities Dealers' Automated Quotation System.

I.      Rights of Action

1.      Maintenance of Eddie Bauer Rights of Action

The Debtors transfer and assign to Eddie Bauer Holdings or any of its subsidiaries, at the sole discretion of the Debtors, all rights on behalf of the Debtors to commence and pursue, as appropriate, any and all Eddie Bauer Rights of Action, whether arising before or after the Petition Date through and including the Effective Date, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, and, in accordance with section 1123(b)(3) of the Bankruptcy Code, all claims, rights, and Eddie Bauer Rights of Action that the respective Debtors may hold against any Entity will automatically vest in Eddie Bauer Holdings and its subsidiaries. From and after the Effective Date, Eddie Bauer Holdings and its subsidiaries will retain and may exclusively enforce any and all Eddie Bauer Rights of Action, and will have the exclusive right, authority and discretion to pursue, institute, prosecute, abandon, settle or compromise any and all Eddie Bauer Rights of Action.

2.      Maintenance of the Creditor Trust Rights of Action

The Debtors transfer and assign to the Creditor Trust all the Debtors' rights, title and interest in and to the Creditor Trust Rights of Action, including all rights to commence and pursue in the name of the Creditor Trust or on behalf of the Debtors, as appropriate, any and all Creditor Trust Rights of Action, whether arising before or after the Petition Date through and including the Effective Date, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases. All Creditor Trust Rights of Action that the respective Debtors may hold against any Entity will automatically vest in the Creditor Trust. The Managing Trustee will be designated as an estate representative of the Debtors' Estates, individually and/or collectively, under sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code, and will have the rights and powers of a trustee appointed under section 1104 of the Bankruptcy Code in each case solely with respect to the Creditor Trust Rights of Action, except to the extent limited by the Plan or the Creditor Trust Agreement. As an estate representative and in the exercise of its discretion in its capacity as such, the Managing Trustee

may, from and after the Effective Date, exclusively enforce any and all Creditor Trust Rights of Action, and will have the exclusive right, authority and discretion to pursue, institute, prosecute, abandon, settle, or compromise any and all Creditor Trust Rights of Action on behalf of the Debtors' Estates, individually and/or collectively, and, if necessary, in the name of a Debtor or the Debtors. In the event that the Managing Trustee commences an action in the name of a Debtor, the Managing Trustee will provide, to the extent practicable, Eddie Bauer Holdings with at least ten days written notice prior to commencing such action. Eddie Bauer Holdings will, and will cause its subsidiaries reasonably to cooperate with the Creditor Trust in its operations and actions. Such reasonable cooperation will include assisting the Creditor Trust to pursue the Creditor Trust Rights of Action by, among other things, preserving and providing documents and information and making available witnesses that may assist the Creditor Trust, including but not limited to making reasonable efforts to secure the cooperation and assistance of former officers, directors and employees of the Reorganized Debtors.

3.      Preservation of All Rights of Action Not Expressly Settled or Released

Unless a claim or Right of Action against a Creditor or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such claim or Right of Action for later enforcement by Eddie Bauer Holdings and its subsidiaries or the Creditor Trust (if such Right of Action constitutes a Creditor Trust Right of Action including, without limitation, claims and Rights of Action not specifically identified or of which Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to Debtors at this time or facts or circumstances which may change or be different from those which Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such claims or Rights of Action upon or after the confirmation and consummation of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Rights of Action have been expressly released in the Plan or other Final Order. In addition, Eddie Bauer Holdings and its subsidiaries, and the Creditor Trust expressly reserve the right to pursue or adopt any claims, crossclaims or counterclaims alleged in any lawsuit in which any of the Debtors are a defendant or an interested party, against any person or entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, subject to the provisions in the Plan or any Final Order.

Subject to the terms of any Final Order or the Plan including the SHI Settlement, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by Eddie Bauer Holdings and its subsidiaries, and the Creditor Trust subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, whether or not (i) such Entity has filed a proof of claim against the Debtors in these Chapter 11 Cases, (ii) such Entity's proof of claim has been the subject of an objection, (iii) such Entity's Claim was included in Debtors' Schedules, or (iv) such Entity's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as disputed, contingent or unliquidated.

4. Timing

The Creditor Trust, Eddie Bauer Holdings, and the Reorganized Debtors will be subject to the provisions of Sections 13.4 and 13.5 of the Plan regardless of when the Rights of Action are transferred.

J. Provisions Regarding Distributions

1. Initial Distribution to Creditors

On the Effective Date, or as soon as practicable thereafter, Eddie Bauer Holdings will make an initial Distribution (the "Initial Distribution") to Holders of Claims that are Allowed Claims as of the Effective Date, or such other date set forth in the Confirmation Order, in accordance with the treatment accorded such Allowed Claims pursuant to Articles III and IV of the Plan. In no event will the Initial Distribution take place prior to the receipt by the Debtors or the Reorganized Debtors, as applicable, of the Cash Settlement Payment and the Senior Debt Facility Proceeds.

On date of the Initial Distribution, Eddie Bauer Holdings will establish a reserve for the Holders of Disputed or Unresolved Administrative Claims as of the Effective Date consisting of: (i) the property which would otherwise be distributable to such Holder on such date in accordance with the Plan were such Disputed Claim or Unresolved Claim an Allowed Claim on such date, in the Face Amount thereof, (ii) such other amount as ordered by the Bankruptcy Court, or (iii) such other property as such Holder and the Debtors agree (the "Disputed Administrative Claims Reserve").

On the date of the Initial Distribution, Eddie Bauer Holdings will transfer to the Creditor Trust the property to be placed by Creditor Trust into a reserve for Holders of all Disputed or Unresolved Claims other than Administrative Claims as of the Effective Date, and such reserve will, as of such date, consist of (i) the property that would otherwise be distributable to such Holder on such date in accordance with the Plan were such Disputed Claim or Unresolved Claim an Allowed Claim on such date, in the Face Amount thereof, (ii) such other amount as ordered by the Bankruptcy Court, or (iii) such other property as such Holder and the Debtors or the Creditor Trust agree (the "Disputed Claims Reserve").

2. Subsequent Distributions to Creditors

After the date of the Initial Distribution, to the extent a Disputed or Unresolved Administrative Claim becomes an Allowed Claim, Eddie Bauer Holdings will make a Distribution to the Holder of such claim from the Disputed Administrative Claims Reserve pursuant to, and to the extent provided for in, the Plan.

After the date of the Initial Distribution, to the extent a Disputed or Unresolved Claim other than an Administrative Claim becomes an Allowed Claim, the Creditor Trust will make a Distribution to the Holder of such claim from the Disputed Claims Reserve pursuant to, and to the extent provided for in, the Plan.

All Distributions made by the Creditor Trust, Eddie Bauer Holdings or the Trustees pursuant to the Plan will be made without any requirement for bond or surety with respect thereto.

3.    Time and Manner of Payments

Any Distribution in Cash will be made by check drawn on a domestic bank or by wire transfer from a domestic bank.  Section 9.4 of the Plan will not apply to the payment of the Cash Settlement Payment; provided, however, that notwithstanding the foregoing the Cash Settlement Payment will be transferred to the Debtors pursuant to the Plan such that the Cash Settlement Payment will be received by the Debtors in same day funds on the Effective Date.

4.    Delivery of Distributions

Subject to the provisions of Bankruptcy Rule 2002(g) and except as otherwise provided under the Plan, Distributions to Holders of Allowed Claims will be made at the address of each such Holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by (i) the address set forth on proofs of claim filed by such Holders or the agent for such Holders, or (ii) an address provided to the Debtors, the Reorganized Debtors, the Creditor Trust Debtors, the Creditor Trust or Eddie Bauer Holdings provided that such address is provided to the Debtors, the Reorganized Debtors, the Creditor Trust Debtors, the Creditor Trust, or Eddie Bauer Holdings, as the case may be, in writing, at least ten Business Days prior to such Distribution.

5.    Undeliverable Distributions

a.    Holding of Undeliverable Distributions

If any Distribution to any Holder of is returned to Eddie Bauer Holdings or the Creditor Trust as undeliverable, no further Distributions will be made to such Holder unless and until Eddie Bauer Holdings or the Creditor Trust, as the case may be, is notified, in writing, of such Holder's then-current address.  Subject to Section 9.6 of the Plan, if any Distribution to any Holder of is returned as undelivered, no further Distribution to such Holder will be made and all undeliverable Distributions will remain in the possession of Eddie Bauer Holdings or the Creditor Trust, as the case may be, until such time as a Distribution becomes deliverable, at which such time all missed Distributions will be made to such Holders, without any interest or other accruals of any kind.  Nothing contained in the Plan will require any of the Reorganized Debtors or the Creditor Trust to attempt to locate any Holder of an Allowed Claim.

b.    Failure to Claim Undeliverable Distributions

Within ten Business Days after the later of the first anniversary of the Effective Date or the first Distribution under the Plan, Eddie Bauer Holdings and the Creditor Trust will file a list with the Bankruptcy Court setting forth the names of those Entities for which Distributions have been attempted hereunder and have been returned as undeliverable as of the date thereof.  Any Holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a Distribution within 60 days from and after the filing of such list will have its Claim for such undeliverable Distribution discharged and will be forever barred from asserting any

such Claim against the Debtors, the Reorganized Debtors, the Creditor Trust Debtors, Eddie Bauer Holdings, the Creditor Trust, the Trustees or any of their assets. In such case, any consideration held for Distribution on account of such Claim will revert to the Creditor Trust.

6. <u>Compliance with Tax Requirements/Allocation</u>

In connection with the Plan, to the extent applicable, the Debtors, Eddie Bauer Holdings and the Creditor Trust, in making Distributions under the Plan, will comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all Distributions pursuant to the Plan will be subject to such withholding and reporting requirements. The Debtors, Eddie Bauer Holdings and the Creditor Trust may withhold the entire Distribution due to any Holder of an Allowed Claim until such time as such Holder provides to the Debtors, Eddie Bauer Holdings, or the Creditor Trust, as the case may be, the necessary information to comply with any withholding requirements of any Governmental Unit. Any property so withheld will then be paid by Eddie Bauer Holdings or the Creditor Trust, as the case may be, to the appropriate authority. If the Holder of an Allowed Claim fails to provide to the Debtors, Eddie Bauer Holdings, or the Creditor Trust, as the case may be, the information necessary to comply with any withholding requirements of any Governmental Unit within six months after the date of first notification by the Debtors, Eddie Bauer Holdings, or the Creditor Trust, as the case may be, to the Holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then the Holder's Distribution will be treated as an undeliverable Distribution in accordance with the Plan.

For tax purposes, Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

7. <u>Time Bar to Cash Payments</u>

Checks issued by the Debtors, Eddie Bauer Holdings and the Creditor Trust on account of Allowed Claims will be null and void if not negotiated within ninety days from and after the date of issuance thereof. Requests for reissuance of any check will be made directly to Eddie Bauer Holdings (if the check was issued on or after the Effective Date by Eddie Bauer Holdings) or the Creditor Trust (if the check was issued after the Effective Date by the Creditor Trust), as the case may be, by the Holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check will be made on or before the later of (i) the first anniversary of the Effective Date or (ii) ninety days after the date of issuance of such check, if such check represents a final Distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks will be discharged and forever barred and the right to all moneys from the voided checks will revert to the Creditor Trust (regardless of whether the check was issued by Eddie Bauer Holdings) for Distribution pursuant to the Plan.

8. <u>Fractional Dollars, Fractional Shares and <i>De Minimis</i> Distributions</u>

Notwithstanding anything contained in the Plan to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the

Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. Eddie Bauer Holdings, as successor to the Debtors, and the Creditor Trust will have the discretion not to make payments of less than 100 dollars on account of any Allowed General Unsecured Claim that was a Disputed Claim as of the Effective Date, unless a specific request is made in writing to the Debtors on or before 90 days after allowance of such Claim.

Notwithstanding anything contained in the Plan to the contrary, only whole numbers of shares of Eddie Bauer Holdings Common Stock will be issued. When any Distribution on account of an Allowed Claim would otherwise result in the issuance of a number of shares of Eddie Bauer Holdings Common Stock that is not a whole number, the actual distribution of such shares only will include the next lower whole number of shares. The total number of shares of Eddie Bauer Holdings Common Stock specified to be distributed to holders of Allowed General Unsecured Claims pursuant to the Plan will be adjusted as necessary to account for the rounding provided for in the Plan. No consideration will be provided in lieu of fractional shares that are rounded down.

In addition, neither Eddie Bauer Holdings nor the Creditor Trust will be required to make any Distribution on account of any Claim in the event that the costs of making such Distribution payment exceed the amount of such Distribution payment, and all Distributions that otherwise would have been distributed to the Holders of such *de minimis* Claims will otherwise be distributed in accordance with the terms of the Plan.

9. Set-off

Except as expressly provided in the Plan, the Debtors and Eddie Bauer Holdings and the Creditor Trust may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, setoff against any Allowed Claim and the Distributions to be made pursuant to the Plan on account thereof (before any Distribution is made on account of such Claim), the claims, rights and causes of action of any nature that any of the Debtors may hold against the Holder of such Allowed Claim. The Holders of Claims may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set-off any Allowed Claims such Holder possesses against the Debtors any claim, rights or causes of action of any nature that the Debtors, may hold against such Holder. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors, Eddie Bauer Holdings, the Creditor Trust or such Holders of any such claims, rights and causes of action that such parties may possess under section 553 of the Bankruptcy Code.

10. Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise of all Claims or controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim with respect thereto, or any Distribution to be made on account of such an Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims or controversies, and the Bankruptcy Court's finding that such

compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and is fair, equitable and reasonable.

K.  Procedures for Resolving Disputed Claims

1.  Prosecution of Objections to Claims

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as set forth in the Plan, the Creditor Trust will have the right to make, file and prosecute objections to General Unsecured Claims, Administrative Claims, Other Secured Claims and Priority Claims.  The Creditor Trust will have the right to prosecute objections to Claims previously filed by the Debtors against any such Claims.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as set forth in the Plan, Eddie Bauer Holdings will have the right to make, file and prosecute objections to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, Eddie Bauer Holdings will have the right to prosecute objections to Claims previously filed by the Debtors against any Administrative Claims, Professional Fee Claims, and Priority Tax Claims.  Notwithstanding Section 10.1 of the Plan, the Creditor Trust and, until dissolved, the Creditors' Committee, will remain a party in interest, with the right to be heard in all matters related to Section 10.1 of the Plan.

Unless another time is set by order of the Bankruptcy Court, all objections to Claims will be filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made by the later of (y) 90 days after the Effective Date; or (z) 90 days after a timely Proof of Claim or request for payment with respect to such Claim is filed; provided, however, that the Creditor Trust and Eddie Bauer Holdings may seek an extension of such time to object.

Except as set forth in the Plan or Confirmation Order, nothing in the Plan, this Disclosure Statement, the Confirmation Order or any order in aid of Confirmation, will constitute, or be deemed to constitute, a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that Debtors had immediately prior to the commencement of the Chapter 11 Cases, against or with respect to any Claim.  Except as set forth in the Plan or the Confirmation Order, upon Confirmation, the Reorganized Debtors, the Creditor Trust Debtors, the Creditor Trust and Eddie Bauer Holdings, each on behalf of itself and/or any of the foregoing parties, will have, retain, reserve and be entitled to assert all such claims, causes of action, rights of setoff and other legal or equitable defenses of any of the Debtors, which will be vested in the Reorganized Debtors, the Creditor Trust Debtors, the Creditor Trust and Eddie Bauer Holdings upon the occurrence of the Effective Date.

2.  Estimation of Claims

Eddie Bauer Holdings and the Creditor Trust may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to

any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Creditor Trust or Eddie Bauer Holdings may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

3.      Cumulative Remedies

All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved as provided in the Plan or by any mechanism approved by the Bankruptcy Court. Until such time as a Claim becomes Allowed, such Claim will be treated as a Disputed Claim for purposes related to allocations, Distributions and voting under the Plan.

4.      Allowance of Claims and Interests

a.      *Disallowance of Claims*

Pursuant to sections 105 and 502(d) of the Bankruptcy Code, no Distributions will be made to Holders of Claims held by Entities from which property is recoverable under section 542, 543, 550, 553, 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code (including the Rights of Action) until such time as such causes of action against that Entity have been settled or resolved by a Final Order and all sums due to any of the Debtors are turned over to the Debtors (on or prior to the Effective Date) or Eddie Bauer Holdings (after the Effective Date).

b.      *Allowance of Claims*

Except as expressly provided in the Plan, no Claim will be deemed Allowed by virtue of the Plan, Confirmation, or any order of the Bankruptcy Court in the Chapter 11 Cases, unless and until such Claim is deemed Allowed under the Bankruptcy Code.

c.      *No Distribution Pending Allowance*

If any Claim is a Disputed Claim or Unresolved Claim, no Distribution provided hereunder will be made on account of such Claim unless such Claim becomes an Allowed Claim.

5.      Personal Injury Claims

No Distributions will be made on account of any Personal Injury Claim unless and until such Claim is liquidated and becomes an Allowed Claim. Any Personal Injury Claim that has not been liquidated prior to the Effective Date and as to which a proof of claim was timely Filed, will be determined and liquidated in accordance with the ADR Procedures. Any Personal Injury Claim determined and liquidated in accordance with the ADR Procedures, will be paid as follows: (i) to the extent such Personal Injury Claim is, in whole or in part, an Insured Personal Injury Claim, the insured portion will be paid by the applicable insurer pursuant to the

provisions of the applicable insurance policies; and (ii) to the extent any portion of such Personal Injury Claim is not an Insured Personal Injury Claim, such portion will be deemed, to the extent applicable, an Allowed Claim in Class 4 (General Unsecured Claims) and treated in accordance with Section 4.5 of the Plan. Nothing contained in Section 10.5 of the Plan will constitute or be deemed a waiver (a) of any claim, right, or Right of Action that the Debtors may have against any person in connection with or arising out of any Personal Injury Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code; (b) of any claim, right, or Right of Action that the Debtors or any entity may hold against any other entity, including, without limitation, insurers under any policies of insurance; or (c) by such insurers of any defenses, including coverage defenses, held by such insurers.

L.    Executory Contracts and Unexpired Leases

    1.    Rejection of Executory Contracts and Unexpired Leases

        Immediately prior to the Effective Date, all executory contracts and unexpired leases of the Debtors will be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code pursuant to the Plan except those executory contracts and unexpired leases that (i) have been previously rejected or assumed by Final Order of the Bankruptcy Court, (ii) are the subject of a motion to reject or assume pending on the Effective Date, (iii) are to be assumed pursuant to the SHI Settlement, or (iv) are identified on the schedule of executory contracts and unexpired leases included in the Plan Supplement. Entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. The non-Debtor parties to any rejected subleases will be responsible for taking all steps necessary to retrieve, at their expense, all personal property in, and to surrender, the premises that are the subject of such leases.

    2.    Assumption of Executory Contracts and Unexpired Leases

        All executory contracts and unexpired leases specially identified (i) on the schedule of executory contracts and unexpired leases included in the Plan Supplement, or (ii) in Section 2.3 of the Plan, will be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code pursuant to the Plan as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to Article XI of the Plan will revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law. Notwithstanding the foregoing, each executory contract and unexpired lease to which a Canadian Debtor is a party will be assumed as of the Effective Date, the Canadian Debtors will cure all defaults under each such executory contract and unexpired lease (except for defaults of the kind set forth in section 365(b)(2) of the Bankruptcy Code) and each executory contract and unexpired lease will be binding on the Canadian Debtor and other Entities party thereto as of the Effective Date. No Person who is a party to, or is entitled to any benefit from, any such contract or lease will, on or following the Effective Date, accelerate, terminate, rescind, refuse to perform or otherwise repudiate its obligations thereunder, or enforce or exercise any right, directly or indirectly, in any manner whatsoever under or in respect of any such contract or lease by reason

of the effect on the Canadian Debtors of the completion of any of the transactions contemplated under the Plan.  The section containing these provisions in the Plan may not be amended with regard to a Canadian Debtor without the approval of the Canadian Court.

3.      Claims Based on Rejection of Executory Contracts or Unexpired Leases

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court approving such rejection.  Any Claims arising from the rejection of an executory contract or unexpired lease not filed within such time will be forever barred from assertion against the Debtors, their respective Estates, the Reorganized Debtors, the Creditor Trust Debtors, Eddie Bauer Holdings, the Creditor Trust and the Trustees and their property unless otherwise ordered by the Bankruptcy Court or provided for in the Plan.  All such Allowed Claims for which proofs of claim are required to be filed will be, and will be treated as, Allowed General Unsecured Claims subject to the provisions of Article IV of the Plan, and to any limitation on allowance of such Claims under section 502(b) of the Bankruptcy Code or otherwise.

4.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree. In the event of a dispute regarding:  (i) the amount of any cure payments, (ii) the ability of Eddie Bauer Holdings or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

5.      Miscellaneous

The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any executory contract of unexpired lease.

Listing an executory contract or unexpired lease on the schedule of executory contracts and unexpired leases included in the Plan Supplement will not constitute an admission by any of the Debtors, the Reorganized Debtors, the Creditor Trust Debtors, the Creditor Trust or Eddie Bauer Holdings that such contract or lease (including any related agreements that may exist) is an executory contract or unexpired lease, or that the applicable Debtor or Reorganized Debtor has any liability thereunder.

6.      Indemnification of Officers, Employees and Restructuring Committee Board Members

The obligations of the Debtors to indemnify any individual serving at any time after the Petition Date as an officer or employee of any Debtor and the Restructuring Committee

Board Members will, to the extent provided in a Debtor's constituent documents or by a written agreement with a Debtor or by applicable state corporate law, as applicable, be assumed by Eddie Bauer Holdings, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date; provided, however, that (i) Eddie Bauer Holdings will have no obligation to indemnify any Excluded Defendant or any SHI Released Party, (ii) any individual who has received, or at any time requests, indemnification pursuant to Section 11.6 of the Plan will provide reasonable cooperation with respect to the pursuit by the Creditor Trust of the Creditor Trust Rights of Action; and (iii) Section 11.6 of the Plan is without prejudice to any Person's right to reimbursement or indemnification under any insurance policy. Notwithstanding the foregoing, clause (ii) of the prior sentence will not apply to any Restructuring Committee Board Member.

7. Compensation and Benefit Programs

Except as otherwise expressly provided in the Plan, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their employees, retirees and non-employee directors and the employees and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, vacation and life, accidental death and dismemberment insurance plans (collectively, the "Benefit Programs") in effect as of the Effective Date will be treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code and will be transferred to Eddie Bauer Holdings; provided, however, that notwithstanding the foregoing, and except as otherwise ordered by the Bankruptcy Court, the Pacific Life Split Dollar Life Insurance Policy for Mr. Richard Fersch will be terminated in accordance with its terms on the Effective Date.

M. Conditions Precedent to Confirmation and Effective Date of the Plan

1. Conditions Precedent to Confirmation of the Plan

The occurrence of the Confirmation Date is subject to satisfaction of the following conditions precedent:

- the entry of the Confirmation Order (i) in form and substance reasonably acceptable to the Debtors and the Creditors' Committee, (ii) in form and substance reasonably acceptable to SHI solely with respect to the Confirmation Order and the Plan incorporating the provisions of the SHI Settlement Term Sheet (including the releases contemplated therein) and the Plan being otherwise consistent with the SHI Settlement Term Sheet, and (iii) which approves the SHI Settlement as a good faith settlement;

- neither the Debtors nor the Creditors' Committee having commenced or filed a motion seeking authority to commence: (i) any action against any Released Party; or (ii) to take discovery from any Released Party; and

- the Confirmation Date occurring on or before June 30, 2005.

2. Conditions Precedent to Effective Date of the Plan

The occurrence of the Effective Date is subject to satisfaction of the following conditions precedent:

a. *Confirmation Order as Final Order* The Confirmation Order shall (i) in form and substance be reasonably acceptable to the Debtors and the Creditors' Committee; (ii) in form and substance be reasonably acceptable to SHI solely with respect to the Confirmation Order incorporating the provisions of the SHI Settlement Term Sheet (including, without limitation, the releases contemplated therein), and being otherwise consistent with the SHI Settlement Term Sheet; and (iii) approve the SHI Settlement as a good faith settlement, and (iv) be a Final Order.

b. *Canadian Confirmation Order as Final Order* The Canadian Confirmation Order shall (i) in form and substance be reasonably acceptable to the Debtors and the Creditors' Committee; in form and substance be reasonably acceptable to (ii) SHI solely with respect to the Canadian Confirmation Order incorporating the provisions of the SHI Settlement Term Sheet (including, without limitation, the releases contemplated therein), and being otherwise consistent with the SHI Settlement Term Sheet; (iii) approve the SHI Settlement as a good faith settlement, and (iv) be a Final Order.

c. *Execution of Documents; Other Actions* All other actions and documents necessary to implement the Plan will have been effected or executed.

d. *Absence of Certain Actions* Neither the Debtors nor the Creditors' Committee shall have commenced or filed a motion seeking authority to commence (i) any action against any SHI Released Party, or (ii) to take discovery from any SHI Released Party.

e. *Occurrence of Effective Date* The Effective Date will occur on or before July 31, 2005.

3. Waiver of Conditions Precedent

To the extent legally permissible, each of the conditions precedent in Sections 12.1 and 12.2 of the Plan may be waived, in whole or in part, by the Debtors with consent of the Creditors' Committee, and of SHI solely with respect to the conditions precedent in Sections 12.1 and 12.2(a), (b), (d) and (e) of the Plan. Any such waiver of a condition precedent may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than proceeding to act as if the condition no longer existed.

N. Injunction, Release and Indemnification

1. Injunction

Except as otherwise expressly provided in the Plan, or to enforce any obligation of any Entity under the Plan, all Entities who have held, hold or may hold Claims or Equity Interests are permanently enjoined, from and after the Effective Date, from: (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or

Interest against the Debtors, their estates, the Reorganized Debtors, the Creditor Trust Debtors, Eddie Bauer Holdings, the Creditor Trust, or the Trustees; (ii) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtors, their estates, the Reorganized Debtors, the Creditor Trust Debtors, Eddie Bauer Holdings, the Creditor Trust, or the Trustees; (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, their estates, the Reorganized Debtors, the Creditor Trust Debtors, Eddie Bauer Holdings, the Creditor Trust or the Trustees against the property or interests in property of any of the foregoing Entities; (iv) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims, Equity Interests which are extinguished or released pursuant to the Plan; and (v) taking any actions to interfere with the implementation or consummation of the Plan that do not conform to or comply with the provisions of the Plan.

With respect to any actions or controversies against the Creditor Trust, the Trustees or the Plan Oversight Committee, all Persons and Entities will be and are permanently enjoined from commencing or continuing any such matter except in the Bankruptcy Court and the Bankruptcy Court will retain exclusive jurisdiction over such matters; provided, however, that Section 13.1(b) of the Plan will not prevent any Excluded Defendant from asserting defenses in any court adjudicating claims brought by the Creditor Trust against such Excluded Defendant, to the extent such defenses are not discharged or released pursuant to the Plan and the Confirmation Order.

2.    Discharge

Except for Distributions under the Plan, and as otherwise provided in the Plan or in the Confirmation Order, on the Effective Date, the Confirmation Order will operate as a discharge under section 1141(d)(1) of the Bankruptcy Code, and as a release of any and all debts (as such term is defined in section 101(12) of the Bankruptcy Code) of, and Claims against, one or more of the Debtors that arose at any time before the Confirmation Date, including, but not limited to, all principal and interest, whether accrued before, on or after the Petition Date, regardless of whether (i) a proof of claim in respect of such Claim has been filed or deemed filed, (ii) such Claim has been Allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the Holder of such Claim has voted on the Plan or has voted to reject the Plan. Without limiting the generality of the foregoing, on the Effective Date, the Debtors will be discharged from any debt that arose before the Confirmation Date and any debt of a kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code and will have all of the benefits and protections set forth in section 1141(d)(1) of the Bankruptcy Code. Except as otherwise specifically provided in the Plan, nothing in the Plan will be deemed to waive, limit or restrict in any manner the discharge granted upon Confirmation of the Plan pursuant to section 1141 of the Bankruptcy Code.

The discharge and release of the Debtors as provided in the Plan will not diminish or impair the enforceability of any insurance policies that may cover claims against any Debtor or any other Person. The discharge and release of the Debtors as provided in the Plan will not diminish or impair any claims arising after the Petition Date with respect to the non-monetary obligations of the Reorganized Debtors or the Creditor Trust Debtors under any insurance policy. The insurers under all policies to which the Debtors are a party will continue to be responsible

for insurance claims, including, without limitation, future claims, in accordance with the terms of the insurance policies and the requirements of state and other applicable law, notwithstanding the effect of the discharge and release under the Plan on any requirement under the insurance policies that the Debtors first satisfy any monetary obligations.

3.  Releases by the Debtors

On the Effective Date, the Debtors, on their own behalf and as representatives of the Estates, release unconditionally, and will be deemed to release unconditionally, each of the Post-Petition Released Parties from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or after the Petition Date through and including the Effective Date in connection with, relating to or arising out of the Chapter 11 Cases, the management and operation of the Debtors, the formulation, negotiation, implementation, confirmation or consummation of the Plan, this Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan.

On the Effective Date, the Debtors, on their own behalf and as representatives of the Estates, release unconditionally, and will be deemed to release unconditionally, each of the Pre-Petition Released Parties from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence taking place before the Petition Date in connection with or relating to Spiegel or any of its direct or indirect subsidiaries.

The Confirmation Order will contain a permanent injunction to effectuate the releases granted in Section 13.3 of the Plan.

4.  SHI Settlement Releases

On the Effective Date, the Debtors, on their own behalf and as representatives of the Estates, and any of the Debtors' direct or indirect non-debtor subsidiaries and the Creditors' Committee or any other entity acting on any of their behalves, release unconditionally, and will be deemed to release unconditionally, each of the Released Parties from any and all claims (including, without limitation, derivative claims), obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence taking place during the period beginning at the beginning of time through and including the Effective Date; provided, however, that such released claims shall not include (i) any claims asserted by FCNB against SHI in the lawsuit between such parties pending in the United States District Court for the District of Oregon, and (ii) any claims by the Debtors with respect to the obligation of SHI or its designee to make the Cash Settlement Payment on the Effective Date in accordance with the terms and conditions of the Plan.

On the Effective Date, each Holder of a Claim (but not shareholders or former shareholders of Spiegel solely in their capacity as shareholders or former shareholders of Spiegel or any Governmental Unit) will be deemed to have unconditionally released each of the Released Parties from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence taking place during the period beginning at the beginning of time through and including the Effective Date and related to the Debtors or their direct or indirect subsidiaries, including but not limited to Contribution Claims; provided, however, that the release pursuant to Section 13.4(b) of the Plan will have no effect on the liability of any Post-Petition Released Party who is not an SHI Released Party that results from any of such Post-Petition Released Party's act or omission after the Petition Date that is determined in a Final Order to have constituted gross negligence or willful misconduct.

On the Effective Date, the Released Parties release unconditionally, and will be deemed to release unconditionally, the Debtors from any and all claims, obligations, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, solely for reimbursement or indemnification under the bylaws of such entities or applicable statute (including, but not limited to, claims that relate to pre-Effective Date activity and, therefore, arose before the Effective Date, but involve expenses actually incurred after the Effective Date); provided, however, such released claims for reimbursement or indemnification will not include (i) claims to the extent covered by insurance, (ii) SHI's claims in its lawsuit against FCNB in the United States District Court for the District of Oregon, (iii) claims held by Restructuring Committee Board Members, and (iv) claims held by Persons who served as officers of the Debtors at any time after the Petition Date.

On the Effective Date, the Released Parties release unconditionally, and will be deemed to release unconditionally, all claims (including, without limitation, derivative claims), obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, existing or arising on or before the Effective Date against the Creditors' Committee, each of the Creditors' Committee's members, and the Creditors' Committee's professionals, including the Creditors' Committee's attorneys, financial advisors and investment banker (but only to the extent such claims relate to a Creditors' Committee member's acts in its official capacity as a Creditors' Committee member or such professional's acts as a professional for the Creditors' Committee).

On the Effective Date, the SHI Released Parties release unconditionally, and will be deemed to release unconditionally, all claims (including, without limitation, derivative claims), obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, existing or arising on or before the Effective Date against the Debtors, and the Debtors' direct and indirect non-debtor subsidiaries, and each of their respective officers, directors, employees, members, agents, brokers, financial advisors, restructuring advisors, investment bankers, auditors or attorneys (but only to the extent such claims relate to acts or omissions in such person's capacity

with respect to a Debtor or non-debtor subsidiary prior to or on the Effective Date); provided, however, that such released claims will not include (i) the Otto KG Goods Unsecured Claims and the SHI Unsecured Claims, (ii) any claims against the Excluded Defendants, (iii) claims to the extent covered by insurance, (iv) any claims arising after the Petition Date under any Buying Agency Agreement, the Germany Joint Venture Agreement, or the Japan Joint Venture Agreement, and (v) SHI's claims in its lawsuit against FCNB in the United States District Court for the District of Oregon.

The Confirmation Order will contain a permanent injunction to effectuate the releases granted in Section 13.4 of the Plan.

Notwithstanding anything to the contrary in Section 13.4 of the Plan, the provisions of Section 13.4 of the Plan will only take effect as of the date the Debtors receive the Cash Settlement Payment.

    5.    <u>Released Parties Claims Over Protection</u>

On the Effective Date, each Holder of a Claim that is an Excluded Defendant will be deemed to have unconditionally released each of the Released Parties from all liability for any judgment obtained by the Creditor Trust against such Excluded Defendant to the extent, if any, that a court determines that such Excluded Defendant would have had (absent the SHI Settlement which is incorporated in the Plan) a claim against any Released Party for contribution, indemnification, or any other basis to contribute to satisfy that judgment (any such claim, a "<u>Contribution Claim</u>").

In the event the Creditor Trust obtains a judgment against any Excluded Defendant (the "<u>Creditor Trust Judgment</u>") and if, notwithstanding the release provided pursuant to Section 13.5(a) of the Plan and any bar to Contribution Claims arising under applicable law by reason of a good faith SHI Settlement, such Excluded Defendant (whether or not such Excluded Defendant is a Holder of a Claim), in turn obtains a judgment or finding against Released Party based on a Contribution Claim requiring such Released Party to satisfy all or any part of the Creditor Trust Judgment (a "<u>Claims Over Determination</u>"), then and in such event, the Creditor Trust will reduce the Creditor Trust Judgment for the benefit of the Released Party and in satisfaction of the Claims Over Determination by an amount or to an extent equal to the Claims Over Determination. Pursuant to this paragraph a Released Party will not incur any liability to an Excluded Defendant in connection with any Creditor Trust Judgment. This paragraph is not intended to release the Excluded Defendants from liability or limit in any way the recovery of damages by the Creditor Trust from the Excluded Defendants, except as may result from the express provisions hereof.

Notwithstanding anything to the contrary in Section 13.5 of the Plan, the provisions of Section 13.5 of the Plan will only take effect as of the date the Debtors receive the Cash Settlement Payment.

    6.    <u>Post-Petition Released Party Exculpation and Limitation of Liability</u>

None of the Post-Petition Released Parties will have or incur any liability to any Holder, or any other party in interest, or any of their respective agents, employees,

representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, including the formulating, negotiating or implementing of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation, Confirmation, Consummation, the administration of the Plan or the property to be distributed under the Plan and in all respects such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities, as applicable, in the Chapter 11 Cases, under the Plan; provided, however, that the foregoing provisions of Section 13.6(a) of the Plan will have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

Notwithstanding any other provision of the Plan, no Holder, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, will have any right of action against any Post Petition Released Party for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, negotiating or implementing the Plan, Consummation, Confirmation, or the administration of the Plan or the property to be distributed under the Plan; provided, however, that the foregoing provisions of Section 13.6(b) of the Plan will have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

The Reorganized Debtors will indemnify each Post Petition Released Party exculpated pursuant to Section 13.6 of the Plan against, hold each such party harmless from, and reimburse each such party for, any and all losses, costs, expenses (including reasonable attorneys' fees and expenses), liabilities and damages sustained by such party arising from any liability described in Section 13.6 of the Plan, excluding any liability that results from any act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

7.      Reservation of Rights

Except as otherwise expressly provided in the Plan, no provisions of Article XIII of the Plan will prohibit or restrain the prosecution of any Claims or Rights of Action against Excluded Defendants.

The express exception of Dr. Urs Aschenbrenner from the Excluded Defendants is not intended to, and does not, release the Excluded Defendants of any liability, including any liability for any alleged acts and omissions of Dr. Aschenbrenner.  The Debtors, the Debtors' direct and indirect non-debtor subsidiaries, the Creditors' Committee, and the successors or assignees of any of them, expressly reserve all of their respective rights against the Excluded Defendants, which are not being released pursuant to the Plan.

O.      Retention of Jurisdiction

Except as otherwise provided in the Plan, the Bankruptcy Court will retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code, arising in or

related to the Chapter 11 Cases and the Plan.  The Bankruptcy Court also will have exclusive jurisdiction:

- to resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any of the Debtors was or is a party or with respect to which the Debtors may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date of the Plan, to add any executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be rejected;

- to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, transactions and other agreements or documents created in connection with the Plan;

- to determine any and all motions, adversary proceedings, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by Eddie Bauer Holdings or the Creditor Trust after the Effective Date (to the extent such venue is selected by Eddie Bauer Holdings or the Creditor Trust, as the case may be);

- to ensure that Distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

- subject to Section 15.10 of the Plan with respect to certain Canadian Entities, to hear and determine any timely objections to Administrative Claims or to proofs of Claims and Equity Interests filed, both before and after the Effective Date, including any objections to the classification of any Claim or Interest, and to allow, disallow, determine, liquidate, classify, estimate or establish the priority of, or secured or unsecured status of, any Claim, in whole or in part;

- to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

- to issue orders in aid of execution of the Plan;

- to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

- to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

- subject to Section 15.10 of the Plan with respect to certain Canadian Entities, to hear and determine disputes arising in connection with or relating to the Plan, the interpretation, implementation or enforcement of the Plan, or the

extent of any Entity's obligations incurred in connection with or released under the Plan;

- to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

- subject to Section 15.10 of the Plan with respect to certain Canadian Entities, to determine any other matters that may arise in connection with or are related to the Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or this Disclosure Statement;

- to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

- to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code, including the allowance or disallowance and classification of late-filed proofs of claim in accordance with Rule 9006(b) of the Bankruptcy Rules;

- to enter a Final Decree closing the Chapter 11 Cases;

- to determine matters that may arise in connection with the Creditor Trust or the Creditor Trust Agreement;

- to determine and hear any actions or controversies by or against the Trustees or the Plan Oversight Committee; and

- subject to Section 15.10 of the Plan with respect to certain Canadian Entities, to hear and determine any matter relating to or arising out of any action or act taken or omission in connection with or related to the formulation, preparation, dissemination, implementation, administration, confirmation or consummation of the Plan, this Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, including any other act or omission taken or to be taken in connection with the Chapter 11 Cases commenced against any party in the Chapter 11 Cases, including the Debtors, the Creditors' Committee, and Released Parties and their respective current and former directors and officers, members, agents, advisors, attorneys, advisors and other professionals and Entities employed pursuant to sections 327 and 1103 of the Bankruptcy Code.

P.   Miscellaneous Provisions

1.   Modification of Plan

Subject to obtaining the approval of the Creditors' Committee, and, if such amendment or modification concerns the SHI Settlement, SHI, the Debtors reserve the right, in

accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order. Upon entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. Claimants that have accepted the Plan will be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim.

2.    Revocation or Withdrawal

The Plan may be revoked or withdrawn by the Debtors prior to the Confirmation Date. If the Plan is revoked or withdrawn prior to the Confirmation Date, then the Plan will be deemed null and void. In such event, nothing contained herein or in the Plan will be deemed to constitute a waiver or release of any claims by the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors.

3.    Term of Existing Injunctions or Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to section 105, 362 or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date, and thereafter will be annulled.

4.    Post-Effective Date Fees and Expenses

From and after the Effective Date, Eddie Bauer Holdings will, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Reorganized Debtors related to implementation and consummation of the Plan.

5.    Exemption from Registration

Pursuant to section 1145 of the Bankruptcy Code, and except as provided in subsection (b) thereof, the issuance of (i) the Eddie Bauer Holdings Common Stock, (ii) Cash, (iii) the Creditor Trust Interests and (iv) either (a) the Senior Credit Facility Proceeds or (b) the Creditor Notes, on account of, and in exchange for, the Claims against the Debtors will be exempt from registration pursuant to section 5 of the Securities Act of 1933 and any other applicable non-bankruptcy law or regulation.

6.    Section 1146 Exception

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan (including, without limitation, the Eddie Bauer Holdings Common Stock, the Creditor Trust Interests, and, if applicable, the Creditor Notes), or the making or delivery of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of

transfer under, in furtherance of, or in connection with the Plan, will not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

7.  Severability

The provisions of the Plan will not be severable unless such severance is agreed to by the Debtors and the Creditors' Committee and such severance would constitute a permissible modification of the Plan pursuant to section 1127 of the Bankruptcy Code.

8.  Plan Supplement

The Plan Supplement will be filed with the Bankruptcy Court no later than ten days prior to the Voting Deadline and will contain (i) forms of the Creditor Trust Agreement, the Eddie Bauer Holdings Certificate of Incorporation, the Eddie Bauer Holdings Bylaws and the Securitization Note, (ii) the principal terms and conditions of the Senior Debt Facility (if applicable) and the Working Capital Facility, (iii) the identity of the proposed senior officers and directors of Eddie Bauer Holdings, (iv) the identity and compensation of any insiders to be retained or employed by Eddie Bauer Holdings, (v) a schedule of executory contracts and unexpired leases to be assumed pursuant to the terms of the Plan, and (vi) a list of the Eddie Bauer Holdings Rights of Action; provided, however, that the Debtors may amend the documents contained in the Plan Supplement through and including the Effective Date in a manner consistent with the Plan and the Disclosure Statement through and including the Effective Date.  The Plan Supplement may also include such other documents as contemplated by the Plan.  Upon the Filing of the Plan Supplement, the Plan Supplement may be inspected in the Office of the Clerk of the Bankruptcy Court during normal court hours.

9.  Governing Law

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of New York.  This paragraph will not affect or alter the governing law, including the choice of law rules, applicable to all claims by, against or among the Excluded Defendants.

10.  Reservation of Rights for Certain Canadian Creditors

The rights of a Canadian Entity that is (i) the Holder of a Claim against a Canadian Debtor and (ii) not subject to personal jurisdiction in the Bankruptcy Court will not be affected, solely with respect to such Claim, by the Plan, but such rights will be subject to all orders and rulings of the Canadian Court regarding such Claim.  Notwithstanding the foregoing, all such Canadian entities will be bound by all terms and provisions of the Plan, including but not limited to the SHI Settlement.

11.  Notices

All notices, requests and demands to or upon the Debtors, Eddie Bauer Holdings or the Creditor Trust to be effective will be in writing, including by facsimile transmission, and,

unless otherwise expressly provided in the Plan, will be deemed to have been duly given or made when actually delivered to all of the following or, in the case of notice by facsimile transmission, when received by all of the following and telephonically confirmed, addressed as follows or to such other addresses as filed with the Bankruptcy Court.

To:

**On behalf of the Debtors:**

James L. Garrity, Jr.
Marc B. Hankin
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY  10022
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

**On behalf of the Creditors' Committee:**

Howard Seife
David M. LeMay
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, NY  10112
Telephone:  (212) 408-5100
Facsimile:  (212) 541-5369

**On behalf of the U.S. Trustee:**

Deirdre A. Martini
OFFICE OF THE UNITED STATES TRUSTEE
33 Whitehall Street
Suite 2100
New York, NY  10004
Telephone:  (212) 510-0500
Facsimile:  (212) 668-2255

**On behalf of the Creditor Trust:**

At the address set forth in the Creditor Trust Agreement.

12.     <u>Closing of Cases</u>

The Reorganized Debtors and the Creditor Trust Debtors will, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to obtain a Final Decree closing the Chapter 11 Cases.

13. <u>Section Headings</u>

The section headings contained in the Plan are for reference purposes only and will not affect the meaning or interpretation of the Plan.

14. <u>Continuing Viability of Other Orders/Agreements</u>

Except to the extent expressly modified by the Plan, (i) all Final Orders previously entered by the Bankruptcy Court and (ii) any agreements between Creditors or between the Debtors and the Creditors will continue in full force and effect.

## VIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a discussion of certain significant U.S. federal income tax considerations of the Plan under the Tax Code.  This general description does not discuss all aspects of U.S. federal income taxation that may be relevant to a Creditor in light of such Creditor's investment circumstances, or to certain types of Creditors subject to special treatment under the U.S. federal income tax laws (for example, life insurance companies, banks, dealers in securities, tax-exempt organizations, foreign corporations and individuals who are not citizens or residents of the United States for U.S. tax purposes) and does not discuss any aspect of state, local or foreign taxation.  This discussion also does not address the U.S. federal income tax consequences to (i) Holders whose Claims are entitled to reinstatement or payment in full in cash or are otherwise unimpaired under the Plan or (ii) Holders whose Claims are extinguished without distribution in exchange therefor.  This discussion is limited to Creditors who hold the Claims as "capital assets" and Creditors who will hold Eddie Bauer Holdings Common Stock and Creditor Notes, if any, as a capital asset (generally property held for investment) within the meaning of section 1221 of the Tax Code.  This discussion is based upon laws, regulations, rulings and decisions now in effect and upon proposed regulations all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision. Moreover, substantial uncertainties, resulting from the lack of a definitive judicial or administrative authority and interpretation, apply to various tax aspects of the transactions discussed herein.  EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE TAX CONSEQUENCES PARTICULAR TO IT FROM THE IMPLEMENTATION OF THE PLAN.

A.    <u>Tax Consequences to Spiegel</u>

1.    <u>Reorganization of Spiegel</u>

Spiegel intends that the transfer of its assets to Eddie Bauer Holdings in exchange for all of the Eddie Bauer Holdings Common Stock followed by the distribution of the Eddie Bauer Holdings Common Stock to the Creditors and the liquidation of Spiegel (the "<u>Reorganization</u>") qualify as a tax-free reorganization described in section 368(a)(1)(G) of the Tax Code (a "<u>G Reorganization</u>").  There is some uncertainty about whether certain of the requirements for a G Reorganization will be met.  In order to qualify as a G Reorganization, Spiegel must transfer "substantially all" of its assets to Eddie Bauer Holdings, within the meaning of the Tax Code.  Certain assets of Spiegel were disposed of either because they were not viable businesses or to generate cash to repay Creditors, and certain other non-operating

assets will be distributed to the Creditor Trust for the benefit of Creditors and thus such assets are not being transferred to Eddie Bauer Holdings. However, the legislative history of section 368(a)(1)(G) indicates an intention to permit cash payments to creditors and asset sales to facilitate a rehabilitative bankruptcy reorganization. The legislative history indicates that, for example, a transaction is not precluded from satisfying the "substantially all" test for a G Reorganization merely because, prior to the transfer to the acquiring corporation, payments to creditors and asset sales were made in order to leave the debtor with more manageable operating assets to continue in business.

Moreover, in order for the transaction to qualify as a G Reorganization, holders of "stock or securities" in the acquired company must exchange such stock or securities for stock or securities of the acquiring corporation (i.e., Eddie Bauer Holdings). In this regard, the term "securities" is not clearly defined under current U.S. federal income tax law; instead, the status of a debt instrument as a security is typically determined based upon an overall evaluation of the nature of the debt instrument, the term to maturity of the debt instrument, the extent of the investor's proprietary interest in the issuer of the debt instrument and certain other factors, with the term of the debt generally considered a very important factor. Debt instruments with terms over 10 years are generally considered securities and debt instruments with terms under 5 years are generally not considered securities. A substantial amount of the Claims have terms of five, six or seven years. In a G Reorganization it is not necessary that all debt exchanged in the reorganization constitute securities, only that some portion of the debt is a security. Although the matter is not free from doubt, Spiegel believes that a sufficient portion of the Claims should constitute "securities" for this purpose.

Accordingly, although the matter is not free from doubt, Spiegel believes that the Reorganization should constitute a G Reorganization. If the Reorganization constitutes a G Reorganization, Eddie Bauer Holdings will succeed to certain tax attributes of Spiegel and its subsidiaries, as described below. In the event the Reorganization does not constitute a G Reorganization, there would be various adverse tax consequences with the result that Eddie Bauer Holdings' available NOLs would be vastly reduced or eliminated (or a federal income tax liability could even result).

2.    Cancellation of Debt Income

As a result of the anticipated cancellation of the Claims in exchange for the transfer of the Eddie Bauer Holdings Common Stock, interests in the Creditor Trust, the Securitization Note, cash and, possibly, Creditor Notes pursuant to the Plan, the amount of Spiegel's aggregate outstanding indebtedness will be reduced. In general, for U.S. federal income tax purposes, a debtor will realize cancellation of debt ("COD") income when a creditor accepts less than full payment in satisfaction of its debt. Under certain provisions of section 108 of the Tax Code, if a debtor corporation transfers stock to a creditor in satisfaction of its indebtedness, such corporation shall be treated as having satisfied the indebtedness with an amount of money equal to the fair market value of the stock. Furthermore, when a corporation uses one debt instrument to retire another, it is treated as having satisfied its prior indebtedness for an amount equal to the "issue price" of the new debt instrument as determined under the original issue discount rules (see section VIII.B.2 below). Absent an exception, the amount of COD income realized must be included in taxable income. Section 108 of the Tax Code

provides in part that gross income does not include COD income if the discharge occurs in a title 11 case. Instead, the taxpayer applies the COD income that would otherwise be included in gross income to reduce the following tax attributes of the debtor member in a consolidated group in the following order: the debtor member's allocable share of consolidated net operating losses or consolidated NOLs, carryovers of the general business credit, carryovers of the minimum tax credit, net capital losses or capital loss carryovers, basis of the taxpayer's depreciable and nondepreciable property (including the stock of its subsidiaries), and the debtor member's allocable share of passive activity loss and credit carryovers and carryovers of foreign tax credit. If the stock basis of a subsidiary of the debtor member is required to be reduced, the tax attributes of the subsidiary must also be reduced in the manner described immediately above. Finally, to the extent there remains any excluded COD of the debtor member for which there has been no attribute reduction, the excluded COD is applied to reduce the remaining consolidated tax attributes of the group on a pro rata basis. The taxpayer may elect to first reduce the basis of depreciable property (at either the debtor member level or, as applicable, the subsidiary level).

Spiegel expects that it will realize significant COD income upon the exchange of the Claims for Eddie Bauer Holdings Common Stock, interests in the Creditor Trust, the Securitization Note, cash and, possibly, Creditor Notes pursuant to the Plan. Based on the estimated reorganization value of Spiegel, the amount of COD income is estimated to be approximately $400 million. The actual amount will differ from this amount because it will reflect the trading price of the Eddie Bauer Holding Common Stock and the Creditor Notes, if issued. Because the realization of COD income will occur in a title 11 case, Spiegel will not recognize such COD income, but will instead reduce tax attributes after the end of the tax year in which the COD income is recognized. Spiegel expects to reduce its NOLs and other attributes, rather than electing to first reduce the basis of some or all of its depreciable property. Under the rules applicable to transactions such as G Reorganizations, in which an acquiror corporation succeeds to certain tax attributes of a transferor corporation, the tax attributes of the transferor corporation that are available to the acquiror corporation will be reduced by the attribute reduction required for the transferor corporation's excluded COD income.

3.      Net Operating Loss Carryover

Based on the assumptions that (i) the Reorganization constitutes a G Reorganization, (ii) the amount of COD income realized by Spiegel will be $400 million, (iii) the books, records, and tax returns of Spiegel and its subsidiaries are accurate, and (iv) certain other assumptions, and determined (a) using estimates of 2004 operating results, (b) without regard to the impact of the Cash Settlement Payment contributed by SHI, and (c) without regard to 2005 operating results, it is estimated that the amount of the NOLs and capital loss carryovers available to Eddie Bauer Holdings would be approximately $750 million and $250 million, respectively. It is possible that the amount of such NOLs and other losses will be challenged by the IRS. As discussed below, such NOL carryovers would be further reduced pursuant to a plan under section 382(l)(5) of the Tax Code for a portion of prior interest deductions, and the NOLs and certain other tax attributes of Spiegel otherwise available to Eddie Bauer Holdings may be subjected to limitation if a plan under section 382(l)(6) of the Tax Code is elected.

4.    <u>Section 382 Limitation</u>

Under section 382 of the Tax Code, if a loss corporation undergoes an "ownership change," the amount of its pre-change losses that may be utilized to offset future taxable income generally will be subject to an annual limitation. Such limitation may also apply to subsequently recognized "built-in" losses, i.e., losses economically accrued but unrecognized as of the date of the ownership change. In general, the annual limitation for a corporation that undergoes an ownership change pursuant to a plan of reorganization in a title 11 case would, pursuant to section 382(l)(6) of the Tax Code, be equal to the product of (i) the value of the loss corporation's outstanding stock immediately after the ownership change (with certain adjustments) and (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (which is, for example, 4.27% for February 2005). However, if the loss corporation does not continue its historic business or use a significant portion of its business assets in a new business for two years after the ownership change, the annual limitation would be zero.

In general, an "ownership change" occurs if the percentage of the value of the loss corporation's stock owned by one or more direct or indirect 5% shareholders (as specially defined for purposes of section 382 of the Tax Code) has increased by more than fifty (50) percentage points over the lowest percentage of that value owned by such 5% shareholders at any time during a three-year testing period. It is anticipated that the issuance of Eddie Bauer Holdings Common Stock pursuant to the Plan will constitute an ownership change of Spiegel, Eddie Bauer Holdings, and each of their direct and indirect subsidiaries.

As stated above, section 382 of the Tax Code also can operate to limit built-in losses recognized subsequent to the date of the ownership change. If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and all items of "built-in" income and deductions), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as a pre-change loss and similarly will be subject to the annual limitation. Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its otherwise available annual allowance. In general, a loss corporation's net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. It is currently not known whether Spiegel will be in a net unrealized built-in loss or net unrealized gain position on the Effective Date.

There is some uncertainty as to how section 382(l)(5), discussed below, and section 382(l)(6) of the Tax Code would apply to a consolidated group of corporations, particularly where not all of the corporations are in bankruptcy. It is generally believed that where the emerging parent corporation is subject to section 382(l)(5) or 382(l)(6), the relevant section should be applied to the group on a consolidated basis and Spiegel intends to take this position. However, there is no authority on this point and this treatment is not free from doubt.

An exception, under section 382(l)(5) of the Tax Code, to the foregoing annual limitation rules generally applies where shareholders and qualified (so-called "old and cold") creditors of the debtor receive at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed title 11 plan. Under this exception, a debtor's pre-change losses are not limited on an annual basis but are reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the reorganization and, during the part of the taxable year prior to and including the reorganization, in respect of the debt exchanged for stock in the reorganization. Moreover, if this exception applies, any subsequent ownership change with respect to the debtor within a two-year period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income, and section 382(l)(6) would apparently apply to the portion of the two-year period prior to the subsequent ownership change.

An old and cold creditor includes a creditor who has held its debt continuously beginning at least 18 months prior to the filing of the title 11 case. In addition, any stock received by a creditor who does not become a direct or indirect 5% shareholder of the reorganized debtor generally will be treated as received by an old and cold creditor, other than in the case of any creditor whose participation in the formulation of the plan makes evident to the debtor that the creditor has not owned the debt for the requisite period. Provided the requirements under section 382(l)(5) are met, the current intention is to apply the exception under section 382(l)(5) of the Tax Code.

5.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOLs, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOLs (as recomputed for AMT purposes). As a result, even in years in which available NOLs could offset all of Eddie Bauer Holding's income, it would be subject to the AMT at a rate of approximately 2% of its income (i.e., 10% of its pre-NOL taxable income for AMT purposes would be subject to a 20% AMT rate).

In addition, if a corporation undergoes an "ownership change" within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be adjusted for certain AMT purposes to reflect the fair market value of such assets as of the change date.

B.    Tax Consequences to the Creditors

For Creditors that exchange Claims for Eddie Bauer Holdings Common Stock, interests in the Creditor Trust, the Securitization Note, cash and, possibly, Creditor Notes pursuant to the Plan, the U.S. federal income tax consequences will depend on whether or not

such exchange qualifies as part of a G Reorganization under the Tax Code.  The discussion below assumes that the Reorganization will qualify as a G Reorganization.

1. <u>Exchange of Claims for Eddie Bauer Holdings Common Stock, Cash and Other Property</u>

The U.S. federal income tax consequences to a Creditor of the exchange of Claims for Eddie Bauer Holdings Common Stock will depend on whether the Creditor's Claims are considered securities for U.S. federal income tax purposes.  In this regard, the term "securities" is not clearly defined under current U.S. federal income tax law; instead, the status of a debt instrument as a security typically is determined based upon an overall evaluation of the nature of the debt instrument, the term to maturity of the debt instrument, the extent of the investor's proprietary interest in the issuer of the debt instrument and certain other factors.  Each Creditor is urged to consult its own tax advisor in this regard to determine whether all or a portion of its Claims constitute securities.  In addition, the discussion in this Section VIII.B.1 (except the last paragraph) assumes that Creditor Notes would not be "securities" for U.S. federal income tax purposes and the last paragraph discusses the case where the Creditor Notes are "securities" for such purposes.

To the extent that a Creditor's Claims are treated as securities, a Creditor will not generally recognize gain or loss on the exchange of such Claims for Eddie Bauer Holdings Common Stock, except that a Creditor would recognize gain, if any, with respect to its Claims to the extent of any "boot" received in the reorganization and would not recognize a loss in the exchange.  Boot received in the exchange will include any cash received, interests in the Creditor Trust, the Securitization Note, and Creditor Notes, if any, received.  Furthermore, a Creditor will be treated as receiving an interest payment to the extent that a portion of the Eddie Bauer Holdings Common Stock and the boot received is allocable to accrued interest that accrued during the Creditor's holding period for the Claims exchanged therefor.  Accordingly, a Creditor who had not previously included such accrued interest in income will recognize ordinary taxable income with respect to such interest payment, and a Creditor who had previously included such accrued interest in income will recognize ordinary income or loss equal to the difference between the Creditor's basis in such interest (i.e., the amount of such accrued interest recognized as income by such Creditor) and the amount of the payment.  Any distributions received by a Creditor of the Eddie Bauer Holdings Common Stock and the boot shall be allocated first to the principal portion of the Claims to the extent thereof and thereafter to any accrued interest on the Claims.  However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.  Each Creditor is urged to consult its tax advisor regarding such allocation.

The tax basis of the Eddie Bauer Holdings Common Stock received in the exchange will be equal to adjusted tax basis of the Claims surrendered in the exchange and increased by any gain recognized on the receipt of boot, decreased by the fair market value of the boot, and increased, for a cash method Creditor, by the amount of income recognized with respect to accrued interest, and decreased by any deduction or loss claimed in respect of any previously accrued interest.  A Creditor's tax basis in any non-cash boot received will be the fair market value of such boot.

The holding period of the Eddie Bauer Holdings Common Stock received in the exchange will include the holding period of the Claims surrendered therefor in the exchange (provided such Claims were held as a capital asset at the time of the exchange), except that any portion of Eddie Bauer Holdings Common Stock allocable to accrued interest will have a new holding period beginning the day after the exchange.

To the extent that a Creditor's Claims do not constitute securities for U.S. federal income tax purposes, such Creditor will generally recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of cash, the fair market value of the Eddie Bauer Holdings Common Stock, the issue price of the Creditor Notes (as discussed in Section VIII.B.2 below), if any, and the fair market value of any other consideration received and (ii) the Creditor's adjusted tax basis in its Claims. Subject to the discussion below, any such gain or loss recognized will be a capital gain or loss for such purposes, assuming that the Creditor has held its Claims as a capital asset. Any such capital gain or loss will be long-term capital gain or loss for such purposes if the Creditor has held its Claims for more than one year. A Creditor, however, will recognize ordinary income to the extent a portion of the Eddie Bauer Holdings Common Stock and any other consideration received is allocable to accrued but unpaid interest on its Claims, and to the extent attributable to accrued market discount, as discussed below in Section VIII.B.6. A Creditor will have a fair market value tax basis in the Eddie Bauer Holdings Common Stock and any other non-cash consideration received by such Creditor.

To the extent that Creditor Notes constitute "securities" and Creditor's Claims constitute "securities" for U.S. federal income tax purposes, a Creditor will not generally recognize gain or loss on the exchange of such Claims for Creditor Notes, except that a Creditor would recognize gain, if any, with respect to its Claims to the extent of any "boot" received in the reorganization, as described above, and would not recognize a loss in the exchange. In addition, in a similar manner as described above, a Creditor would be treated as receiving an interest payment to the extent of any accrued but unpaid interest that accrued during the Creditor's holding period for the Claims that would be allocable to the Creditor Notes. The tax basis of the Creditor Notes and the Eddie Bauer Holdings Common Stock, taken together, would be determined in a similar manner as for the Eddie Bauer Holdings Common Stock, as described above, and such adjusted tax basis would be allocated between the Eddie Bauer Holdings Common Stock and the Creditor Notes based on their relative fair market values. The holding period of the Creditor Notes received in the exchange would include the holding period of the Claims surrendered therefor in the exchange (provided such Claims were held as a capital asset at the time of the exchange), except that any portion of Creditor Notes allocable to accrued interest will have a new holding period beginning the day after the exchange. To the extent the Creditor Notes constitute "securities" and the Creditor's Claims do not constitute "securities" for U.S. federal income tax purposes, the consequences to a Creditor are described in the paragraph immediately above.

2.    Original Issue Discount

Creditors should be aware that the Creditor Notes, if issued, may be issued with original issue discount ("OID"). The total amount of OID on the Creditor Notes will be the excess of the stated redemption price at maturity over the issue price of the Creditor Notes. The Creditors generally must include OID in gross income in advance of the receipt of cash

attributable to that income (but will not be taxed again when such cash is received). The amount of OID includible in income each year is determined using a constant yield to maturity.

Because a substantial amount of the Creditor Notes will not be issued for money, the issue price of the Creditor Notes depends on whether a substantial amount of such Creditor Notes are considered to be "traded on an established market" within the meaning of applicable U.S. Treasury Regulations. Spiegel expects that the Creditor Notes will be considered to be traded on an established market. As a result, the issue price of the Creditor Notes will be the fair market value of the Creditor Notes, determined as of the issue date.

The "stated redemption price at maturity" of a debt instrument is the aggregate of all payments due to the holder under such debt instrument at or before its maturity date, other than interest that is actually and unconditionally payable in cash or property (other than debt instruments of the issuer) at fixed intervals of one year or less during the entire term of the instrument at certain specified rates ("qualified stated interest").

The amount of OID includible in income for a taxable year by a Creditor will generally equal the sum of the "daily portions" of the total OID on the Creditor Notes for each day during the taxable year on which such Creditor held the Creditor Notes. Generally, the daily portion of the OID is determined by allocating to each day in any accrual period a ratable portion of the OID allocable to such accrual period. The amount of OID allocable to an accrual period will generally be the product of the "adjusted issue price" of a note at the beginning of such accrual period and its "yield to maturity," less the amount of any qualified stated interest allocable to such period. The "adjusted issue price" of a note at the beginning of an accrual period will equal the issue price plus the amount of OID previously includible in the gross income of any Creditor, less any payments made on such note on or before the first day of the accrual period. The "yield to maturity" of a note will be computed on the basis of a constant interest rate and compounded at the end of each accrual period. An accrual period may be of any length and may vary in length over the term of the note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the final day or the first day of an accrual period.

If a Creditor's adjusted tax basis in the Creditor Notes immediately after the exchange of the Claims for the Creditor Notes (i) is less than or equal to the sum of all amounts payable on the Creditor Notes other than payments of qualified stated interest, but (ii) exceeds the adjusted issue price of such Creditor Notes, such excess will be considered "acquisition premium." In such case, the daily portion of OID for any day that the Creditor holds the Creditor Notes is reduced by a fraction, the numerator of which is the amount of acquisition premium and the denominator of which is the excess of the sum of all amounts payable on the Creditor Notes after the date of exchange over the adjusted issue price of the Creditor Notes. Alternatively, a Creditor may elect to amortize acquisition premium on a constant-yield basis.

If the Creditor's adjusted tax basis in the Creditor Notes immediately after the exchange exceeds the amount that is the stated redemption at maturity, the Creditor will be considered to have amortizable bond premium equal to such excess and will not be required to accrue any OID income. In addition, the Creditor may elect to amortize this premium using a constant yield method over the remaining term of the Creditor Notes. A Creditor who elects to

amortize bond premium may offset each interest payment on such Creditor Notes by the portion of the bond premium allocable to such payment and must reduce its tax basis in the Creditor Notes by the amount of the premium amortized in any year.

3.    Securitization Note

Spiegel intends to take the position that (i) the Securitization Note constitutes a debt instrument that is a contingent payment debt instrument within the meaning of Treasury regulation section 1.1275-4, (ii) the entire amount due under the Securitization Note is contingent, and (iii) the Securitization Note will not be, and Claims exchanged therefor are not, publicly traded within the meaning of applicable Treasury regulations.  There is no assurance that the IRS will agree with this position, and Creditors are urged to consult their own tax advisors regarding the consequences of the ownership of the Securitization Note.

If the Securitization Note constitutes a contingent payment debt instrument (and assuming the foregoing positions are respected), Creditors must include in income any payments under the Securitization Note when such payments are made.  A portion of the payment received by the Creditor on the Securitization Note will be treated as principal, determined by discounting the payment at the "test rate" from the payment date to the issue date, and the remainder of such payment is treated as interest.  The "test rate" is the "applicable Federal rate" for the Securitization Note determined as if the term of the Securitization Note began on the issue date of the Securitization Note and ended on the date the contingent payment is made.  Contingent amounts received by a Creditor that are treated as principal payments will reduce the Creditor's basis in its allocable portion of the Securitization Note.  If a Creditor's basis is reduced to zero, any additional principal payments will be treated as gain from the sale or exchange of its allocable portion of the Securitization Note.

4.    Subsequent Disposition of Eddie Bauer Holdings Common Stock and Creditor Notes

a.    *Disposition of Eddie Bauer Holdings Common Stock*

Upon the sale, exchange, redemption or other taxable disposition of Eddie Bauer Holdings Common Stock (collectively, a "Stock Disposition"), a Creditor will generally recognize capital gain or loss equal to the difference between (i) the amount of cash and the fair market value of any property received with respect to such disposition and (ii) the Creditor's adjusted tax basis in the Eddie Bauer Holdings Common Stock.  Such capital gain or loss will be long-term capital gain or loss if the Creditor's holding period for such Eddie Bauer Holdings Common Stock exceeds one year on the date of the Stock Disposition.

b.    *Disposition of Creditor Notes*

Upon the sale, exchange, redemption or other taxable disposition of a Creditor Note (collectively, a "Note Disposition"), a Creditor will generally recognize capital gain or loss equal to the difference between (i) the amount of cash and the fair market value of any property received with respect to such disposition and (ii) the Creditor's adjusted tax basis in the Creditor Note.  A Creditor's adjusted tax basis in a note generally will equal the Creditor's initial tax basis in the note increased by the amount of original issue discount, if any, previously included in

income, decreased for the amount of bond premium, if any, amortized over the term of the note, and decreased by the amount of any cash payment received with respect to the Creditor Note other than payments of qualified stated interest. Such capital gain or loss will generally be long-term capital gain or loss if the Creditor's holding period for such Creditor Note exceeds one year on the date of the Note Disposition.

*c.     Accrued Market Discount*

Any accrued "market discount" not treated as ordinary income upon a tax-free exchange of market discount bonds carries over to nonrecognition property received in the exchange. Assuming that the Reorganization qualifies as a G Reorganization, Creditors that have accrued market discount would carry over the portion of accrued market discount allocable to the Eddie Bauer Holdings Common Stock and Creditor Notes (assuming the Creditor Notes constitute securities), if any, received in exchange for Claims that are treated as "securities," such that any gain recognized by the Creditor upon a subsequent disposition of such Eddie Bauer Holdings Common Stock and Creditor Notes would be treated as ordinary income to the extent of any accrued market discount not previously included in income (unless the amount of such market discount was a *de minimis* amount, in which case market discount is disregarded). In general, a Claim will have accrued "market discount" if such Claim was acquired after its original issuance at a discount to its adjusted issue price.

5.      Receipt of a Beneficial Interest in the Creditor Trust

*a.     Tax Reporting for Assets of the Creditor Trust*

Certain Creditors will also receive an interest in the Creditor Trust. The Creditor Trust is intended to be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of U.S. Treasury Regulation section 301.7701-4(d), and the Plan, the Creditor Trust and the Disclosure Statement are intended to comply with the advance-ruling guidelines contained in Rev. Proc. 94-45, 1994-2 C.B. 684, although no advance ruling will be sought for the Creditor Trust. The Creditor Trust will be treated as a grantor trust for U.S. federal income tax purposes, all of the assets of which are deemed owned by the Creditors pursuant to Tax Code sections 671 through 677 (or successor provisions). The Managing Trustee will file all returns for the Creditor Trust as a grantor trust pursuant to U.S. Treasury Regulation section 1.671-4(a) (or successor provisions).

The Creditor Trust is being created pursuant to the Plan for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Creditor Trust. The transfers by Spiegel of Creditor Trust Assets to the Creditor Trust will be treated for all federal income tax purposes as a distribution of the Creditor Trust Assets directly to the Creditors at the time of creation of the Creditor Trust, followed by the immediate transfer by the Creditors of the Creditor Trust Assets to the Creditor Trust in exchange for beneficial interests in the Creditor Trust. Creditors will be treated as the grantors and direct owners of a specified undivided interest in the Creditor Trust Assets for all U.S. federal income tax purposes (such Creditor Trust Assets will have a tax basis equal to their fair market value on the date transferred to the Creditor Trust). Pursuant to the Plan, the

Managing Trustee will determine the valuations of the transferred property, such valuations will be used for all U.S. federal income tax purposes, and all Creditors shall be bound by such valuations.

The Managing Trustee will provide to the Creditors an annual statement that will list items of income, deduction and credit applicable to the Creditor Trust in the taxable year. The statement also will clearly specify the portion of the total items that is attributed to each Creditor. The character of items of income, deduction and credit to any Creditor and the ability of such Creditor to benefit from any deduction or losses will depend on the particular situation of the Creditor. Each Creditor will pay any tax imposed by any governmental unit on its portion of the income of the Creditor Trust. The Managing Trustee, however, will comply with all withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements.

The U.S. federal income tax reporting obligation of a Creditor with respect to the Creditor Trust is not dependent upon the Creditor Trust distributing any cash or other proceeds. Therefore, a Creditor may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Creditor Trust, whether or not the Creditor Trust has made any concurrent distribution to such Creditor. In general, a distribution by the Creditor Trust to a Creditor will not be taxable to such Creditor because the Creditors are already regarded for U.S. federal income tax purposes as owning the underlying Creditor Trust Assets. Creditors are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Creditor Trust.

The Creditor Trust will terminate five years from the Effective Date. If warranted by the facts and circumstances and subject to the approval of the Bankruptcy Court upon a finding that an early termination of the Creditor Trust is appropriate or that an extension of the term of the Creditor Trust is necessary to the liquidating purpose of the Creditor Trust, the term of the Creditor Trust may be terminated early or may be extended for a finite term based on the particular facts and circumstances. For any extension, Bankruptcy Court approval must be obtained within six months of the beginning of the extended term.

b.      *Tax Reporting for Assets of the Creditor Trust Allocable to Disputed Claims.*

From and after the Effective Date and until such time as all Disputed Claims or Unresolved Claims (such Disputed Claims and Unresolved Claims, collectively "Section 7.9 Disputed Claims") are resolved, a portion of the assets of the Creditor Trust (or, possibly, a portion of the Creditor Trust Interests) will be retained on account of such claims and, as discussed below, will be treated for federal income tax purposes as if held in a separate trust. Periodically, as any Section 7.9 Disputed Claims are resolved, an allocable portion of the net assets (or Interests) held in reserve will be released, thereby entitling either (i) a Holder of a Disputed Claim that became an Allowed Claim to a beneficial interest in the Creditor Trust and (assuming prior distributions from the Creditor Trust to holders of beneficial interests) an actual cash distribution or (ii) the Holders of previously allowed Claims to an increased beneficial interest in the Creditor Trust and (assuming prior distributions from the Creditor Trust to holders of beneficial interests) an additional cash distribution.

Under section 468B(g) of the Tax Code, amounts earned by an escrow account, settlement fund, or similar fund are subject to current tax. Although certain Treasury regulations have been issued under this section, no final Treasury regulations have yet been promulgated to address the tax treatment of such accounts in a bankruptcy setting. Thus, depending on the facts of a particular situation, such an account could be treated as a separately taxable trust, as a grantor trust treated as owned by the holders of Section 7.9 Disputed Claims, or otherwise. On February 1, 1999, the IRS issued proposed Treasury regulations that, if finalized in their current form, would specify the tax treatment of escrows of the type here involved that are established after such Treasury regulations became final. In general, such Treasury regulations would tax such an escrow in a manner similar to a corporation. As to previously established escrows, such Treasury regulations would provide that the IRS would not challenge any reasonably and consistently applied method of taxation for income earned by the escrow, and any reasonably and consistently applied method for reporting such income.

Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury regulations, the receipt by the Managing Trustee of a private letter ruling if the Managing Trustee so requests one (or the receipt of an adverse determination by the IRS upon audit if not contested by the Managing Trustee), the Managing Trustee will:

(1) treat all the assets of the Creditor Trust allocable to, or retained on account of, the Section 7.9 Disputed Claims, as a discrete trust (the "Separate Trust") for federal income tax purposes, consisting of separate and independent shares to be established in respect of each disputed claim, in accordance with the trust provisions of the Tax Code (section 641 et seq. of the Tax Code);

(2) treat as a taxable income or loss of the Separate Trust with respect to any given taxable year the portion of the taxable income or loss of the Creditor Trust that would have been allocated to the holders of such Section 7.9 Disputed Claims had such claims been allowed on the Effective Date (but only for the portion of the taxable year with respect to which such claims are unresolved);

(3) treat as a distribution from the Separate Trust any increased amounts distributed by the Creditor Trust as a result of any Disputed Claim against Spiegel being resolved earlier in the taxable year, to the extent such distribution related to taxable income or loss of the Separate Trust determined in accordance with the provisions hereof; and

(4) to the extent permitted by applicable law, report consistently for state and local income tax purposes.

In addition, pursuant to the Plan, all holders of Claims are required to report consistently with such treatment. Accordingly, subject to issuance of definitive guidance, the Managing Trustee will report on the basis that any amounts earned by the Separate Trust and any

taxable income of the Creditor Trust allocable to it are subject to a separate entity level tax, except to the extent such earnings are distributed during the same taxable year. Any amounts earned by or attributable to the Separate Trust and treated as distributed to a holder during the same taxable year will be includible in such holder's gross income.

6.     Tax Consequences to Creditors on the Redemption of Claims by Spiegel for Cash

The receipt solely of cash by the Creditors in exchange for the Claims will be a taxable transaction for U.S. federal income tax purposes. Accordingly, a Creditor that receives solely cash will generally recognize gain or loss for such purposes in an amount equal to the difference between the amount of cash received and the Creditor's adjusted tax basis in its Claims. Subject to the discussion below, any such gain or loss recognized will be a capital gain or loss for such purposes, assuming that the Creditor has held its Claims as a capital asset. Any such capital gain or loss will be long-term capital gain or loss for such purposes if the Creditor has held its Claims for more than one year.

In the case of a Creditor who acquired the Claims at a market discount (unless the amount of such market discount was a *de minimis* amount, in which case market discount is disregarded), any gain recognized upon the sale of the Claims will represent ordinary income to the extent of the market discount that accrued during the period such Creditor held such Claim, unless the Creditor previously had elected to include such accrued market discount in the Creditor's income on a current basis. In general, a Claim will have accrued market discount if such Claim was acquired after its original issuance at a discount to its adjusted issue price.

Furthermore, to the extent a portion of the cash received by the Creditor is allocable to accrued but unpaid interest on the Claims: if the Creditor had not previously included such accrued interest in income, it will recognize ordinary taxable income with respect to such interest payment; and if the Creditor had previously included such accrued interest in income, it will recognize ordinary income or loss equal to the difference between the Creditor's basis in such interest (i.e., the amount of such accrued interest recognized as income by such Creditor) and the amount of the payment.

C.     Backup Withholding

Under certain circumstances, a Creditor may be subject to backup withholding at the rate of 28% with respect to "reportable payments." Spiegel will be required to deduct and withhold the prescribed amount if (i) the Creditor fails to furnish a taxpayer identification number ("TIN") to Spiegel in the manner required, (ii) the IRS notifies Spiegel that the TIN furnished by the Creditor is incorrect, (iii) there has been a failure of the Creditor to certify under penalty of perjury that the Creditor is not subject to withholding or (iv) the Creditor is notified by the IRS that such Creditor failed to report properly payments of interest and dividends and the IRS has notified Spiegel that such Creditor is subject to backup withholding.

Backup withholding is not an additional tax. Any amount withheld from a payment to a Creditor under the backup withholding rules is allowable as a credit against such Creditor's U.S. federal income tax liability (and may entitle such holder to a refund), provided that the required information is furnished to the IRS. Certain persons are exempt from backup

withholding, including corporations and financial institutions.  Creditors should consult their tax advisors as to their qualification for exemption from backup withholding and the procedure for obtaining such exemption.

## IX.    CERTAIN CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a discussion of certain Canadian federal income tax considerations of the Plan under the *Income Tax Act* (Canada) (the "Canada Tax Act").  This general description does not discuss all aspects of Canadian federal income taxation that may be relevant to a Creditor in light of such Creditor's circumstances.

This discussion is based on the current provisions of the Canada Tax Act, the regulations thereunder and the administrative practices and policies of the Canada Revenue Agency (the "CRA") and also takes into account all specific proposals to amend the Canada Tax Act and the regulations thereunder publicly announced by the Minister of Finance, Canada, prior to the date hereof.  Except for the foregoing, this discussion does not take into account or anticipate any changes in law, whether by legislative, regulatory, administrative or judicial action.  Furthermore, this discussion does not take into account provincial or foreign income tax legislation or considerations.

The following discussion of income tax considerations is of a general nature only and is not intended to constitute advice to any particular Creditor.  EACH CREDITOR IS URGED TO SEEK INDEPENDENT ADVICE REGARDING THE TAX CONSEQUENCES PARTICULAR TO IT FROM THE IMPLEMENTATION OF THE PLAN.

A.    Tax Consequences to Companies in the Spiegel Group

1.    Tax Consequences to Spiegel on the Transfer of Shares of Spiegel Group Teleservices-Canada, Inc.

Pursuant to the provisions of the *Canada-U.S. Income Tax Convention*, any capital gain arising on the transfer of shares of Spiegel Group Teleservices-Canada, Inc. to Eddie Bauer, Inc. will be exempt from Canadian tax, since that the shares of Spiegel Group Teleservices-Canada, Inc. do not derive their value principally from real property situated in Canada.

Spiegel will be required and expects to make an application under section 116 of the Canada Tax Act for a certificate of compliance (a "Section 116 Certificate") on the transfer of the shares of Spiegel Group Teleservices-Canada, Inc.  If a Section 116 Certificate is not obtained by Spiegel by the thirtieth day of the month following the month in which the transfer of the shares took place, Eddie Bauer, Inc. will be required to make a remittance to the CRA in the amount of 25% of the fair market value of the Spiegel Group Teleservices-Canada, Inc. shares.  However, it is possible that the CRA may direct Eddie Bauer, Inc. in writing that such remittance is not required.

2. <u>Tax Consequences to Spiegel Group Teleservices-Canada, Inc. and Eddie Bauer of Canada, Inc. on Debt Forgiveness</u>

The debt forgiveness rules under section 80 of the Canada Tax Act apply where a commercial debt obligation has been settled or extinguished at any time. A commercial debt obligation is a debt obligation, other than an excluded obligation, interest payable in respect of which was deductible in computing the debtor's income or would have been deductible if interest had been paid or payable on the obligation. Section 80 does not apply to excluded obligations, which include debts held on income account. However, the CRA has taken the administrative position that section 80 will apply to a bona fide compromise of trade debts under the Companies' Creditors Arrangement Act. Assuming that the intercompany obligations of Eddie Bauer of Canada, Inc. and Spiegel Group Teleservices-Canada, Inc. constitute commercial debt obligations, section 80 will apply when such intercompany obligations are eliminated and extinguished on the Effective Date of the Plan.

In general terms, the forgiven amount of the debt for purposes of section 80 of the Canada Tax Act will be equal to A minus B, where A is the lesser of the amount for which the obligation was issued and the principal amount of the obligation and B is the amount, if any, paid at the time in satisfaction of the principal amount of the obligation. Once the forgiven amount is determined, it is applied to reduce certain tax attributes of the debtor in the following order:

(1)     prior years' non-capital losses;

(2)     prior years' allowable business investment losses;

(3)     prior years' net capital losses;

(4)     capital cost and undepreciated capital cost of depreciable property;

(5)     cumulative eligible capital (goodwill);

(6)     resource expenditures;

(7)     adjusted cost base of capital property (such as land and portfolio investments) excluding shares and debts of corporations of which the debtor is a "specified shareholder" (i.e. a shareholder who holds 10% or more of the corporation's shares);

(8)     adjusted cost case of shares and debts of corporations of which the debtor is a specified shareholder, but not including related corporations;

(9)     adjusted cost base of shares and debts of related corporations and interests in related partnerships; and

(10)     current year net capital losses.

Any remaining balance may be transferred to reduce the tax attributes of an eligible person under section 80.04 of the Canada Tax Act. An eligible person for purposes of this section is a taxable Canadian corporation (or an eligible Canadian partnership) by which the debtor is controlled or which is controlled by the debtor or persons related to the debtor.

If a "residual balance" remains after the reduction of tax attributes as set out above, half of this amount will be included in the income of the debtor under subsection 80(13) of the Canada Tax Act. A corporation resident in Canada is permitted to claim a reserve under section 61.4 to spread the income inclusion required by subsection 80(13) of the Canada Tax Act over five years. A deduction may also be available under section 61.3 of the Canada Tax Act, which essentially limits the income inclusion required by the debt forgiveness rules to twice the corporation's net assets.

It is expected that Spiegel Group Teleservices-Canada, Inc. will have a forgiven amount for purposes of section 80 of the Canada Tax Act, resulting from the extinguishment under the Plan of debts owed by Spiegel Group Teleservices-Canada, Inc. to intercompany creditors. This forgiven amount will be applied to reduce certain tax attributes of Spiegel Group Teleservices-Canada, Inc. However, it is possible that a residual balance will remain after the reduction of tax attributes and that an income inclusion may be required by Spiegel Group Teleservices-Canada, Inc. under subsection 80(13) of the Canada Tax Act.

It is expected that Eddie Bauer of Canada, Inc. will have a forgiven amount for purposes of section 80 of the Canada Tax Act, resulting from the settlement under the Plan of Claims which constitute trade payables of Eddie Bauer of Canada, Inc. However, Eddie Bauer of Canada, Inc. has significant intercompany debts owing to it which will be extinguished under the Plan and the extinguishment of those debts will either produce a capital loss against which any forgiven amount can be applied or an unrecognized loss which would offset any required income inclusion under subsection 80(13) of the Canada Tax Act. As a result, Eddie Bauer of Canada, Inc. should not have an income inclusion for purposes of section 80 of the Canada Tax Act.

## X.    CONFIRMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan.

A.    <u>Confirmation Hearing</u>

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. By order of the Bankruptcy Court, the Confirmation Hearing has been scheduled for _____, 2005 at 10:00 a.m. (prevailing Eastern Time) before the Honorable Cornelius Blackshear, United States Bankruptcy Judge for the Southern District of New York, United States Bankruptcy Court, Courtroom 601, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing,

conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court and set forth the name of the objecting party, the nature and amount of the Claim or Equity Interest held or asserted by the objecting party against the Debtors' estates or property, the basis for the objection and the specific grounds therefor.  The objection, together with proof of service thereof, must then be filed with the Bankruptcy Court, with a copy to chambers, and served upon:  (i) counsel for the Debtors, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022 (Attn:  James L. Garrity, Jr., Esq. and Marc B. Hankin, Esq.); (ii) The Office of the United States Trustee, 33 Whitehall Street, Suite 2100, New York, New York 10044 (Attn: Deirdre A. Martini, Esq.); (iii) counsel for the Official Committee of Unsecured Creditors, Chadbourne & Parke LLP, 30 Rockefeller Plaza, New York, New York 10112 (Attn:  Howard Seife, Esq. and David LeMay, Esq.); (iv) counsel for the Bank of America, N.A., Agent for the Debtors' postpetition lenders, Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022 (Attn:  Marc D. Rosenberg, Esq. and Benjamin Mintz, Esq.); and (v) counsel for SHI, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099 (Attn:  Alan J. Lipkin, Esq.) and Dykema Gossett Rooks Pitts PLLC, 10 S. Wacker Dr., Ste. 2300, Chicago, IL 60606 (Attn: Jay A. Lipe, Esq.).

Objections to confirmation of the Plan are governed by Federal Rule of Bankruptcy Procedure 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED BY 4:00 P.M. (PREVAILING EASTERN TIME) ON _____, 2005, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

B.      Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan (i) is accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible and (iii) is in the "best interests" of Holders of Claims and Equity Interests that are impaired under the Plan.

1.      Acceptance

Claims in Class 4 and Class 5 are impaired and the Holders of such Claims are entitled to vote to accept or reject the Plan.

Claims in Class 1, Class 2 and Class 3 are unimpaired by the Plan, and the Holders thereof are conclusively presumed to have accepted the Plan.

Holders of Class 6 Equity Interests are deemed to have rejected the Plan because they will not receive a Distribution.

2.      Unfair Discrimination and Fair and Equitable Tests

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both.  Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the nonacceptance of a plan by one or more impaired classes of

claims or equity interests. To obtain such confirmation, it must be demonstrated to the bankruptcy court that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to for its claims or interests.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and interests, as follows:

(a) *Secured Claims*: Either the plan must provide: (i) for the holders of such claims to retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and for each holder of a claim to receive deferred cash payments totaling at least the allowed amount of such claim, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; (ii) for the sale of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or (iii) for the realization by such holders of the indubitable equivalent of such claims.

(b) *Unsecured Claims*: Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) *Equity Interests*: Either (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (y) the fixed liquidation preference or redemption price, if any, of such stock or (z) the value of the stock, or (ii) the holders of interests that are junior to the stock will not receive any property under the plan.

3. <u>Feasibility</u>

The Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of their financial performance for the fiscal years December 31, 2005 through January 3, 2009. These projections, and the assumptions on which they are based, are included in the Debtors' Projected Financial Information, annexed hereto as **Exhibit F**. Based upon such projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

The financial information and projections appended to this Disclosure Statement include for the four fiscal years in the Projection Period:

- Projected Consolidated Balance Sheets of Reorganized Debtors as of December 31, 2005, December 30, 2006, December 29, 2007 and January 3, 2009;

- Projected Consolidated Statements of Operation of Reorganized Debtors as of December 31, 2005, December 30, 2006, December 29, 2007 and January 3, 2009; and

- Projected Consolidated Statements of Cash Flow of Reorganized Debtors as of December 31, 2005, December 30, 2006, December 29, 2007 and January 3, 2009.

The pro forma financial information and the projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date under the Plan will occur no later than May 28, 2005.

The Debtors have prepared these financial projections, with the assistance of their financial advisors, based upon certain assumptions that they believe to be reasonable under the circumstances. Those assumptions considered to be significant are described in the financial projections, which are annexed hereto as **Exhibit F**. The financial projections have not been examined or compiled by independent accountants. The Debtors make no representation as to the accuracy of the projections or their ability to achieve the projected results. Many of the assumptions on which the projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the Projection Period may vary from the projected results and the variations may be material. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

4.      Best Interests Test

With respect to each impaired Class of Claims and Equity Interests, confirmation of the Plan requires that each Holder of a Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what Holders of Claims and Equity Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the costs and expenses of liquidation and by such

additional administrative and priority claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of Claims and other Claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors during the Chapter 11 Cases, such as compensation for attorneys, financial advisors and accountants, would be paid in full from liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing Claims, must be compared with the value of the property offered to such Classes of Claims under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) the substantial increases in claims that would be satisfied on a priority basis or on parity with Creditors in the Chapter 11 Cases, the Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to the liquidation of the Debtors under chapter 7. For purposes of the best interests test, distributions available to Unsecured Creditors as proposed in the Plan are compared to proceeds available in hypothetical chapter 7 liquidation. Actual distribution to Creditor Classes and individual Creditors will be additionally diluted by an increase in Claims arising from, among other things, rejection of substantially all remaining prepetition executory contracts.

**Distribution Available for Unsecured Creditors**

| Chapter 7 Liquidation | | Chapter 11 Plan as Proposed | |
|---|---|---|---|
| Estimated Cash Proceeds | $390.2 | Class 4 Distributable Cash | $200.9 |
| | | Cash Settlement Payment | $104 |
| | | Additional Cash or Take-Back Notes | $300 |
| | | Reorganized Eddie Bauer Equity | $564.9 |
| **Total Distribution** | **$390.2** | **Total Distribution** | **$1,168.9** |

The Debtors also believe that the value of any distributions to each Class of Allowed Claims in a chapter 7 case, including all Secured Claims, would be less than the value

of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. It is likely that distribution of the proceeds of the liquidation could be delayed significantly after the completion of such liquidation in order to resolve claims and prepare for distributions. In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

The Spiegel, Inc., *et al*. Liquidation Analysis is annexed hereto as **Exhibit G**. The information set forth in **Exhibit G** provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates. Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the Liquidation Analysis.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and their financial advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation. The chapter 7 liquidation period is assumed to be a period of at least 12 months, allowing for, among other things, the discontinuation and wind-down of operations within the first few months, compliance with applicable regulatory requirements, the sale of assets and the collection of receivables.

## XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors and the Creditors' Committee believe that the Plan provides Creditors and Holders of Equity Interests with the greatest possible value and earliest possible returns that can be realized on their respective Claims and Equity Interests. The Debtors and the Creditors' Committee also believe that the Plan is fair and reasonable in its treatment of all constituencies. The alternatives to Confirmation of the Plan are (i) liquidation of the Debtors and distribution under chapter 7 of the Bankruptcy Code, (ii) confirmation of an alternative plan submitted by a party in interest in the Chapter 11 Cases, and (iii) dismissal of the Chapter 11 Cases. As discussed below, the Debtors and the Creditors' Committee believe that the alternatives will be less beneficial to Creditors and Holders of Equity Interests than if the Plan is consummated.

## A.    Liquidation Under Chapter 7

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors. A discussion of the effect that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Equity Interests is set forth in Section X.B.4 of this Disclosure Statement. The Debtors believe that liquidation under chapter 7 would result in, among other things, (i) smaller distributions being made to creditors and Equity Interest Holders than those provided for in the Plan because of additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other

professionals, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations, and (iii) the failure to realize the greater, going concern value of the Debtors' assets. The Debtors' liquidation analysis is attached hereto as **Exhibit G**.

B.      Alternative Chapter 11 Plan

If the Plan is not confirmed, the Debtors, the Creditors' Committee or any of the parties-in-interest could attempt to formulate a different chapter 11 plan. The Debtors and the Creditors' Committee believe that no other plan would provide Creditors and Holders of Equity Interests with a greater value or earlier recovery than they would be entitled to receive under the Plan.

The Debtors have been engaged in extensive negotiations with numerous parties having an interest in the Chapter 11 Cases. The Debtors have no reason to believe that any further negotiations regarding a plan of reorganization with any of these parties would lead to any alternative plan of reorganization that would provide greater recoveries, whether proposed by the Debtors or any other interested party, that could be confirmed within a reasonable period of time and without protracted litigation and additional administrative expense.

The Debtors believe that the Plan enables the Debtors to successfully and expeditiously emerge from chapter 11, preserves their businesses and allows the Creditors to realize the highest recoveries under the circumstances. If a liquidation of the Debtors were undertaken, two options would be available: (i) liquidation under chapter 11 of the Bankruptcy Code, or (ii) liquidation under chapter 7 of the Bankruptcy Code. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7 and a trustee need be appointed. Accordingly, Creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to the Creditors because a greater return to the Creditors is provided for in the Plan.

C.      Dismissal of the Chapter 11 Cases

Upon dismissal of the Chapter 11 Cases, the protections of the Bankruptcy Code would disappear, thereby resulting in costly, uncontrolled and protracted litigation in various jurisdictions around the country among and between the Creditors. Therefore, the Debtors believe that the dismissal of the Chapter 11 Cases is not a viable alternative to the Plan.

## XII.   CONCLUSION AND RECOMMENDATION

The Debtors believe that the Plan is in the best interests of all Holders of Claims and urge the Holders of Impaired Claims in Classes 4 and 5 to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the Balloting Agent at the address set forth in Section I.C of this Disclosure Statement so that they will be actually received on or before 4:00 p.m., prevailing Eastern Time, on _____, 2005.

Dated:   Downers Grove, Illinois
February 18, 2005

NEWPORT NEWS, INC.

By:   /s/ James M. Brewster
James M. Brewster
Senior Vice President and Director

SPIEGEL, INC.

By:   /s/ William Kosturos
William Kosturos
Interim Chief Executive Officer, Chief
Restructuring Officer and Director

SPIEGEL CATALOG, INC.

By:   /s/ James M. Brewster
James M. Brewster
Vice President and Director

SPIEGEL PUBLISHING CO.

By:   /s/ James M. Brewster
James M. Brewster
Vice President and Director

ULTIMATE OUTLET INC.

By:   /s/ James M. Brewster
James M. Brewster
Vice President and Director

SPIEGEL CATALOG SERVICES, LLC

By:   /s/ James M. Brewster
James M. Brewster
Vice President and Director

SPIEGEL MARKETING CORPORATION

By: /s/ James M. Brewster
James M. Brewster
Vice President and Director

SPIEGEL MANAGEMENT GROUP, INC.

By: /s/ William Kosturos
William Kosturos
Interim Chief Executive Officer and Chief
Restructuring Officer

EDDIE BAUER, INC.

By: /s/ William Kosturos
William Kosturos
Chairman and Director

EDDIE BAUER DIVERSIFIED SALES, LLC

By: /s/ James M. Brewster
James M. Brewster
President and Director

EDDIE BAUER INTERNATIONAL
DEVELOPMENT, LLC

By: /s/ James M. Brewster
James M. Brewster
President and Director

EDDIE BAUER SERVICES, LLC

By: /s/ James M. Brewster
James M. Brewster
Vice President and Director

EDDIE BAUER OF CANADA, INC.

By: /s/ James M. Brewster
James M. Brewster
Vice President and Director

NEWPORT NEWS SERVICES, LLC

By:    /s/ James M. Brewster
        James M. Brewster
        Vice President and Director

NEW HAMPTON REALTY CORP.

By:    /s/ James M. Brewster
        James M. Brewster
        Senior Vice President and Director

DISTRIBUTION FULFILLMENT SERVICES, INC. (DFS)

By:    /s/ James M. Brewster
        James M. Brewster
        Vice President and Director

SPIEGEL GROUP TELESERVICES, INC.

By:    /s/ James M. Brewster
        James M. Brewster
        Vice President and Director

SPIEGEL GROUP TELESERVICES-CANADA, INC.

By:    /s/ James M. Brewster
        James M. Brewster
        Vice President and Director

RETAILER FINANCIAL PRODUCTS, INC.

By:    /s/ James M. Brewster
        James M. Brewster
        Vice President and Director

GEMINI CREDIT SERVICES, INC.

By:    /s/ James M. Brewster
        James M. Brewster
        President and Director